UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

05 - 11727 DPW

-----------------------------------

Barry M. Cohen, )
)
    Plaintiff, )
)
    v. )    Civil Action No.:
)
The City of Newton, The Newton )
Police Department, )
Police Chief Jose M. Cordero, )    RECEIPT # 66410
Newton Police Officer Rocky Marini )    AMOUNT $ 250
(Badge No. 13963), )    SUMMONS ISSUED 4
Newton Police Detective Robert F. )    LOCAL RULE 4.1
Sampson, Newton Police Detective )    WAIVER FORM
Sergeant George McMains, )    MCF ISSUED
Newton Police Officer Zachary )    BY DPTY. CLK. TDM
Raymond, Newton Police Officer )    DATE 8/22/05
Joseph T. McLaughlin, )
The Newton Division of the )
District Court Department of )
The Trial Court, )
Henry H. Schultz, Clerk )
Magistrate, )
William A. McEvoy, Jr., Assistant )    MAGISTRATE JUDGE
Clerk Magistrate, )
Middlesex District Attorney's )
Office, and The Commonwealth )
Of Massachusetts, )
)
    Defendants. )

-----------------------------------

## PLAINTIFF'S COMPLAINT AND CLAIM FOR JURY TRIAL

### PARTIES

1.    The Plaintiff, Barry M. Cohen (hereinafter "Mr. Cohen"), is an individual residing in Newton, Massachusetts.

2.     The Defendant, The City of Newton (hereinafter "The City"), is a municipality located in the Commonwealth of Massachusetts, with municipal offices located at City Hall, 1000 Commonwealth Avenue, Newton Centre, Massachusetts 02459.  At all times relevant hereto, The City was and is a municipality existing under and by virtue of the laws of the Commonwealth of Massachusetts.

3.     The Defendant, The Newton Police Department (hereinafter "the Newton Police") was, at all times relevant hereto, operated, maintained, managed, supervised and controlled as a police department as part of and in conjunction with the municipal functions of The City, with headquarters located at 1321 Washington Street, West Newton, Massachusetts.

4.     The Defendant, Police Chief Jose M. Cordero (Hereinafter "Cordero"), was the Chief of the Newton Police Department at all times relevant hereto, with an unknown shield number.

5.     The Defendant, Police Officer Rocky Marini (hereinafter "Marini"), is a police officer employed by the Newton Police, with a badge number of 13963.

6.     The Defendant, Police Detective Robert F. Sampson (hereinafter "Sampson"), is a police detective employed by the Newton Police, with an unknown shield number.

7.     The Defendant, Police Detective Sergeant George McMains (hereinafter "McMains"), is a police detective employed by the Newton Police, with an unknown shield number.

8.     The Defendant, Newton Police Officer Zachary Raymond (hereinafter "Raymond"), is a police officer employed by the Newton Police, with an unknown badge number.

9.     The Defendant, Newton Police Officer Joseph T. McLaughlin (hereinafter "McLaughlin"), is a police officer employed by the Newton Police, with an unknown badge number.

2

10.    The Defendant, The Newton Division of the District Court Department of the Trial Court (hereinafter the "Newton District Court"), has a usual place of business on Washington Street, Newton, Massachusetts.

11.    The Defendant, Henry H. Schultz (hereinafter "Magistrate Schultz"), is the Clerk-Magistrate of the Newton District Court.

12.    The Defendant, William A. McEvoy, Jr. (hereinafter "Magistrate McEvoy"), is the Assistant Clerk-Magistrate of the Newton District Court.

13.    The Defendant, The Middlesex District Attorney's Office (hereinafter "Middlesex D.A."), is an agency of the Commonwealth of Massachusetts, with a usual place of business at 40 Thorndike Street, East Cambridge, Massachusetts.

14.    The Defendant, the Commonwealth of Massachusetts (hereinafter "The Commonwealth"), is the sovereign and is named a party herein by and through the Attorney General of the Commonwealth of Massachusetts, with a usual place of business at Ashburton Place, Boston, Massachusetts.

**BACKGROUND**

15.    Mr. Cohen is forty-three years old.  He grew up in and has resided in Newton, Massachusetts, with his parents, for most of his life.

16.    Prior to the incidents described herein, Mr. Cohen had never been arrested; charged with a crime; been a defendant in a criminal matter; or otherwise subject to a criminal investigation.

17.    All of the conditions precedent to the commencement of an action against the Defendants the City of Newton, the Middlesex D.A., and the Commonwealth have been satisfied.  A copy of the Plaintiff's presentment letters to those entities is hereto attached as Exhibit 1. The City of Newton and the Commonwealth have responded to the Plaintiff's presentment letters, a copy of which responses are hereto attached as Exhibit 2.   The Middlesex D.A. has not responded to Mr. Cohen's presentment letter.

3

18.    At all times relevant hereto, the City of Newton employed the Defendants Cordero, Marini, Raymond, McLaughlin, Sampson, and McMains as a police chief, police officers and police detectives, in their respective capacities.

19.    At all times relevant hereto, the Commonwealth, employed the Defendants Magistrate Schultz and Magistrate McEvoy as the Clerk-Magistrate and Assistant Clerk Magistrate of the Newton District Court, respectively.

20.    Each and all of the acts of the Defendants alleged herein were done by the Defendants, their agents, servants and/or employees, and each of them, not as individuals, but under the color and pretense of the statutes, ordinances, regulations, customs and usages of the Commonwealth and the City of Newton, and under the authority of their office as police officers and/or officials of said state, city and county.

## A.    The Newton Police's Over-Aggressive Policies and Practices

21.    In February 2002, the City of Newton hired the Defendant Cordero to become the Chief of the Newton Police.

22.    Cordero then implemented new policies and a new philosophy of policing within the City of Newton. Cordero's policies recklessly encouraged aggressive police tactics and resulted in almost a tripling of the number of arrests in Newton during the period from February 2002 to February 2003.  A copy of a Newton Tab article detailing the increase in arrests in Newton is hereto attached as Exhibit 3.

23.    Upon information and belief, the Newton Police engaged in targeted and aggressive policing in an effort to demonstrate to the public that the Police were providing a high level of public safety.  See copy of editorial authored by Cordero regarding public safety, which appeared in the Newton Tab, hereto attached as Exhibit 4.

24.    Newton Police officers and the community at large were critical of the "heavy handed" and "over-aggressive" nature of Cordero's policies, especially with regard to Cordero's efforts to reduce the officers' ability to employ discretion when deciding when to detain and/or arrest

4

suspects. See copy of editorial of Officer John Daly, hereto attached as Exhibit 5.

25. Upon information and belief, the Newton District Court, Magistrate Schultz, and Magistrate McEvoy assisted Cordero in implementing said aggressive police tactics by willfully and/or recklessly forsaking their role to evaluate the constitutionality and propriety of the Police's actions. By so doing, the Newton District Court, Magistrate Schultz, and Magistrate McEvoy effectively abandoned their impartial judicial function and became in effect a "rubber stamp" of the police's efforts to aggressively police Newton.

26. Upon information and belief, despite the Newton Police's over-aggressive policies, during the period from April through August 2003, there was a sharp increase in the number of reported car burglaries. During the month of March 2003, there were only approximately eight (8) car breaks in Newton. In the month of May 2003, alone, the number of car breaks had increased to approximately fifty-two (52). The exponential increase in the number of car breaks during mid-2003 triggered great public concern.

27. Upon information and belief, the Newton Police were embarrassed by and concerned about the negative public sentiment regarding the large number of car robberies, which were occurring during the summer of 2003 despite their implementation of very aggressive policing tactics. Thus, the Newton Police further heightened their already reckless and aggressive approach in an effort to put an end to the embarrassing rash of car breaks.

28. Indeed, Cordero himself stated with respect to the number of car breaks that "It's a big deal all of a sudden we've had 156 car breaks . . . and we're going to have 156 more if we don't do anything." See copy of Newton Tab article quoting Cordero, hereto attached as Exhibit 6.

29. On September 18, 2003, in apparent response to public pressure and dissatisfaction due to the large number of car breaks, Cordero issued a press release, which advised Newton residents, how to avoid car robberies.     A copy of said press release is hereto attached as Exhibit 7.

30. By issuing the press release, Cordero and the Police clearly sought to make a public display of their attempt to prevent further car robberies and had decided to dedicate extra resources to attempting to catch the perpetrator(s) of the numerous above-referenced car robberies.

31. Specifically, Cordero and the Police ordered Marini to conduct a surveillance operation during the early morning hours of September 25, 2003 in a targeted effort to catch the perpetrator(s) of the numerous car robberies.

32. In July 2004, without notice or warning, Cordero suddenly resigned as Police Chief. See copy of article from the Newton Tab relating to said resignation, hereto attached as Exhibit 10. Cordero's resignation was so abrupt that Cordero was caused to forfeit one hundred and twenty (120) days of sick pay. See Exhibit 8.

33. At all relevant times, the Defendants were engaged in the enactment, implementation, and execution of policies and procedures, which were unconstitutional and/or likely to result in the violation of the rights of individuals, including the Plaintiff.

## B.  **Mr. Cohen's Encounter with the Newton Police**

34. On Thursday, September 25, 2003, at approximately 1:15 A.M. (hereinafter "the night of the incident"), Mr. Cohen, as customary, left his parent's home to take a brief walk in his neighborhood.

35. On the night of the incident, Mr. Cohen was carrying a flashlight, as he regularly does as a safety precaution, and was also wearing brown dress gloves, as he regularly does.

36. Shortly after leaving his parent's home, having traveled approximately four blocks, Mr. Cohen was lawfully walking along Fellsmere Road away from Ward Street and towards Mandalay Road.

37. Mr. Cohen observed an overturned trash barrel and refuse strewn directly in front of his path and all over the street.

6

38.   After observing the refuse, Mr. Cohen began to re-trace his steps towards Ward Street.

39.   As soon as Mr. Cohen began to backtrack towards Ward Street, he heard rustling noises apparently coming from a white van which was parked on the opposite side of Fellsmere Road, diagonally across from where Mr. Cohen was lawfully walking.   These noises caused Mr. Cohen to become concerned.

40.   As Mr. Cohen had nearly passed the point parallel to the position of the white van on the opposite side of Fellsmere Road, Mr. Cohen saw the driver's door begin to open and heard a voice coming from the van call "hey, hey you, get over here."

41.   Upon hearing this voice, Mr. Cohen became more frightened and ran towards Ward Street.   At all relevant times, Mr. Cohen was on the opposite side of Fellsmere Road from the location of the said van.

42.   After a few additional seconds, Mr. Cohen looked back over his shoulder as he was running towards Ward Street and observed a man dressed in a black sweater and dark trousers running after him with a hand-held badge.

43.   It was later learned by Mr. Cohen that the man following him was the Defendant, Marini.   Marini was conducting a targeted surveillance operation in an effort to try to catch the perpetrator(s) of the aforementioned car robberies as part of his regular and official employment as a police officer for the Defendants, the City and the Newton Police.

44.   Mr. Cohen stopped running upon seeing Marini's badge and immediately explained to Marini that he was out for a walk, and that he had run only because he was afraid that he was being "attacked" and/or "kidnapped."

45.   Marini responded to Mr. Cohen, at least twice, that "you were just in the wrong place at the wrong time, bro" and that "if you're out this late, you'll be stopped every time."

46.   Marini then relayed information relating to Mr.
Cohen over his radio and the message "no warrants" came
back over the radio.   Marini then told Mr. Cohen that "you
are free to go" and Mr. Cohen then went home.

47.   Despite being encouraged by Cordero and the
Newton Police to engage in aggressive police tactics and
make arrests, and despite being sent on patrol in a
concentrated effort to stop further car-breaks, Marini
elected not to arrest Mr. Cohen early in the morning on
September 25, 2003.

## B.   The Decision to Arrest Mr. Cohen

48.   Upon information and belief, when Cordero learned
of Marini's early morning encounter with Mr. Cohen, Cordero
became upset that an arrest of Mr. Cohen had not been made
on the night of the incident, although no factual or legal
basis existed to permit arrest.

49.   Upon information and belief, despite Marini's on-
scene decision not to detain or arrest Mr. Cohen and
despite the lack of any additional information, Cordero
ordered police officers and detectives to arrest Mr. Cohen
the next day.

50.   Therefore, in direct contravention and willful
and wanton disregard of Mr. Cohen's civil rights, the
Newton Police and Marini prepared a false and improperly
suggestive incident report (hereinafter "the report")
relating to the encounter with Mr. Cohen on Fellsmere Road
(Incident Report Number 359046).   A copy of said report is
hereto attached as Exhibit 9.

51.   The report was intentionally infused with a
variety of misrepresentations designed to unlawfully create
the false impression that Mr. Cohen was engaged in criminal
conduct during his encounter with Marini.

52.   Upon information and belief, the Newton Police
unlawfully applied for a warrant authorizing the false
arrest of Mr. Cohen later on September 25, 2003 despite
knowing that no basis existed for any such warrant
application.

8

53. Upon information and belief, Magistrate McEvoy rejected the Police's initial request for a warrant. The Newton Police apparently re-submitted their request for the issuance of the warrant and the second request was apparently granted by Magistrate McEvoy on the order of Magistrate Schultz at the improper urging of Cordero and the Newton Police.

54. The Newton District Court, in direct contravention of the law and despite the absence of any probable cause to justify arrest, issued a warrant to arrest Mr. Cohen. A copy of the warrant produced in response to Mr. Cohen's demand letter indicates that Magistrate Schultz signed the warrant. A copy of the warrant as produced is hereto attached as Exhibit 10. The Defendant Magistrates knew or should have known that no legal justification existed for the issuance of the warrant for Mr. Cohen's arrest.

55. It should be noted that, upon information and belief, the circumstances surrounding the issuance of the warrant for Mr. Cohen's arrest were not in the ordinary course of normal procedure.

## C.  **Mr. Cohen's False Arrest**

56. Upon returning to his parent's home from some errands on the evening on September 25, 2003, Mr. Cohen discovered that telephone messages had been left by a person who identified himself as Detective Sampson (hereinafter "Sampson") of The Newton Police.

57. Mr. Cohen returned Sampson's telephone calls immediately.

58. Sampson requested that Mr. Cohen come to the police station immediately. Sampson was unwilling to tell Mr. Cohen the reason for his request.

59. Over the course of the next approximately ten minutes, Mr. Cohen and Sampson spoke twice on the telephone regarding Mr. Cohen's attempts to accommodate the Sampson's request, despite having a previously scheduled appointment.

60. Mr. Cohen advised Sampson that he had been unable to reach anyone to re-schedule his appointment and thus it was a bad time for him to leave. Sampson shortly

9

thereafter ended the conversation by saying "We'll be in touch."

61. Approximately ten minutes after the second telephone conversation with Sampson ended, Mr. Cohen heard loud knocking at the front door of his parents' home.

62. At the door of Mr. Cohen's parents' home were two men dressed in plain clothes and one uniformed police officer.

63. As soon as Mr. Cohen began to open the door, the police officers pushed the door open and all three men entered Mr. Cohen's parents' home and arrested Mr. Cohen.

64. No warrant was ever presented to Mr. Cohen at the time of his arrest. Despite requests of Mr. Cohen and his counsel, no copy of the warrant has ever been produced.

65. It was later learned that the identity of the men in plain clothes were the Defendants Sampson and McMains. The identity of the uniformed officer was apparently Police Officer Zachary Raymond.

66. The Defendants Sampson, McMains, and Raymond, used unreasonable and excessive force during the false arrest of Mr. Cohen and during the transport of Mr. Cohen to the police station, which excessive force included, but was not limited to, handcuffing Mr. Cohen too tightly.

67. It should be noted that Marini was not present at the time of Mr. Cohen's arrest; at any time during his false imprisonment; and/or during any of Mr. Cohen's court appearances.

## D.  Mr. Cohen's False Imprisonment

68. Mr. Cohen was knowingly falsely arrested and falsely imprisoned without probable cause or legal justification during the night of September 25, 2003 at the Newton Police station.

69. During his false imprisonment, McMains, Sampson, Raymond, and McLaughlin and other unknown police officers subjected Mr. Cohen to harassment, threats, intimidation, and excessive force. This improper conduct included, but was not limited to, McMains' continuous threats and verbal

10

harassment of Mr. Cohen throughout the course of his false imprisonment.

70.    Among other things, McMains threatened Mr. Cohen that he would be indefinitely jailed and precluded from contacting anyone unless Mr. Cohen signed a two-sided document, which bore Mr. Cohen's, fingerprints and which also contained many blank lines.

71.    Mr. Cohen was reluctant to sign the document as he was intentionally not informed of its purpose and thus feared it could be filled in by the Newton Police with false information.  Mr. Cohen's said reluctance apparently angered McMains, who assaulted and used excessive force against Mr. Cohen while both his wrists were cuffed to a steel pipe.

72.    Moreover, on several occasions Mr. Cohen invoked his constitutional right to counsel by requesting that he be allowed to discuss the order to sign the fingerprint document with an attorney.  Mr. Cohen's requests for counsel were explicitly denied. McMains assault and use of the ultimatum of indefinite imprisonment in an attempt to coerce Mr. Cohen's to sign the document was most egregious.

73.    When Mr. Cohen indicated he would not sign the document without first reviewing same with his counsel, McMains had Mr. Cohen placed in a cell.

74.    Only after an extended duration of solitary confinement and considerable delay, and after signing the document under great duress, was Mr. Cohen allowed to call his home to arrange for bail.

75.    Some time later, Mr. Cohen was then told that his father had come to the station but that Mr. Cohen's bail had suddenly been raised from $40.00 to $500.00.  This caused additional delay in Mr. Cohen's release.

76.    Mr. Cohen was not released until some time late in the evening and was subject to unlawful and inappropriate intimidation, harassment, and excessive force throughout the course of his imprisonment.

**E.    Mr. Cohen's Malicious Prosecution**

77.    Mr. Cohen reported to the Newton District Court the morning following his arrest (September 24, 2003) and was arraigned and charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle.   There was no legal or factual basis for said charges being levied against Mr. Cohen.

78.    Shortly after Mr. Cohen's arrest, notice thereof was reported in the Newton Tab on October 1, 2003.

80.    The Newton Tab is a weekly newspaper widely circulated in the City.   It was a great humiliation, slander, and embarrassment to Mr. Cohen (a lifelong Newton resident) for his name, address, and a description of his arrest to appear in the "Police Log" portion of the Newton Tab.

81.    Moreover, on October 15, 2003, an article was published in the Newton Tab by Cordero, which reported that an arrest had been made in connection with said rash of car robberies.   Copies of said article is hereto attached as Exhibit 11.

82.    In the clearest indication of the unlawful nature of the criminal charges levied against Mr. Cohen, the Newton District Court dismissed the charges against Mr. Cohen on October 21, 2003, approximately one month after Mr. Cohen's arrest and after Mr. Cohen had made three court appearances.

83.    Said dismissal occurred during a pre-trial proceeding and was entered by the Court over the objection of the Middlesex District Attorney's office.

## COUNT I
### (POLICY OF NON-FEASANCE IN THE PROTECTION OF PLAINTIFF'S CIVIL RIGHTS)

84.    The Plaintiff repeats and realleges the paragraphs 1 through 83 as if set forth fully herein.

85.    Upon information and belief, the Defendants Cordero, Marini, Sampson, and McMains are graduates of The Police Academy of the Commonwealth, which Academy is

12

operated by the Commonwealth for purposes of training the State and local police officers who serve throughout the Commonwealth.

86.  At all times relevant hereto, the Defendants the City and the Commonwealth had the duty to competently and sufficiently hire, train and retain within the Police Academy and at the Command and Patrol levels, the Defendant Officers in the protection of the Constitutional rights of the Plaintiff under the Fourteenth Amendment to the United States Constitution.

87.  In addition, the Defendants the City and the Commonwealth had the duty to competently and sufficiently hire, train and retain within the Police Academy and at the Command and Patrol levels, the defendant officers to conform their conduct to a standard, established by law, for the protection of citizens, such as Plaintiff, against unreasonable risk of harm by conducting themselves in such a manner as not to intentionally, wantonly, and/or negligently inflict injuries to citizens such as the Plaintiff herein.

88.  The Defendant the Commonwealth had the duty to competently and sufficiently hire, train and retain the Defendants the Newton District Court, Magistrate Schultz, Magistrate McEvoy, and the Middlesex D.A. to conform their conduct to a standard, established by law, for the protection of citizens, such as Plaintiff, against unreasonable risk of harm by conducting themselves in such a manner as not to intentionally, wantonly, and/or negligently inflict injuries to citizens such as the Plaintiff herein.

89.  The Defendants the City and the Commonwealth failed to competently and sufficiently hire, train and retain the various Defendants to conform and conduct themselves to a statute established by law for the protection of citizens, such as Plaintiff, against unreasonable risk of harm by conducting themselves in such a manner as not to intentionally, wantonly and/or negligently inflict injuries to citizens such as the Plaintiff herein.

90.  That on or about September 25, 2003, and prior thereto, the City and the Commonwealth, in violation of 42 U.S.C. § 1983 and Massachusetts law, caused the Plaintiff

13

to be injured and damaged in failing to competently hire, train and retain police officers, including but not limited to the defendant officers to conform and conduct themselves to a statute established by law for the protection of citizens, such as Plaintiff, against unreasonable risk of harm by conducting themselves in such a manner as not to intentionally, wantonly and/or negligently inflict injuries to citizens such as Plaintiff herein.

91.    That on or about September 25, 2003, and prior thereto, the Commonwealth, in violation of 42 U.S.C. § 1983 and Massachusetts law, caused the Plaintiff to be injured and damaged in failing to competently hire, train and retain the Defendants the Newton District Court, Magistrate Schultz, Magistrate McEvoy, and the Middlesex D.A. to conform and conduct themselves to a statute established by law for the protection of citizens, such as Plaintiff, against unreasonable risk of harm by conducting themselves in such a manner as not to intentionally, wantonly and/or negligently inflict injuries to citizens such as Plaintiff herein.

92. Immediately thereafter, aforementioned defendant Marini along with other agents, servants and employees of the Police Department prepared a false and improperly suggestive incident report (hereinafter "the report") relating to Marini's encounter with Mr. Cohen on Fellsmere Road (Incident Report Number 359046).  The Police Department then improperly, and without legal justification, sought a warrant for Mr. Cohen's arrest.

93.    Thereafter, the Defendants Magistrate Schultz, Magistrate McEvoy, and the Newton District Court direct contravention of the law and despite the absence of any probable cause to justify arrest, issued a warrant to arrest Mr. Cohen in an extra-judicial effort to further the police's illegitimate goal of arresting Mr. Cohen despite knowing he had not engaged in any criminal activity.

94.    Thereafter, the Defendants falsely arrested and imprisoned the Plaintiff and deprived him of his rights and liberties as set forth in the Constitutions of the United States and of the Commonwealth, unreasonably handcuffed him too tightly and threatened the Plaintiff with the use of physical force.

14

95.   Following said arrest, the Defendants wrongfully and falsely accused and charged the Plaintiff with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle.

96.   The false arrest and imprisonment of the Plaintiff was caused by all of the Defendants, their servants, agents and/or employees, without authority of law, or any reasonable cause or belief that he was, in fact, guilty of the crimes with which he was charged.

97.   As a result of the aforesaid arrest, Plaintiff was forcibly hand-cuffed, detained, transported and treated as a common criminal and incarcerated and imprisoned at a facilities owned, operated, maintained and controlled by the Defendant the City for several hours and thereby deprived of his rights, liberties and freedoms under color of State Law in violation of 42 U.S.C. §1983 and Massachusetts law.

98.   As a further result of the deprivation of Plaintiff's right to be free from the deprivation of rights guaranteed to him by the Fourteenth Amendment to the United States Constitution, he was caused to suffer injury and damage both mentally and physically, severe nervous shock and emotional distress and illness.

99.   On or about September 25, 2003, in violation of the rights, privileges and immunities guaranteed to him under the Fourteenth Amendment to the United States Constitution and under color of State law, the Defendant officers and each of them acting individually and in concert, in violation of 42 U.S.C. Section 1983 and Massachusetts law, while on duty, detained the Plaintiff, even though the Defendants knew or should have known that the Plaintiff was wholly innocent.

100. All of the actions of all the Defendants, their agents, servants and/or employees were committed with the intention to cause bodily and mental injury to the Plaintiff; and to arrest, restrain and imprison the Plaintiff without his consent; to invade the Plaintiff's privacy.  At all times, the Plaintiff was conscious of his arrest, did not consent to the assault, battery, and false arrest, and the assault, false arrest and imprisonment were not otherwise privileged.

101. The assault, battery, arrest and imprisonment of
the Plaintiff were not justified by probable cause or other
legal privilege and the Defendants, their agents, servants
and/or employees acting under the color of statute,
ordinances, regulations, customs and usages of the
Commonwealth and The City and under the authority of their
office as police officers, falsely charged the Plaintiff
with violating M.G.L. c. 274, Section 6, Attempt to Commit
A Crime, Breaking Into A Motor Vehicle, although the
Defendants, acting in such capacity, knew that such charges
were false.

102. The Defendants the City and the Commonwealth,
their agents, servants and employees failed to adequately
and properly hire, retain, train, supervise, discipline or
in any other way control the behavior and performance of
the said Defendants, their agents, servants and/or
employees; that in their hiring practices in the exercise
of their police functions and their failure to enforce the
laws of the Commonwealth and The City is evidence of the
reckless lack of cautious regard for the rights of the
public, including Plaintiff; and that said Defendants
exhibited a lack of that degree of due care which prudent
and reasonable individuals would show in executing the
duties of the said Defendants.

103. The Defendants the City and the Commonwealth,
their agents, servants and/or employees failed to hire,
train, supervise, discipline or in any other way control
the defendant officers in the exercise of their functions.
The said Defendants failure to enforce the laws of the
Commonwealth and the City was and is carried out willfully,
wantonly, maliciously and with such reckless disregard for
the consequences so as to display a conscious disregard for
the dangers of harm and injury to citizens of the
Commonwealth and the City, including Plaintiff herein.

104. The said prosecution and criminal charges and
hearings instituted and procured by the Defendants, their
agents, servants and/or employees were unlawful and
malicious and without any reasonable or probable cause
whatsoever; that the commencement and/or continuation of
the criminal proceedings by the Defendants against the
Plaintiff was without probable cause with actual malice and
terminated in favor of the Plaintiff.

16

105. That the Plaintiff was and is wholly innocent, and was forced by the Defendants to submit to court proceedings.

106. It was determined that the said charges were falsely and maliciously made. The Judge of the Newton District Court dismissed all charges against Plaintiff.

107. The said prosecution and criminal charges and hearings were instituted and procured by the Defendants, their agents, servants and/or employees unlawfully and maliciously and without any reasonable or probable cause whatsoever; that the commencement and/or continuation of the criminal proceedings by the Defendants against the Plaintiff were without probable cause, with actual malice and were terminated in favor of the Plaintiff.

108. By reason of the aforesaid unlawful and malicious prosecution, the Plaintiff was deprived of his liberty, was subjected to great indignity, humiliation, pain and great distress of mind and body and was held up to scorn and ridicule, was injured in his character and reputation, was prevented from attending his usual business and avocation, was injured in his reputation in the community and the said Plaintiff has been otherwise damaged.

109. Although Defendants knew or should have known of the fact that this pattern of conduct was carried out by their agents, servants and/or employees, the Defendants the City and the Commonwealth had not taken any steps or made any efforts to halt this course of conduct, to make redress to the Plaintiff or other citizens injured thereby, or to take any disciplinary action whatever against any of their employees, agents, or servants.

110. The unlawful and illegal conduct of the Defendants, their agents, servants and/or employees and each of them, deprived Plaintiff of the following rights, privileges and immunities secured to him by the Constitution of the United States and of the Commonwealth: The right of Plaintiff to be secure in his person and effects against unreasonable search and seizure under the Fourth and Fourteenth Amendments to the Constitution of the United States; the right of Plaintiff to be informed of the nature and cause of the accusation against him as secured to him under the Sixth and Fourteenth Amendments to the Constitution of the United States; and the right of

17

Plaintiff not to be deprived of life, liberty or property
without due process of law, and the right to the equal
protection of the laws secured by the Fourteenth Amendment
to the Constitution of the United States.

111. That by reason of the foregoing, this Plaintiff
was severely injured and damaged, rendered sick, sore, lame
and disabled, sustained severe nervous shock and mental
anguish, great physical pain and emotional upset, has
suffered and continues to suffer serious and extreme mental
and emotional anguish, distress and psychological damages
and difficulties, some of which injuries are permanent in
nature and duration, and Plaintiff will be permanently
caused to suffer pain, inconvenience and other effects of
such injuries; Plaintiff incurred and in the future will
necessarily incur further hospital and/or medical expenses
in an effort to be cured of said injuries; and Plaintiff
has suffered and in the future will necessarily suffer
additional loss of time and earnings from employment; and
Plaintiff will be unable to pursue the usual duties with
the same degree of efficiency as prior to this occurrence,
all to Plaintiff's great damage.

WHEREFORE, the Plaintiff prays for judgment against
the Defendants for damages and costs.

## COUNT II
## False Arrest/Imprisonment

112. The Plaintiff repeats and realleges the
paragraphs 1 through 111 as if set forth fully herein.

113. On or about September 23, 2004, the Plaintiff was
lawfully on Fellsmere Road, Newton, Massachusetts.

114. The Defendants Marini and the Newton Police
maliciously and intentionally created a false incident
report which falsely alleged that Mr. Cohen had been
attempting to break into a motor vehicle.

115. The Newton Police obtained an arrest warrant
under false pretenses and the Newton District Court and the
Defendant Magistrates issued said warrant in violation of
the law.

116. Sampson, McMains, and the Newton Police arrested and imprisoned Mr. Cohen without cause and/or justification.

117. The Plaintiff was wholly innocent of the said criminal charges and did not contribute in any way to the conduct of the Defendants, their agents, servants and/or employees and was forced by the Defendants to submit to the aforesaid arrest and imprisonment thereto entirely against his will.

118. As a result of the aforesaid accusations made by the Defendants, their agents, servants and/or employees acting under their employment and within the scope of their authority, made falsely, publicly, wickedly and maliciously, the Plaintiff was compelled to appear before a Judge of the Newton District Court, to be arraigned.

119. That the Defendants, their agents, servants and employees, as set forth on the aforementioned date, time and place, intended to confine the Plaintiff; in that the Plaintiff was conscious of the confinement; Plaintiff did not consent to the confinement; and that the confinement was not otherwise privileged.

120. That by reason of the false arrest, imprisonment and detention of the Plaintiff, Plaintiff was subjected to great indignities, humiliation and ridicule, in being so detained, charged and prosecuted with various crimes, and greatly injured in his credit and circumstances and was then and there prevented and hindered from performing and transacting his necessary affairs and business and he was caused to suffer much pain in both mind and body, the loss of employment and the loss of employment opportunities.

121. That by reason of the foregoing, this Plaintiff was severely injured and damaged, rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, has suffered and continues to suffer serious and extreme mental and emotional anguish, distress and psychological damages and difficulties, some of which injuries are permanent in nature and duration, and Plaintiff will be permanently caused to suffer pain, inconvenience and other effects of such injuries; Plaintiff incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and Plaintiff

19

has suffered and in the future will necessarily suffer additional loss of time and earnings from employment; and Plaintiff will be unable to pursue the usual duties with the same degree of efficiency as prior to this occurrence, all to Plaintiff's great damage.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for damages and costs.

### COUNT III

#### Malicious Prosecution

122. The Plaintiff repeats and realleges the paragraphs 1 through 121 as if set forth fully herein.

123. On or about September 23, 2004, the Plaintiff was lawfully on Fellsmere Road, Newton, Massachusetts.

124. The Defendants Marini and the Newton Police maliciously and intentionally created a false incident report which falsely alleged that Mr. Cohen had been attempting to break into a motor vehicle.

125. The Newton Police obtained an arrest warrant under false pretenses and the Newton District Court and the Magistrates issued said warrant in violation of the law.

126. Sampson, McMains, and the Police Newton arrested and imprisoned Mr. Cohen without cause and/or justification.

127. At all relevant times Marini, Sampson, McMains and the Newton Police were acting in their capacity as police officers and their actions were the result of the customs, policies, and practices of the Newton Police, the City, and the Commonwealth.

128. That the Plaintiff was and is wholly innocent, and was forced by the Defendants to submit to court proceedings.

129. That the Defendants, their agents, servants and/or employees, falsely and maliciously and without probable cause or provocation charged the Plaintiff with a crime under M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle.

20

130. That the Defendants, their agents, servants and/or employees acting in the performance of their employment and within the scope of their authority, testified falsely and withheld vital information before the Magistrates and a Judge of the Newton District Court.

131. That upon examination, the said charges were falsely and maliciously made and the Judge of the Newton District Court dismissed all charges against Plaintiff, despite the objection of the Middlesex D.A.

132. The said prosecution and criminal charges and hearings were instituted and procured by the Defendants, their agents, servants and/or employees unlawfully and maliciously and without any reasonable or probable cause whatsoever; that the commencement and/or continuation of the criminal proceedings by the Defendants against the Plaintiff was without probable cause, with actual malice and was terminated in favor of the Plaintiff.

133. That by reason of the aforesaid unlawful and malicious prosecution, the Plaintiff was deprived of his liberty, was subjected to great indignity, humiliation, pain and great distress of mind and body and was held up to scorn and ridicule, was injured in his character and reputation, was prevented from attending his usual business and vocation, was injured in his reputation in the community and the said Plaintiff has been otherwise damaged.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for damages and costs.

## COUNT IV
## (ASSAULT AND BATTERY)

134. The Plaintiff repeats and realleges the paragraphs 1 through 133 as if set forth fully herein.

135.    On or about September 25, 2003, the Plaintiff, Mr. Cohen, was lawfully and properly present in the vicinity of Ward Street and Fellsmere Road, Newton, Massachusetts.

136. The force used in the course of Mr. Cohen's arrest by the Defendants the Newton Police, Sampson, and

McMains was excessive, unnecessary, unwarranted and
violent.

137. As a result of the defendant officer's
aforementioned assault and battery of the Plaintiff has
been damaged.

WHEREFORE, the Plaintiff prays for judgment against
the Defendants for damages and costs.

## COUNT V
### (COMMON LAW NEGLIGENCE)

138. The Plaintiff repeats and realleges the
paragraphs 1 through 137 as if set forth fully herein.

139. The Defendants The City and the Commonwealth were
negligent in its operation, management, supervision and
control of the Newton Police, the Magistrates, the Newton
District Court, and the Middlesex D.A.; in not providing
adequate training of defendant police officers while at the
Police Academy; in their supervision of Defendant police
officers while assigned to precincts; in failing to provide
adequate supervision of Defendant police officers during
their training at the Police Academy; in not providing
adequate training and/or supervision to the Magistrates,
the Newton District Court and/or the Middlesex D.A.

140. The individual Defendants were negligent in
failing to use reasonable care in the detainment and
confinement of the Plaintiff on or about September 25,
2003.

141. That by reason of the foregoing, this Plaintiff
was severely injured and damaged, rendered sick, sore, lame
and disabled, sustained severe nervous shock and mental
anguish, great physical pain and emotional upset, has
suffered and continues to suffer serious and extreme mental
and emotional anguish, distress and psychological damages
and difficulties, some of which injuries are permanent in
nature and duration, and Plaintiff will be permanently
caused to suffer pain, inconvenience and other effects of
such injuries; Plaintiff incurred and in the future will
necessarily incur further hospital and/or medical expenses
in an effort to be cured of said injuries; and Plaintiff
has suffered and in the future will necessarily suffer
additional loss of time and earnings from employment; and

22

Plaintiff will be unable to pursue the usual duties with
the same degree of efficiency as prior to this occurrence,
all to Plaintiff's great damage.

## COUNT VI
### (VIOLATION OF INDIVIDUAL'S RIGHT TO
### BE FREE FROM UNREASONABLE SEARCHES
### AND SEIZURES UNDER THE CONSTITUTION
### OF THE COMMONWEALTH)

142.    The Plaintiff repeats and realleges the
paragraphs 1 through 141 as if set forth fully herein.

143.    On or about September 25, 2003, the
Plaintiff, Mr. Cohen, was lawfully and properly present in
the vicinity of Ward Street and Fellsmere Road, Newton,
Massachusetts.

144. In violation of the rights, privileges and
immunities guaranteed to him under the Constitution of the
Commonwealth, the Plaintiff was unlawfully seized by the
defendant police officers and/or others acting in concert
with them, when said defendant police officers and/or
others acting in concert with them, and each of them acting
individually and in concert, while on duty, detained the
Plaintiff, even though the Defendants knew or should have
known that the Plaintiff was wholly innocent.

145. That by reason of the foregoing, this Plaintiff
was severely injured and damaged, rendered sick, sore, lame
and disabled, sustained severe nervous shock and mental
anguish, great physical pain and emotional upset, has
suffered and continues to suffer serious and extreme mental
and emotional anguish, distress and psychological damages
and difficulties, some of which injuries are permanent in
nature and duration, and Plaintiff will be permanently
caused to suffer pain, inconvenience and other effects of
such injuries; Plaintiff incurred and in the future will
necessarily incur further hospital and/or medical expenses
in an effort to be cured of said injuries; and Plaintiff
has suffered and in the future will necessarily suffer
additional loss of time and earnings from employment; and
Plaintiff will be unable to pursue the usual duties with
the same degree of efficiency as prior to this occurrence,
all to Plaintiff's great damage.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for damages, reasonable attorney's fees, and costs.

THE PLAINTIFF CLAIMS A TRIAL BY JURY ON ALL MATTERS SET FORTH HEREIN.

Respectfully submitted,
Plaintiff,
Barry M. Cohen,
By his attorney,

Christopher W. McHallam
BBO #637464
500 Commercial Street
Suite 4R
Boston, Massachusetts 02109
(617) 523-4552

# HERBERT STUART COHEN
### Attorney At Law
### 500 Commercial Street
### Suite 4R
### Boston, Massachusetts  02109

**Telephone (617) 523-4552**          November 2, 2004          **Telecopier  (617) 723-9211**

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Superintendent Robert MacDonald
Acting Chief
Newton Police Department
1321 Washington Street
Newton, Massachusetts 02465

> Re:  False Arrest and Malicious Prosecution
>      Of Barry M. Cohen

Dear Superintendent MacDonald:

Please be advised that this office has been retained
by Barry M. Cohen (hereinafter "Mr. Cohen") with respect to
his claims and causes of action arising from his
unjustified and unlawful arrest by the Newton Police
Department (hereinafter "the Newton Police") which occurred
on September 25, 2003; the unlawful issuance of an arrest
warrant by the Newton District Court on the same day; the
violation and abrogation of Mr. Cohen's civil rights on
that day and thereafter by the Newton Police; the negligent
training, supervision, and oversight by the City of Newton
(hereinafter "the City") which resulted in Mr. Cohen's
unlawful arrest; the negligent training, supervision, and
oversight the City and Commonwealth of Massachusetts
(hereinafter "the Commonwealth") which resulted in the
perpetuation of a groundless criminal case against Mr.
Cohen; and the subsequent malicious prosecution of him by
the Middlesex District Attorney and the Commonwealth.

This letter is submitted in accordance with M.G.L. c.
258 and constitutes a presentment letter as defined by said
statute.

## I.    **Personal Background**

Mr. Cohen is forty two years old.  He grew up in and
has resided in Newton, Massachusetts, with his parents Saul
and Naomi Cohen (well established and respected members of

1

the Newton Community) for most of his life.  At the time of
the incident, Mr. Cohen was residing in New York and had
been visiting his parents.  Prior to the incident described
herein, Mr. Cohen had never been arrested; charged with a
crime; been a defendant in a criminal matter; or otherwise
subject to a criminal investigation.

## II.   **Mr. Cohen's Encounter with the Newton Police**

On Thursday, September 25, 2003, at approximately 1:15
A.M. (hereinafter "the night of the incident"), Mr. Cohen,
as customary, left his parent's home to take a brief walk.
On the night of the incident, Mr. Cohen was carrying a
flashlight, as he regularly does as a safety precaution.

Mr. Cohen was also wearing brown leather gloves on the
night of the incident.  Mr. Cohen wears gloves on virtually
a full-time basis due to a medical/psychological condition
known as Obsessive Compulsive Disorder.  Mr. Cohen was
wearing a light blue shirt; navy blue poplin suit jacket;
black denim trousers; brown leather gloves; brown leather
walking shoes; and silver wire-rimmed glasses.

Shortly after leaving his parent's home, approximately
four blocks from the house, as Mr. Cohen walked along
Fellsmere Road away from Ward Street and towards Mandalay
Road, he observed an overturned trash barrel and refuse
strewn directly in front of his path.  After observing the
refuse, Mr. Cohen began to re-trace his steps towards Ward
Street.

As soon as Mr. Cohen began to backtrack towards Ward
Street, he heard rustling noises apparently coming from a
white van which was parked on the opposite side of
Fellsmere Road, diagonally across from where Mr. Cohen was
walking.  At all times, Mr. Cohen was on the opposite side
of the street from where said van was parked.

As Mr. Cohen continued to walk towards Ward Street,
there were repetitions of the noises apparently coming from
the van.  Mr. Cohen became alarmed and significantly
quickened his pace towards Ward Street.  As Mr. Cohen had
nearly passed the position of the van on the opposite side
of the street, Mr. Cohen saw the driver's door begin to
open and heard a voice coming from the van call "hey, hey
you, get over here."  Upon hearing this voice, Mr. Cohen
became panicked and ran towards Ward Street.

2

After a few additional seconds, Mr. Cohen looked back over his shoulder and observed a man dressed in a black sweater and dark trousers running after him with a badge held in his hand. It was later learned that the man following Mr. Cohen was Officer Marini (hereinafter "Marini") of the Newton Police. Marini was, upon information and belief, conducting a sting operation in an attempt to catch the perpetrator(s) of the numerous car robberies which had been occurring in Newton at that time.

Mr. Cohen stopped running upon seeing Marini's badge. Mr. Cohen explained to Marini that he was out for a walk and that he had run because he was afraid that he was being "attacked" and/or "kidnapped." Mr. Cohen made it clear that Marini had frightened and traumatized him by chasing him for no apparent reason. Marini responded to Mr. Cohen, at least twice, that "you were just in the wrong place at the wrong time, bro" and that "if you're out this late, you'll be stopped every time."

Mr. Cohen cooperated immediately and fully with Marini's inquiries and provided his name, address, social security number, birth date, and telephone number. At no time did Marini inquire as to what items Mr. Cohen had in his possession, search, and/or frisk Mr. Cohen. In a clear indication that he did not believe Mr. Cohen was in engaged in a criminal activity, Marini did not inquire about or make reference to the flashlight Mr. Cohen was carrying or make any reference to the van.

Marini then relayed information relating to Mr. Cohen over his radio, and Mr. Cohen heard the message "no warrants" came back in reply. Marini then told Mr. Cohen that "you are free to go" and Mr. Cohen then went home.

Especially in light of his medical/psychological condition, Mr. Cohen was extremely shaken by his encounter with Marini.

### III. **Mr. Cohen's False Arrest**

Mr. Cohen claims he was falsely arrested by the Newton Police without probable cause and/or legal justification. The City was negligent in its training, supervision, and oversight of the Newton Police, which negligence resulted

3

in Mr. Cohen's false arrest and was a direct and proximate cause of the damages resulting therefrom.

By way of background, from April through August, 2003, there had been approximately 200 car burglaries in Newton. On September 18, 2003, a press release was disseminated by the Newton Police which advised Newton residents how to avoid car robberies. A copy of said press release is hereto attached as Exhibit 1. Clearly, the Newton Police were concerned about public sentiment regarding the large number of car robberies which had occurred and sought to make a public display of their efforts to prevent further car robberies.

Upon information and belief, when senior Newton Police officials learned of Marini's early morning encounter with Mr. Cohen, they became upset that an arrest had not been made. Apparently, said officials wished to make an arrest in connection with the above-referenced rash of car robberies. Upon information and belief, said senior officials ordered Newton Police officers and detectives to arrest Mr. Cohen in an apparent attempt to demonstrate that the Newton Police were actively pursuing the perpetrators of the above-described multitude of car robberies.

Therefore, in direct contravention of Mr. Cohen's legal and civil rights, the Newton Police prepared a false and improperly suggestive incident report (hereinafter "the report") relating to Marini's encounter with Mr. Cohen on Fellsmere Road (Incident Report Number 359046). A copy of said report is hereto attached as Exhibit 2. Upon information and belief, the report was prepared to improperly create a justification for arresting and prosecuting Mr. Cohen.

The report was infused with a variety of misrepresentations designed to create the false impression that Mr. Cohen was engaged in criminal conduct. Critically, however, the report does not contain any assertion that Mr. Cohen came near the van; touched the van; looked into the van; attempted to reach into the van and/or attempted to open the doors of the van.

Upon information and belief, the Police unlawfully applied for a warrant authorizing the false arrest of Mr. Cohen later on September 25, 2003. Upon information and belief, the Newton District Court was reluctant to issue

4

the warrant but finally did so, in direct contravention of
the law and despite the absence of any probable cause to
justify arrest, after being urged to do by senior Newton
Police officials.

Upon returning from some errands some time after 6:00
P.M. on September 25, 2003, Mr. Cohen discovered that
telephone messages had been left by a person who identified
himself as Detective Sampson (hereinafter "Sampson") of the
Newton Police. Mr. Cohen returned Sampson's telephone
calls immediately.

Sampson requested that Mr. Cohen come to the Netwon
Police station immediately, without telling Mr. Cohen the
reason for his request. Over the course of the next
approximately ten minutes, Mr. Cohen and Sampson spoke
twice on the telephone regarding Mr. Cohen's attempts to
accommodate the Police's request, despite having a
previously scheduled appointment. Mr. Cohen advised
Sampson that he had been unable to reach anyone to re-
schedule his appointment and thus it was a bad time for him
to leave. Sampson shortly thereafter ended the
conversation by saying "we'll be in touch."

Approximately ten minutes after the second telephone
conversation with Sampson, Mr. Cohen heard loud knocking at
the front door of his parents' house. At the door were two
men dressed in plain clothes and one uniformed Police
officer. As soon as Mr. Cohen began to open the door, the
Police officers pushed the door open and all three men
entered. Mr. Cohen was surprised by the Police's sudden
appearance at his parents' home and shocked by their sudden
and forced intrusion. No warrant was ever presented to Mr.
Cohen and to date Mr. Cohen has never been provided a copy
of same, despite his and his counsel's request.

Mr. Cohen was immediately arrested, and, thereupon,
the Newton Police handcuffed his arms behind his back. Mr.
Cohen was frisked and then led, in full view of the public,
from his parents' home down the driveway to a squad car
parked at the corner of Hammond Street and Hammondswood
Road.

The Police used unreasonable and excessive force
during the false arrest of Mr. Cohen.

Mr. Cohen was placed with his arms handcuffed behind his back in the rear of the squad car (which car had an unpadded fiberglass rear seat). As a result, the handcuffs dug into and broke the skin of Mr. Cohen's wrists.

At all relevant times, Mr. Cohen cooperated with the Newton Police and did not resist arrest.

It was later learned that the men in plain clothes were Sampson and Detective McMains (hereinafter "McMains"). The identity of the uniformed officer remains unknown. None of the men had ever met Mr. Cohen prior to that instant. Marini was not present at the time of Mr. Cohen's arrest.

Mr. Cohen was taken to the Police Station and was subjected to humiliating and degrading treatment including, but not limited to, being interrogated; fingerprinted; photographed; frisked twice; and confined to a cell.  Most egregiously, during the entire course of the intake procedures both of Mr. Cohen's wrists were handcuffed to a steel pipe, rendering him completely humiliated, defenseless, and immobile.

#### IV.  **Mr. Cohen's False Imprisonment**

Mr. Cohen claims that the Newton Police falsely imprisoned him without probable cause, legal justification, and in violation of his legal and civil rights.  Moreover, during his incarceration at the Police station, McMains and other Newton Police officers improperly harassed, assaulted, and used excessive force against Mr. Cohen.  The City's negligent training, oversight, and supervision constituted a direct and proximate cause of Mr. Cohen's false imprisonment, harassment, assault, and exposure to the use of excessive force and the damages resulting therefrom.

After intake procedures had been completed, Mr. Cohen was falsely imprisoned for several hours during the night of September 25, 2003.  During his false imprisonment, Mr. Cohen was subjected to harassment, threats, intimidation, and excessive force.

The incidents of harassment and assault include, but are not limited to, McMains' continuous threats and

6

harassment of Mr. Cohen throughout the course of his false
imprisonment.  Among other things, McMains threatened Mr.
Cohen that he would be indefinitely jailed and precluded
from contacting anyone unless Mr. Cohen signed a form which
bore Mr. Cohen's fingerprints and which also contained many
blank lines.

Mr. Cohen was reluctant to sign the form as he feared
it could be filled in with incriminating false information.
Mr. Cohen's said reluctance apparently angered McMains, who
assaulted and used excessive force against Mr. Cohen while
both his wrists were cuffed to the steel pipe, as described
above.  Specifically, McMains rushed towards and came right
up to Mr. Cohen while yelling at Mr. Cohen as if he were
going to strike and injure the defenseless Mr. Cohen in an
apparent attempt to coerce Mr. Cohen's signature.  McMains'
assault was particularly traumatic and distressing to Mr.
Cohen, given his medical/psychological condition.

McMains carried out his threats by placing Mr. Cohen
in solitary confinement in a jail cell with no outside
contact.  Mr. Cohen was confined in the cell for several
hours.  After a significant duration of confinement in the
cell, and under duress and with great reluctance, Mr. Cohen
ultimately agreed to sign the form bearing his
fingerprints, thereby hoping to end his confinement and so
as to attempt to contact his family.

After considerable delay, Mr. Cohen was allowed to
call his home to arrange for bail after signing said form.
Some time later, Mr. Cohen was then told that his father
had come to the station but that Mr. Cohen's bail had been
raised from $40.00 to $500.00.  This caused additional
delay in Mr. Cohen's release.  Mr. Cohen was not released
until late in the evening.

### V.    **Mr. Cohen's Malicious Prosecution**

Mr. Cohen claims that he was maliciously prosecuted by
the Police and the Middlesex District Attorney for a crime
which he did not commit and for which no probable cause
existed to justify prosecution.  As a result of Mr. Cohen's
unlawful prosecution, Mr. Cohen's legal and civil rights
were violated.  The City's and the Commonwealth's negligent
training, supervision, and oversight were a direct and
proximate cause of Mr. Cohen's malicious prosecution and
the damages resulting therefrom.

7

Mr. Cohen reported to the Newton District Court the on the morning of September 26, 2003, and was arraigned and charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle. Mr. Cohen was forced to retain private counsel in order to defend himself against said unsubstantiated and unlawful charges.

Shortly after Mr. Cohen's arrest, notice of Mr. Cohen's arrest was reported in the Newton Tab on October 1, 2003. Moreover, in a clear indication that Mr. Cohen's false arrest was motivated by the Newton Police's apparent desire to create the impression it was diligently pursuing the perpetrators of the numerous car robberies, on October 15, 2003, an article was published in the Newton Tab by the Newton Police Chief which reported that an arrest had been made in connection with said rash of car robberies. Copies of said articles are hereto attached as Exhibit 3.

At some time after Mr. Cohen's arraignment, in a blatant violation of court rules and protocol, Sampson improperly called Mr. Cohen's home, despite knowing that Mr. Cohen was represented by counsel. Upon information and belief, Sampson sought to meet with Mr. Cohen's father at the Police station in an apparent attempt to engage in an improper communication.

The clearest indication of the improper and unlawful nature of the criminal charges levied against Mr. Cohen was the highly unusual dismissal of the charges by the Newton District Court on October 21, 2003; approximately one month after Mr. Cohen's arrest and after Mr. Cohen had made three court appearances. Said dismissal occurred during a pre-trial proceeding and was entered over the objection of the Middlesex District Attorney's office.

## VI.   The Impact Upon Mr. Cohen

As a direct and proximate result of the unlawful conduct of the Newton Police, the City, the Middlesex District Attorney and the Commonwealth as described herein above, Mr. Cohen's federal and state civil and legal rights were severely and egregiously violated and he has consequently suffered substantial damages.

8

The impact of these events on Mr. Cohen's life has
been significant and highly destructive.  Mr. Cohen has
suffered damages which include, but are not limited to,
damages to his reputation; humiliation; severe emotional
distress; the incurrence of significant legal fees; the
invasion of his privacy; physical illness and injury; and
damages relating to the deprivation of his civil rights.
Mr. Cohen's damages are ongoing.

Demand is hereby made for copies of all documents,
records, video tapes, recordings, and other tangible things
which relate to the incidents described herein.

Your prompt response is anticipated.

Very truly yours,

Christopher W. McHallam

# HERBERT STUART COHEN

## Attorney At Law
### 500 Commercial Street
### Suite 4R
### Boston, Massachusetts 02109

Telephone (617) 523-4552                 October 29, 2004                 Telecopier  (617) 723-9211

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

The Honorable David B. Cohen
Mayor of the City of Newton
City Hall
1000 Commonwealth Avenue
Newton Centre, Massachusetts 02459

> Re:  False Arrest and Malicious Prosecution
>      Of Barry M. Cohen

Dear Mayor Cohen:

Please be advised that this office has been retained
by Barry M. Cohen (hereinafter "Mr. Cohen") with respect to
his claims and causes of action arising from his
unjustified and unlawful arrest by the Newton Police
Department (hereinafter "the Newton Police") which occurred
on September 25, 2003; the unlawful issuance of an arrest
warrant by the Newton District Court on the same day; the
violation and abrogation of Mr. Cohen's civil rights on
that day and thereafter by the Newton Police; the negligent
training, supervision, and oversight by the City of Newton
(hereinafter "the City") which resulted in Mr. Cohen's
unlawful arrest; the negligent training, supervision, and
oversight the City and Commonwealth of Massachusetts
(hereinafter "the Commonwealth") which resulted in the
perpetuation of a groundless criminal case against Mr.
Cohen; and the subsequent malicious prosecution of him by
the Middlesex District Attorney and the Commonwealth.

This letter is submitted in accordance with M.G.L. c.
258 and constitutes a presentment letter as defined by said
statute.

## I.  Personal Background

Mr. Cohen is forty two years old.  He grew up in and
has resided in Newton, Massachusetts, with his parents Saul
and Naomi Cohen (well established and respected members of

1

the Newton Community) for most of his life.  At the time of
the incident, Mr. Cohen was residing in New York and had
been visiting his parents.  Prior to the incident described
herein, Mr. Cohen had never been arrested; charged with a
crime; been a defendant in a criminal matter; or otherwise
subject to a criminal investigation.

## II.  Mr. Cohen's Encounter with the Newton Police

On Thursday, September 25, 2003, at approximately 1:15
A.M. (hereinafter "the night of the incident"), Mr. Cohen,
as customary, left his parent's home to take a brief walk.
On the night of the incident, Mr. Cohen was carrying a
flashlight, as he regularly does as a safety precaution.

Mr. Cohen was also wearing brown leather gloves on the
night of the incident.  Mr. Cohen wears gloves on virtually
a full-time basis due to a medical/psychological condition
known as Obsessive Compulsive Disorder.  Mr. Cohen was
wearing a light blue shirt; navy blue poplin suit jacket;
black denim trousers; brown leather gloves; brown leather
walking shoes; and silver wire-rimmed glasses.

Shortly after leaving his parent's home, approximately
four blocks from the house, as Mr. Cohen walked along
Fellsmere Road away from Ward Street and towards Mandalay
Road, he observed an overturned trash barrel and refuse
strewn directly in front of his path.  After observing the
refuse, Mr. Cohen began to re-trace his steps towards Ward
Street.

As soon as Mr. Cohen began to backtrack towards Ward
Street, he heard rustling noises apparently coming from a
white van which was parked on the opposite side of
Fellsmere Road, diagonally across from where Mr. Cohen was
walking.  At all times, Mr. Cohen was on the opposite side
of the street from where said van was parked.

As Mr. Cohen continued to walk towards Ward Street,
there were repetitions of the noises apparently coming from
the van.  Mr. Cohen became alarmed and significantly
quickened his pace towards Ward Street.  As Mr. Cohen had
nearly passed the position of the van on the opposite side
of the street, Mr. Cohen saw the driver's door begin to
open and heard a voice coming from the van call "hey, hey
you, get over here."  Upon hearing this voice, Mr. Cohen
became panicked and ran towards Ward Street.

2

After a few additional seconds, Mr. Cohen looked back over his shoulder and observed a man dressed in a black sweater and dark trousers running after him with a badge held in his hand.  It was later learned that the man following Mr. Cohen was Officer Marini (hereinafter "Marini") of the Newton Police.  Marini was, upon information and belief, conducting a sting operation in an attempt to catch the perpetrator(s) of the numerous car robberies which had been occurring in Newton at that time.

Mr. Cohen stopped running upon seeing Marini's badge. Mr. Cohen explained to Marini that he was out for a walk and that he had run because he was afraid that he was being "attacked" and/or "kidnapped."  Mr. Cohen made it clear that Marini had frightened and traumatized him by chasing him for no apparent reason.  Marini responded to Mr. Cohen, at least twice, that "you were just in the wrong place at the wrong time, bro" and that "if you're out this late, you'll be stopped every time."

Mr. Cohen cooperated immediately and fully with Marini's inquiries and provided his name, address, social security number, birth date, and telephone number.  At no time did Marini inquire as to what items Mr. Cohen had in his possession, search, and/or frisk Mr. Cohen.  In a clear indication that he did not believe Mr. Cohen was in engaged in a criminal activity, Marini did not inquire about or make reference to the flashlight Mr. Cohen was carrying or make any reference to the van.

Marini then relayed information relating to Mr. Cohen over his radio, and Mr. Cohen heard the message "no warrants" came back in reply.  Marini then told Mr. Cohen that "you are free to go" and Mr. Cohen then went home.

Especially in light of his medical/psychological condition, Mr. Cohen was extremely shaken by his encounter with Marini.

### III. **Mr. Cohen's False Arrest**

Mr. Cohen claims he was falsely arrested by the Newton Police without probable cause and/or legal justification. The City was negligent in its training, supervision, and oversight of the Newton Police, which negligence resulted

3

the warrant but finally did so, in direct contravention of
the law and despite the absence of any probable cause to
justify arrest, after being urged to do by senior Newton
Police officials.

Upon returning from some errands some time after 6:00
P.M. on September 25, 2003, Mr. Cohen discovered that
telephone messages had been left by a person who identified
himself as Detective Sampson (hereinafter "Sampson") of the
Newton Police.  Mr. Cohen returned Sampson's telephone
calls immediately.

Sampson requested that Mr. Cohen come to the Netwon
Police station immediately, without telling Mr. Cohen the
reason for his request.  Over the course of the next
approximately ten minutes, Mr. Cohen and Sampson spoke
twice on the telephone regarding Mr. Cohen's attempts to
accommodate the Police's request, despite having a
previously scheduled appointment.  Mr. Cohen advised
Sampson that he had been unable to reach anyone to re-
schedule his appointment and thus it was a bad time for him
to leave.  Sampson shortly thereafter ended the
conversation by saying "we'll be in touch."

Approximately ten minutes after the second telephone
conversation with Sampson, Mr. Cohen heard loud knocking at
the front door of his parents' house.  At the door were two
men dressed in plain clothes and one uniformed Police
officer.  As soon as Mr. Cohen began to open the door, the
Police officers pushed the door open and all three men
entered.  Mr. Cohen was surprised by the Police's sudden
appearance at his parents' home and shocked by their sudden
and forced intrusion.  No warrant was ever presented to Mr.
Cohen and to date Mr. Cohen has never been provided a copy
of same, despite his and his counsel's request.

Mr. Cohen was immediately arrested, and, thereupon,
the Newton Police handcuffed his arms behind his back.  Mr.
Cohen was frisked and then led, in full view of the public,
from his parents' home down the driveway to a squad car
parked at the corner of Hammond Street and Hammondswood
Road.

The Police used unreasonable and excessive force
during the false arrest of Mr. Cohen.

5

Mr. Cohen was placed with his arms handcuffed behind his back in the rear of the squad car (which car had an unpadded fiberglass rear seat). As a result, the handcuffs dug into and broke the skin of Mr. Cohen's wrists.

At all relevant times, Mr. Cohen cooperated with the Newton Police and did not resist arrest.

It was later learned that the men in plain clothes were Sampson and Detective McMains (hereinafter "McMains"). The identity of the uniformed officer remains unknown. None of the men had ever met Mr. Cohen prior to that instant. Marini was not present at the time of Mr. Cohen's arrest.

Mr. Cohen was taken to the Police Station and was subjected to humiliating and degrading treatment including, but not limited to, being interrogated; fingerprinted; photographed; frisked twice; and confined to a cell. Most egregiously, during the entire course of the intake procedures both of Mr. Cohen's wrists were handcuffed to a steel pipe, rendering him completely humiliated, defenseless, and immobile.

### IV.   Mr. Cohen's False Imprisonment

Mr. Cohen claims that the Newton Police falsely imprisoned him without probable cause, legal justification, and in violation of his legal and civil rights. Moreover, during his incarceration at the Police station, McMains and other Newton Police officers improperly harassed, assaulted, and used excessive force against Mr. Cohen. The City's negligent training, oversight, and supervision constituted a direct and proximate cause of Mr. Cohen's false imprisonment, harassment, assault, and exposure to the use of excessive force and the damages resulting therefrom.

After intake procedures had been completed, Mr. Cohen was falsely imprisoned for several hours during the night of September 25, 2003. During his false imprisonment, Mr. Cohen was subjected to harassment, threats, intimidation, and excessive force.

The incidents of harassment and assault include, but are not limited to, McMains' continuous threats and

6

harassment of Mr. Cohen throughout the course of his false
imprisonment. Among other things, McMains threatened Mr.
Cohen that he would be indefinitely jailed and precluded
from contacting anyone unless Mr. Cohen signed a form which
bore Mr. Cohen's fingerprints and which also contained many
blank lines.

Mr. Cohen was reluctant to sign the form as he feared
it could be filled in with incriminating false information.
Mr. Cohen's said reluctance apparently angered McMains, who
assaulted and used excessive force against Mr. Cohen while
both his wrists were cuffed to the steel pipe, as described
above. Specifically, McMains rushed towards and came right
up to Mr. Cohen while yelling at Mr. Cohen as if he were
going to strike and injure the defenseless Mr. Cohen in an
apparent attempt to coerce Mr. Cohen's signature. McMains'
assault was particularly traumatic and distressing to Mr.
Cohen, given his medical/psychological condition.

McMains carried out his threats by placing Mr. Cohen
in solitary confinement in a jail cell with no outside
contact. Mr. Cohen was confined in the cell for several
hours. After a significant duration of confinement in the
cell, and under duress and with great reluctance, Mr. Cohen
ultimately agreed to sign the form bearing his
fingerprints, thereby hoping to end his confinement and so
as to attempt to contact his family.

After considerable delay, Mr. Cohen was allowed to
call his home to arrange for bail after signing said form.
Some time later, Mr. Cohen was then told that his father
had come to the station but that Mr. Cohen's bail had been
raised from $40.00 to $500.00. This caused additional
delay in Mr. Cohen's release. Mr. Cohen was not released
until late in the evening.

### V.    Mr. Cohen's Malicious Prosecution

Mr. Cohen claims that he was maliciously prosecuted by
the Police and the Middlesex District Attorney for a crime
which he did not commit and for which no probable cause
existed to justify prosecution. As a result of Mr. Cohen's
unlawful prosecution, Mr. Cohen's legal and civil rights
were violated. The City's and the Commonwealth's negligent
training, supervision, and oversight were a direct and
proximate cause of Mr. Cohen's malicious prosecution and
the damages resulting therefrom.

7

Mr. Cohen reported to the Newton District Court the on the morning of September 26, 2003, and was arraigned and charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle. Mr. Cohen was forced to retain private counsel in order to defend himself against said unsubstantiated and unlawful charges.

Shortly after Mr. Cohen's arrest, notice of Mr. Cohen's arrest was reported in the Newton Tab on October 1, 2003. Moreover, in a clear indication that Mr. Cohen's false arrest was motivated by the Newton Police's apparent desire to create the impression it was diligently pursuing the perpetrators of the numerous car robberies, on October 15, 2003, an article was published in the Newton Tab by the Newton Police Chief which reported that an arrest had been made in connection with said rash of car robberies. Copies of said articles are hereto attached as Exhibit 3.

At some time after Mr. Cohen's arraignment, in a blatant violation of court rules and protocol, Sampson improperly called Mr. Cohen's home, despite knowing that Mr. Cohen was represented by counsel. Upon information and belief, Sampson sought to meet with Mr. Cohen's father at the Police station in an apparent attempt to engage in an improper communication.

The clearest indication of the improper and unlawful nature of the criminal charges levied against Mr. Cohen was the highly unusual dismissal of the charges by the Newton District Court on October 21, 2003; approximately one month after Mr. Cohen's arrest and after Mr. Cohen had made three court appearances. Said dismissal occurred during a pre-trial proceeding and was entered over the objection of the Middlesex District Attorney's office.

## VI.   The Impact Upon Mr. Cohen

As a direct and proximate result of the unlawful conduct of the Newton Police, the City, the Middlesex District Attorney and the Commonwealth as described herein above, Mr. Cohen's federal and state civil and legal rights were severely and egregiously violated and he has consequently suffered substantial damages.

8

The impact of these events on Mr. Cohen's life has been significant and highly destructive.  Mr. Cohen has suffered damages which include, but are not limited to, damages to his reputation; humiliation; severe emotional distress; the incurrence of significant legal fees; the invasion of his privacy; physical illness and injury; and damages relating to the deprivation of his civil rights.  Mr. Cohen's damages are ongoing.

Demand is hereby made for copies of all documents, records, video tapes, recordings, and other tangible things which relate to the incidents described herein.

Your prompt response is anticipated.

Very truly yours,

Christopher W. McHallam

Cc:  Daniel M. Funk, Esq.
     City Solicitor

     Brooke K. Lipsett
     President of The Board of Aldermen

9

## HERBERT STUART COHEN

### Attorney At Law
### 500 Commercial Street
### Suite 4R
### Boston, Massachusetts 02109

**Telephone (617) 523-4552**            November 2, 2004            **Telecopier (617) 723-9211**

### VIA CERTIFIED MAIL
### RETURN RECEIPT REQUESTED

District Attorney Martha Coakley
Middlesex District Attorney
Superior Courthouse
40 Thorndike Street
East Cambridge, Massachusetts 02141

> Re:  False Arrest and Malicious Prosecution
>      Of Barry M. Cohen

Dear District Attorney Coakley:

Please be advised that this office has been retained
by Barry M. Cohen (hereinafter "Mr. Cohen") with respect to
his claims and causes of action arising from his
unjustified and unlawful arrest by the Newton Police
Department (hereinafter "the Newton Police") which occurred
on September 25, 2003; the unlawful issuance of an arrest
warrant by the Newton District Court on the same day; the
violation and abrogation of Mr. Cohen's civil rights on
that day and thereafter by the Newton Police; the negligent
training, supervision, and oversight by the City of Newton
(hereinafter "the City") which resulted in Mr. Cohen's
unlawful arrest; the negligent training, supervision, and
oversight the City and Commonwealth of Massachusetts
(hereinafter "the Commonwealth") which resulted in the
perpetuation of a groundless criminal case against Mr.
Cohen; and the subsequent malicious prosecution of him by
the Middlesex District Attorney and the Commonwealth.

This letter is submitted in accordance with M.G.L. c.
258 and constitutes a presentment letter as defined by said
statute.

### I.   Personal Background

Mr. Cohen is forty two years old. He grew up in and
has resided in Newton, Massachusetts, with his parents Saul
and Naomi Cohen (well established and respected members of

1

the Newton Community) for most of his life. At the time of the incident, Mr. Cohen was residing in New York and had been visiting his parents. Prior to the incident described herein, Mr. Cohen had never been arrested; charged with a crime; been a defendant in a criminal matter; or otherwise subject to a criminal investigation.

## II.  **Mr. Cohen's Encounter with the Newton Police**

On Thursday, September 25, 2003, at approximately 1:15 A.M. (hereinafter "the night of the incident"), Mr. Cohen, as customary, left his parent's home to take a brief walk. On the night of the incident, Mr. Cohen was carrying a flashlight, as he regularly does as a safety precaution.

Mr. Cohen was also wearing brown leather gloves on the night of the incident. Mr. Cohen wears gloves on virtually a full-time basis due to a medical/psychological condition known as Obsessive Compulsive Disorder. Mr. Cohen was wearing a light blue shirt; navy blue poplin suit jacket; black denim trousers; brown leather gloves; brown leather walking shoes; and silver wire-rimmed glasses.

Shortly after leaving his parent's home, approximately four blocks from the house, as Mr. Cohen walked along Fellsmere Road away from Ward Street and towards Mandalay Road, he observed an overturned trash barrel and refuse strewn directly in front of his path. After observing the refuse, Mr. Cohen began to re-trace his steps towards Ward Street.

As soon as Mr. Cohen began to backtrack towards Ward Street, he heard rustling noises apparently coming from a white van which was parked on the opposite side of Fellsmere Road, diagonally across from where Mr. Cohen was walking. At all times, Mr. Cohen was on the opposite side of the street from where said van was parked.

As Mr. Cohen continued to walk towards Ward Street, there were repetitions of the noises apparently coming from the van. Mr. Cohen became alarmed and significantly quickened his pace towards Ward Street. As Mr. Cohen had nearly passed the position of the van on the opposite side of the street, Mr. Cohen saw the driver's door begin to open and heard a voice coming from the van call "hey, hey you, get over here." Upon hearing this voice, Mr. Cohen became panicked and ran towards Ward Street.

2

After a few additional seconds, Mr. Cohen looked back over his shoulder and observed a man dressed in a black sweater and dark trousers running after him with a badge held in his hand.  It was later learned that the man following Mr. Cohen was Officer Marini (hereinafter "Marini") of the Newton Police.  Marini was, upon information and belief, conducting a sting operation in an attempt to catch the perpetrator(s) of the numerous car robberies which had been occurring in Newton at that time.

Mr. Cohen stopped running upon seeing Marini's badge. Mr. Cohen explained to Marini that he was out for a walk and that he had run because he was afraid that he was being "attacked" and/or "kidnapped."  Mr. Cohen made it clear that Marini had frightened and traumatized him by chasing him for no apparent reason.  Marini responded to Mr. Cohen, at least twice, that "you were just in the wrong place at the wrong time, bro" and that "if you're out this late, you'll be stopped every time."

Mr. Cohen cooperated immediately and fully with Marini's inquiries and provided his name, address, social security number, birth date, and telephone number.  At no time did Marini inquire as to what items Mr. Cohen had in his possession, search, and/or frisk Mr. Cohen.  In a clear indication that he did not believe Mr. Cohen was in engaged in a criminal activity, Marini did not inquire about or make reference to the flashlight Mr. Cohen was carrying or make any reference to the van.

Marini then relayed information relating to Mr. Cohen over his radio, and Mr. Cohen heard the message "no warrants" came back in reply.  Marini then told Mr. Cohen that "you are free to go" and Mr. Cohen then went home.

Especially in light of his medical/psychological condition, Mr. Cohen was extremely shaken by his encounter with Marini.

### III. **Mr. Cohen's False Arrest**

Mr. Cohen claims he was falsely arrested by the Newton Police without probable cause and/or legal justification. The City was negligent in its training, supervision, and oversight of the Newton Police, which negligence resulted

3

in Mr. Cohen's false arrest and was a direct and proximate cause of the damages resulting therefrom.

By way of background, from April through August, 2003, there had been approximately 200 car burglaries in Newton. On September 18, 2003, a press release was disseminated by the Newton Police which advised Newton residents how to avoid car robberies.  A copy of said press release is hereto attached as Exhibit 1.  Clearly, the Newton Police were concerned about public sentiment regarding the large number of car robberies which had occurred and sought to make a public display of their efforts to prevent further car robberies.

Upon information and belief, when senior Newton Police officials learned of Marini's early morning encounter with Mr. Cohen, they became upset that an arrest had not been made.  Apparently, said officials wished to make an arrest in connection with the above-referenced rash of car robberies.  Upon information and belief, said senior officials ordered Newton Police officers and detectives to arrest Mr. Cohen in an apparent attempt to demonstrate that the Newton Police were actively pursuing the perpetrators of the above-described multitude of car robberies.

Therefore, in direct contravention of Mr. Cohen's legal and civil rights, the Newton Police prepared a false and improperly suggestive incident report (hereinafter "the report") relating to Marini's encounter with Mr. Cohen on Fellsmere Road (Incident Report Number 359046).  A copy of said report is hereto attached as Exhibit 2.  Upon information and belief, the report was prepared to improperly create a justification for arresting and prosecuting Mr. Cohen.

The report was infused with a variety of misrepresentations designed to create the false impression that Mr. Cohen was engaged in criminal conduct. Critically, however, the report does not contain any assertion that Mr. Cohen came near the van; touched the van; looked into the van; attempted to reach into the van and/or attempted to open the doors of the van.

Upon information and belief, the Police unlawfully applied for a warrant authorizing the false arrest of Mr. Cohen later on September 25, 2003.  Upon information and belief, the Newton District Court was reluctant to issue

4

the warrant but finally did so, in direct contravention of
the law and despite the absence of any probable cause to
justify arrest, after being urged to do by senior Newton
Police officials.

Upon returning from some errands some time after 6:00
P.M. on September 25, 2003, Mr. Cohen discovered that
telephone messages had been left by a person who identified
himself as Detective Sampson (hereinafter "Sampson") of the
Newton Police.  Mr. Cohen returned Sampson's telephone
calls immediately.

Sampson requested that Mr. Cohen come to the Netwon
Police station immediately, without telling Mr. Cohen the
reason for his request.  Over the course of the next
approximately ten minutes, Mr. Cohen and Sampson spoke
twice on the telephone regarding Mr. Cohen's attempts to
accommodate the Police's request, despite having a
previously scheduled appointment.  Mr. Cohen advised
Sampson that he had been unable to reach anyone to re-
schedule his appointment and thus it was a bad time for him
to leave.  Sampson shortly thereafter ended the
conversation by saying "we'll be in touch."

Approximately ten minutes after the second telephone
conversation with Sampson, Mr. Cohen heard loud knocking at
the front door of his parents' house.  At the door were two
men dressed in plain clothes and one uniformed Police
officer.  As soon as Mr. Cohen began to open the door, the
Police officers pushed the door open and all three men
entered.  Mr. Cohen was surprised by the Police's sudden
appearance at his parents' home and shocked by their sudden
and forced intrusion.  No warrant was ever presented to Mr.
Cohen and to date Mr. Cohen has never been provided a copy
of same, despite his and his counsel's request.

Mr. Cohen was immediately arrested, and, thereupon,
the Newton Police handcuffed his arms behind his back.  Mr.
Cohen was frisked and then led, in full view of the public,
from his parents' home down the driveway to a squad car
parked at the corner of Hammond Street and Hammondswood
Road.

The Police used unreasonable and excessive force
during the false arrest of Mr. Cohen.

Mr. Cohen was placed with his arms handcuffed behind his back in the rear of the squad car (which car had an unpadded fiberglass rear seat). As a result, the handcuffs dug into and broke the skin of Mr. Cohen's wrists.

At all relevant times, Mr. Cohen cooperated with the Newton Police and did not resist arrest.

It was later learned that the men in plain clothes were Sampson and Detective McMains (hereinafter "McMains"). The identity of the uniformed officer remains unknown. None of the men had ever met Mr. Cohen prior to that instant. Marini was not present at the time of Mr. Cohen's arrest.

Mr. Cohen was taken to the Police Station and was subjected to humiliating and degrading treatment including, but not limited to, being interrogated; fingerprinted; photographed; frisked twice; and confined to a cell. Most egregiously, during the entire course of the intake procedures both of Mr. Cohen's wrists were handcuffed to a steel pipe, rendering him completely humiliated, defenseless, and immobile.

### IV.  **Mr. Cohen's False Imprisonment**

Mr. Cohen claims that the Newton Police falsely imprisoned him without probable cause, legal justification, and in violation of his legal and civil rights. Moreover, during his incarceration at the Police station, McMains and other Newton Police officers improperly harassed, assaulted, and used excessive force against Mr. Cohen. The City's negligent training, oversight, and supervision constituted a direct and proximate cause of Mr. Cohen's false imprisonment, harassment, assault, and exposure to the use of excessive force and the damages resulting therefrom.

After intake procedures had been completed, Mr. Cohen was falsely imprisoned for several hours during the night of September 25, 2003. During his false imprisonment, Mr. Cohen was subjected to harassment, threats, intimidation, and excessive force.

The incidents of harassment and assault include, but are not limited to, McMains' continuous threats and

6

harassment of Mr. Cohen throughout the course of his false imprisonment. Among other things, McMains threatened Mr. Cohen that he would be indefinitely jailed and precluded from contacting anyone unless Mr. Cohen signed a form which bore Mr. Cohen's fingerprints and which also contained many blank lines.

Mr. Cohen was reluctant to sign the form as he feared it could be filled in with incriminating false information. Mr. Cohen's said reluctance apparently angered McMains, who assaulted and used excessive force against Mr. Cohen while both his wrists were cuffed to the steel pipe, as described above. Specifically, McMains rushed towards and came right up to Mr. Cohen while yelling at Mr. Cohen as if he were going to strike and injure the defenseless Mr. Cohen in an apparent attempt to coerce Mr. Cohen's signature. McMains' assault was particularly traumatic and distressing to Mr. Cohen, given his medical/psychological condition.

McMains carried out his threats by placing Mr. Cohen in solitary confinement in a jail cell with no outside contact. Mr. Cohen was confined in the cell for several hours. After a significant duration of confinement in the cell, and under duress and with great reluctance, Mr. Cohen ultimately agreed to sign the form bearing his fingerprints, thereby hoping to end his confinement and so as to attempt to contact his family.

After considerable delay, Mr. Cohen was allowed to call his home to arrange for bail after signing said form. Some time later, Mr. Cohen was then told that his father had come to the station but that Mr. Cohen's bail had been raised from $40.00 to $500.00. This caused additional delay in Mr. Cohen's release. Mr. Cohen was not released until late in the evening.

### V.  Mr. Cohen's Malicious Prosecution

Mr. Cohen claims that he was maliciously prosecuted by the Police and the Middlesex District Attorney for a crime which he did not commit and for which no probable cause existed to-justify prosecution. As a result of Mr. Cohen's unlawful prosecution, Mr. Cohen's legal and civil rights were violated. The City's and the Commonwealth's negligent training, supervision, and oversight were a direct and proximate cause of Mr. Cohen's malicious prosecution and the damages resulting therefrom.

7

Mr. Cohen reported to the Newton District Court the on the morning of September 26, 2003, and was arraigned and charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle. Mr. Cohen was forced to retain private counsel in order to defend himself against said unsubstantiated and unlawful charges.

Shortly after Mr. Cohen's arrest, notice of Mr. Cohen's arrest was reported in the Newton Tab on October 1, 2003. Moreover, in a clear indication that Mr. Cohen's false arrest was motivated by the Newton Police's apparent desire to create the impression it was diligently pursuing the perpetrators of the numerous car robberies, on October 15, 2003, an article was published in the Newton Tab by the Newton Police Chief which reported that an arrest had been made in connection with said rash of car robberies. Copies of said articles are hereto attached as Exhibit 3.

At some time after Mr. Cohen's arraignment, in a blatant violation of court rules and protocol, Sampson improperly called Mr. Cohen's home, despite knowing that Mr. Cohen was represented by counsel. Upon information and belief, Sampson sought to meet with Mr. Cohen's father at the Police station in an apparent attempt to engage in an improper communication.

The clearest indication of the improper and unlawful nature of the criminal charges levied against Mr. Cohen was the highly unusual dismissal of the charges by the Newton District Court on October 21, 2003; approximately one month after Mr. Cohen's arrest and after Mr. Cohen had made three court appearances. Said dismissal occurred during a pre-trial proceeding and was entered over the objection of the Middlesex District Attorney's office.

## VI.  The Impact Upon Mr. Cohen

As a direct and proximate result of the unlawful conduct of the Newton Police, the City, the Middlesex District Attorney and the Commonwealth as described herein above, Mr. Cohen's federal and state civil and legal rights were severely and egregiously violated and he has consequently suffered substantial damages.

8

The impact of these events on Mr. Cohen's life has been significant and highly destructive.  Mr. Cohen has suffered damages which include, but are not limited to, damages to his reputation; humiliation; severe emotional distress; the incurrence of significant legal fees; the invasion of his privacy; physical illness and injury; and damages relating to the deprivation of his civil rights. Mr. Cohen's damages are ongoing.

Demand is hereby made for copies of all documents, records, video tapes, recordings, and other tangible things which relate to the incidents described herein.

Your prompt response is anticipated.

Very truly yours,

Christopher W. McHallam

9

# HERBERT STUART COHEN

### Attorney At Law
### 500 Commercial Street
### Suite 4R
### Boston, Massachusetts 02109

**Telephone (617) 523-4552**          November 4, 2004          **Telecopier (617) 723-9211**

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

Attorney General Thomas F. Reilly
Office of the Attorney General
One Ashburton Place
20th Floor
Boston, Massachusetts 02108

              Re:   False Arrest and Malicious Prosecution
                    <u>Of Barry M. Cohen</u>

Dear Attorney General Reilly:

       Please be advised that this office has been retained
by Barry M. Cohen (hereinafter "Mr. Cohen") with respect to
his claims and causes of action arising from his
unjustified and unlawful arrest by the Newton Police
Department (hereinafter "the Newton Police") which occurred
on September 25, 2003; the unlawful issuance of an arrest
warrant by the Newton District Court on the same day; the
violation and abrogation of Mr. Cohen's civil rights on
that day and thereafter by the Newton Police; the negligent
training, supervision, and oversight by the City of Newton
(hereinafter "the City") which resulted in Mr. Cohen's
unlawful arrest; the negligent training, supervision, and
oversight the City and Commonwealth of Massachusetts
(hereinafter "the Commonwealth") which resulted in the
perpetuation of a groundless criminal case against Mr.
Cohen; and the subsequent malicious prosecution of him by
the Middlesex District Attorney and the Commonwealth.

       This letter is submitted in accordance with M.G.L. c.
258 and constitutes a presentment letter as defined by said
statute.

       I.    **Personal Background**

       Mr. Cohen is forty two years old.  He grew up in and
has resided in Newton, Massachusetts, with his parents Saul
and Naomi Cohen (well established and respected members of

1

the Newton Community) for most of his life.  At the time of
the incident, Mr. Cohen was residing in New York and had
been visiting his parents.  Prior to the incident described
herein, Mr. Cohen had never been arrested; charged with a
crime; been a defendant in a criminal matter; or otherwise
subject to a criminal investigation.

## II.  **Mr. Cohen's Encounter with the Newton Police**

On Thursday, September 25, 2003, at approximately 1:15
A.M. (hereinafter "the night of the incident"), Mr. Cohen,
as customary, left his parent's home to take a brief walk.
On the night of the incident, Mr. Cohen was carrying a
flashlight, as he regularly does as a safety precaution.

Mr. Cohen was also wearing brown leather gloves on the
night of the incident.  Mr. Cohen wears gloves on virtually
a full-time basis due to a medical/psychological condition
known as Obsessive Compulsive Disorder.  Mr. Cohen was
wearing a light blue shirt; navy blue poplin suit jacket;
black denim trousers; brown leather gloves; brown leather
walking shoes; and silver wire-rimmed glasses.

Shortly after leaving his parent's home, approximately
four blocks from the house, as Mr. Cohen walked along
Fellsmere Road away from Ward Street and towards Mandalay
Road, he observed an overturned trash barrel and refuse
strewn directly in front of his path.  After observing the
refuse, Mr. Cohen began to re-trace his steps towards Ward
Street.

As soon as Mr. Cohen began to backtrack towards Ward
Street, he heard rustling noises apparently coming from a
white van which was parked on the opposite side of
Fellsmere Road, diagonally across from where Mr. Cohen was
walking.  At all times, Mr. Cohen was on the opposite side
of the street from where said van was parked.

As Mr. Cohen continued to walk towards Ward Street,
there were repetitions of the noises apparently coming from
the van.  Mr. Cohen became alarmed and significantly
quickened his pace towards Ward Street.  As Mr. Cohen had
nearly passed the position of the van on the opposite side
of the street, Mr. Cohen saw the driver's door begin to
open and heard a voice coming from the van call "hey, hey
you, get over here."  Upon hearing this voice, Mr. Cohen
became panicked and ran towards Ward Street.

2

After a few additional seconds, Mr. Cohen looked back over his shoulder and observed a man dressed in a black sweater and dark trousers running after him with a badge held in his hand. It was later learned that the man following Mr. Cohen was Officer Marini (hereinafter "Marini") of the Newton Police. Marini was, upon information and belief, conducting a sting operation in an attempt to catch the perpetrator(s) of the numerous car robberies which had been occurring in Newton at that time.

Mr. Cohen stopped running upon seeing Marini's badge. Mr. Cohen explained to Marini that he was out for a walk and that he had run because he was afraid that he was being "attacked" and/or "kidnapped." Mr. Cohen made it clear that Marini had frightened and traumatized him by chasing him for no apparent reason. Marini responded to Mr. Cohen, at least twice, that "you were just in the wrong place at the wrong time, bro" and that "if you're out this late, you'll be stopped every time."

Mr. Cohen cooperated immediately and fully with Marini's inquiries and provided his name, address, social security number, birth date, and telephone number. At no time did Marini inquire as to what items Mr. Cohen had in his possession, search, and/or frisk Mr. Cohen. In a clear indication that he did not believe Mr. Cohen was in engaged in a criminal activity, Marini did not inquire about or make reference to the flashlight Mr. Cohen was carrying or make any reference to the van.

Marini then relayed information relating to Mr. Cohen over his radio, and Mr. Cohen heard the message "no warrants" came back in reply. Marini then told Mr. Cohen that "you are free to go" and Mr. Cohen then went home.

Especially in light of his medical/psychological condition, Mr. Cohen was extremely shaken by his encounter with Marini.

### III. **Mr. Cohen's False Arrest**

Mr. Cohen claims he was falsely arrested by the Newton Police without probable cause and/or legal justification. The City was negligent in its training, supervision, and oversight of the Newton Police, which negligence resulted

3

in Mr. Cohen's false arrest and was a direct and proximate cause of the damages resulting therefrom.

By way of background, from April through August, 2003, there had been approximately 200 car burglaries in Newton. On September 18, 2003, a press release was disseminated by the Newton Police which advised Newton residents how to avoid car robberies. A copy of said press release is hereto attached as Exhibit 1. Clearly, the Newton Police were concerned about public sentiment regarding the large number of car robberies which had occurred and sought to make a public display of their efforts to prevent further car robberies.

Upon information and belief, when senior Newton Police officials learned of Marini's early morning encounter with Mr. Cohen, they became upset that an arrest had not been made. Apparently, said officials wished to make an arrest in connection with the above-referenced rash of car robberies. Upon information and belief, said senior officials ordered Newton Police officers and detectives to arrest Mr. Cohen in an apparent attempt to demonstrate that the Newton Police were actively pursuing the perpetrators of the above-described multitude of car robberies.

Therefore, in direct contravention of Mr. Cohen's legal and civil rights, the Newton Police prepared a false and improperly suggestive incident report (hereinafter "the report") relating to Marini's encounter with Mr. Cohen on Fellsmere Road (Incident Report Number 359046). A copy of said report is hereto attached as Exhibit 2. Upon information and belief, the report was prepared to improperly create a justification for arresting and prosecuting Mr. Cohen.

The report was infused with a variety of misrepresentations designed to create the false impression that Mr. Cohen was engaged in criminal conduct. Critically, however, the report does not contain any assertion that Mr. Cohen came near the van; touched the van; looked into the van; attempted to reach into the van and/or attempted to open the doors of the van.

Upon information and belief, the Police unlawfully applied for a warrant authorizing the false arrest of Mr. Cohen later on September 25, 2003. Upon information and belief, the Newton District Court was reluctant to issue

4

the warrant but finally did so, in direct contravention of
the law and despite the absence of any probable cause to
justify arrest, after being urged to do by senior Newton
Police officials.

Upon returning from some errands some time after 6:00
P.M. on September 25, 2003, Mr. Cohen discovered that
telephone messages had been left by a person who identified
himself as Detective Sampson (hereinafter "Sampson") of the
Newton Police.  Mr. Cohen returned Sampson's telephone
calls immediately.

Sampson requested that Mr. Cohen come to the Netwon
Police station immediately, without telling Mr. Cohen the
reason for his request.  Over the course of the next
approximately ten minutes, Mr. Cohen and Sampson spoke
twice on the telephone regarding Mr. Cohen's attempts to
accommodate the Police's request, despite having a
previously scheduled appointment.  Mr. Cohen advised
Sampson that he had been unable to reach anyone to re-
schedule his appointment and thus it was a bad time for him
to leave.  Sampson shortly thereafter ended the
conversation by saying "we'll be in touch."

Approximately ten minutes after the second telephone
conversation with Sampson, Mr. Cohen heard loud knocking at
the front door of his parents' house.  At the door were two
men dressed in plain clothes and one uniformed Police
officer.  As soon as Mr. Cohen began to open the door, the
Police officers pushed the door open and all three men
entered.  Mr. Cohen was surprised by the Police's sudden
appearance at his parents' home and shocked by their sudden
and forced intrusion.  No warrant was ever presented to Mr.
Cohen and to date Mr. Cohen has never been provided a copy
of same, despite his and his counsel's request.

Mr. Cohen was immediately arrested, and, thereupon,
the Newton Police handcuffed his arms behind his back.  Mr.
Cohen was frisked and then led, in full view of the public,
from his parents' home down the driveway to a squad car
parked at the corner of Hammond Street and Hammondswood
Road.

The Police used unreasonable and excessive force
during the false arrest of Mr. Cohen.

Mr. Cohen was placed with his arms handcuffed behind his back in the rear of the squad car (which car had an unpadded fiberglass rear seat). As a result, the handcuffs dug into and broke the skin of Mr. Cohen's wrists.

At all relevant times, Mr. Cohen cooperated with the Newton Police and did not resist arrest.

It was later learned that the men in plain clothes were Sampson and Detective McMains (hereinafter "McMains"). The identity of the uniformed officer remains unknown. None of the men had ever met Mr. Cohen prior to that instant. Marini was not present at the time of Mr. Cohen's arrest.

Mr. Cohen was taken to the Police Station and was subjected to humiliating and degrading treatment including, but not limited to, being interrogated; fingerprinted; photographed; frisked twice; and confined to a cell. Most egregiously, during the entire course of the intake procedures both of Mr. Cohen's wrists were handcuffed to a steel pipe, rendering him completely humiliated, defenseless, and immobile.

## IV. **Mr. Cohen's False Imprisonment**

Mr. Cohen claims that the Newton Police falsely imprisoned him without probable cause, legal justification, and in violation of his legal and civil rights. Moreover, during his incarceration at the Police station, McMains and other Newton Police officers improperly harassed, assaulted, and used excessive force against Mr. Cohen. The City's negligent training, oversight, and supervision constituted a direct and proximate cause of Mr. Cohen's false imprisonment, harassment, assault, and exposure to the use of excessive force and the damages resulting therefrom.

After intake procedures had been completed, Mr. Cohen was falsely imprisoned for several hours during the night of September 25, 2003. During his false imprisonment, Mr. Cohen was subjected to harassment, threats, intimidation, and excessive force.

The incidents of harassment and assault include, but are not limited to, McMains' continuous threats and

6

harassment of Mr. Cohen throughout the course of his false
imprisonment. Among other things, McMains threatened Mr.
Cohen that he would be indefinitely jailed and precluded
from contacting anyone unless Mr. Cohen signed a form which
bore Mr. Cohen's fingerprints and which also contained many
blank lines.

Mr. Cohen was reluctant to sign the form as he feared
it could be filled in with incriminating false information.
Mr. Cohen's said reluctance apparently angered McMains, who
assaulted and used excessive force against Mr. Cohen while
both his wrists were cuffed to the steel pipe, as described
above.  Specifically, McMains rushed towards and came right
up to Mr. Cohen while yelling at Mr. Cohen as if he were
going to strike and injure the defenseless Mr. Cohen in an
apparent attempt to coerce Mr. Cohen's signature.  McMains'
assault was particularly traumatic and distressing to Mr.
Cohen, given his medical/psychological condition.

McMains carried out his threats by placing Mr. Cohen
in solitary confinement in a jail cell with no outside
contact.  Mr. Cohen was confined in the cell for several
hours.  After a significant duration of confinement in the
cell, and under duress and with great reluctance, Mr. Cohen
ultimately agreed to sign the form bearing his
fingerprints, thereby hoping to end his confinement and so
as to attempt to contact his family.

After considerable delay, Mr. Cohen was allowed to
call his home to arrange for bail after signing said form.
Some time later, Mr. Cohen was then told that his father
had come to the station but that Mr. Cohen's bail had been
raised from $40.00 to $500.00.  This caused additional
delay in Mr. Cohen's release.  Mr. Cohen was not released
until late in the evening.

## V.   Mr. Cohen's Malicious Prosecution

Mr. Cohen claims that he was maliciously prosecuted by
the Police and the Middlesex District Attorney for a crime
which he did not commit and for which no probable cause
existed to justify prosecution.  As a result of Mr. Cohen's
unlawful prosecution, Mr. Cohen's legal and civil rights
were violated.  The City's and the Commonwealth's negligent
training, supervision, and oversight were a direct and
proximate cause of Mr. Cohen's malicious prosecution and
the damages resulting therefrom.

7

Mr. Cohen reported to the Newton District Court the on the morning of September 26, 2003, and was arraigned and charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle. Mr. Cohen was forced to retain private counsel in order to defend himself against said unsubstantiated and unlawful charges.

Shortly after Mr. Cohen's arrest, notice of Mr. Cohen's arrest was reported in the Newton Tab on October 1, 2003. Moreover, in a clear indication that Mr. Cohen's false arrest was motivated by the Newton Police's apparent desire to create the impression it was diligently pursuing the perpetrators of the numerous car robberies, on October 15, 2003, an article was published in the Newton Tab by the Newton Police Chief which reported that an arrest had been made in connection with said rash of car robberies. Copies of said articles are hereto attached as Exhibit 3.

At some time after Mr. Cohen's arraignment, in a blatant violation of court rules and protocol, Sampson improperly called Mr. Cohen's home, despite knowing that Mr. Cohen was represented by counsel. Upon information and belief, Sampson sought to meet with Mr. Cohen's father at the Police station in an apparent attempt to engage in an improper communication.

The clearest indication of the improper and unlawful nature of the criminal charges levied against Mr. Cohen was the highly unusual dismissal of the charges by the Newton District Court on October 21, 2003; approximately one month after Mr. Cohen's arrest and after Mr. Cohen had made three court appearances. Said dismissal occurred during a pre-trial proceeding and was entered over the objection of the Middlesex District Attorney's office.

## VI.   The Impact Upon Mr. Cohen

As a direct and proximate result of the unlawful conduct of the Newton Police, the City, the Middlesex District Attorney and the Commonwealth as described herein above, Mr. Cohen's federal and state civil and legal rights were severely and egregiously violated and he has consequently suffered substantial damages.

8

The impact of these events on Mr. Cohen's life has been significant and highly destructive.  Mr. Cohen has suffered damages which include, but are not limited to, damages to his reputation; humiliation; severe emotional distress; the incurrence of significant legal fees; the invasion of his privacy; physical illness and injury; and damages relating to the deprivation of his civil rights. Mr. Cohen's damages are ongoing.

Demand is hereby made for copies of all documents, records, video tapes, recordings, and other tangible things which relate to the incidents described herein.

Your prompt response is anticipated.

Very truly yours,

Christopher W. McHallam

LAW DEPARTMENT



# CITY OF NEWTON, MASSACHUSETTS
### CITY HALL
1000 COMMONWEALTH AVENUE
NEWTON CENTRE, MA 02459
TELEPHONE (617) 796-1240
FACSIMILE (617) 796-1254

**CITY SOLICITOR**
**DANIEL M. FUNK**

ASSOCIATE CITY SOLICITORS
OUIDA C.M. YOUNG        GAYLE A. SMALLEY

ASSISTANT CITY SOLICITORS
MICHAEL D. BASEMAN
RICHARD G. CHMIELINSKI
CATHERINE A. LESTER SALCHERT
DONNALYN B. LYNCH KAHN
EILEEN M. MCGETTIGAN
CATHERINE L. FARRELL

January 18, 2005

Christopher W. McHallam
Offices of Herbert Stuart Cohen
500 Commercial Street
Suite 4R
Boston, MA 02109

RE:    Barry M. Cohen
       File No. 04-539

Dear Mr. McHallam:

The City of Newton has completed its investigation of the claims of your client, Barry Cohen, concerning the events of September 25, 2003, and Mr. Cohen's subsequent arrest. The claims include unlawful arrest, violation of civil rights, negligent training and supervision of City of Newton police officers and wrongful issuance of a criminal complaint.[1]

The City's investigation reveals that the Newton Police Department was conducting a surveillance operation in the early morning hours on September 25, 2003. A brown and beige unmarked Ford van baited with a cell phone and money on the console was parked on Fellsmere Road facing Ward Street in Newton. Newton Police Officer Rocky Marini was hidden behind the right passenger front seat. He was positioned so that he could see out the window. The window to the van was slightly open to hear sounds from the street. This surveillance operation was in response to a number of recent car break-ins in the vicinity.

At around 1:30am, Officer Marini noticed a man with a flashlight coming towards the

---

[1] There are also claims alleging malicious prosecution by the Middlesex District Attorney's office and the Commonwealth. As you are surely aware, the City of Newton bears no responsibility for the actions of the District Attorney's office or the Commonwealth, and therefore will not address those claims.

van. The man approached the van and shined the flashlight in the side window of the van.[2] At that very moment, Officer Marini's radio went off. The sound apparently scared off the person with the flashlight, because Officer Marini heard and saw him running away. Officer Marini quickly got out of the van and shouted "Stop Police." Officer Marini was in full police uniform.

The man did not initially stop. Officer Marini caught up with him at the corner of Fellsmere Road. The man was wearing glasses, dark clothing, dark footwear and dark leather gloves. Officer Marini asked the man what he was doing at that hour with a flashlight pointed in the window of a van. He responded that he was out for a walk. He was asked why he had a flashlight. He explained that he had a flashlight so that he could see where he was going. However, the streets in the area were well lit. He was asked why he was wearing gloves. He responded that he was cold. It was, however, warm outside. He was asked why he ran. He responded that he ran because he was being chased by Officer Marini. He did not state that he ran because he feared being "attacked" or "kidnapped". He did not state that he had any medical or psychological condition.

Officer Marini then asked for some identification. The man responded that he had no identification on him, but gave his name as Barry Cohen. He also gave his date of birth and stated that he was an unemployed actor from New York temporarily staying at his parents' house at 87 Hammond Street in Newton.[3] He said he planned to return to New York in a few days.

Officer Marini checked whether there were any outstanding warrants for Mr. Cohen in either Massachusetts or New York. After discovering there were none, Officer Marini did let Mr. Cohen proceed on his way. Officer Marini never indicated in any fashion that there would be no subsequent warrant for the arrest of Mr. Cohen. The absence of warrants was the only reason Mr. Cohen was let go at that time.

Contrary to the assertions in your letter, Mr. Cohen did not appear or indicate that he was frightened or traumatized during this encounter. Rather, he appeared suspiciously nervous and hesitant about answering questions. Officer Marini did not state words to the effect that Mr. Cohen was in the wrong place at the wrong time or that he would be stopped any time he was out that late.

Later that morning, pursuant to Officer Marini's indication in his incident report that he would be taking our charges against Mr. Cohen, an arrest warrant was issued by the Newton District Court. Detectives Sampson and McMains were charged with making the arrest. Your allegations concerning phone calls made by Detective Sampson to Mr. Cohen are all accurate. Detective Sampson did leave telephone messages for Mr. Cohen on September 25, 2004 and did request that Mr. Cohen come to the Newton Police station. Mr. Cohen indicated that it was a bad time for him and that he had an appointment.

---

[2] Contrary to the assertions in your letter, the incident report by Officer Marini clearly states that Mr. Cohen was walking towards the unmarked van and that Mr. Cohen shined his flashlight in the side window of the van.

[3] Hammond Street is approximately a mile and a half from Fellsmere Road and Ward Street.

2

After Mr. Cohen stated that he would not be able to appear at the Newton Police station, Detectives Sampson and McMains, along with Officer Raymond went to 87 Hammond Street to arrest Mr. Cohen. The detectives and officer appeared at the front door. Mr. Cohen answered the door. They identified themselves and asked if he was Barry Cohen. He said he was. He opened the door for them and they entered the foyer area. The officers did not push the door open and forcefully barge in. The detectives informed Mr. Cohen he was under arrest for attempted breaking and entering. He behaved somewhat bizarrely and indicated that he did not want to be touched. He was then handcuffed according to police procedure and driven to the Newton Police station by Officer Raymond. There was no unreasonable or excessive force used during the arrest of Mr. Cohen. There was no force used whatsoever as Mr. Cohen did not resist arrest. Mr. Cohen never complained about the handcuffs or rear seat of the police car.

At the Newton Police Department, Mr. Cohen was subject to standard and proper booking procedures. According to police procedure, he had one hand handcuffed to a bar at all times while he was at the booking desk. He was not as you suggest "humiliated, defenseless and immobile". He did not have both wrists handcuffed to a steel pipe. He was first asked if he suffered any injuries as a result of his arrest. He stated that he had not. He was asked basic information including his name, address and occupation. He was read his Miranda rights. He was photographed. He was patted down. He was asked to surrender any items on his person. At this point, the booking process began to break down because Mr. Cohen refused to be compliant.

Mr. Cohen did not wish to surrender keys he wore around his neck on a chain. He did eventually give them to the detectives, but with much difficulty. He was reluctant to be fingerprinted, but did eventually cooperate. He refused, however, to sign the fingerprint card. Detective McMains explained the fingerprint card to Mr. Cohen, but he still refused, preventing the completion of the booking process.

Since Mr. Cohen would not complete the booking process, he was placed in a cell by two police officers. He was not placed in "solitary confinement" as you suggest. He was placed alone in a single cell according to Newton Police Department policy and procedure. The fingerprint card was again explained to Mr. Cohen and he was given a blank fingerprint card to read. There were no threats or force used when Mr. Cohen was placed in the cell. It is standard police operating procedure to place an arrestee in a cell when the arrestee refuses to complete the booking process. And, a phone call is not permitted until the booking process is complete.

Detective McMains did not threaten Mr. Cohen. He was not angry at Mr. Cohen. He did not yell at Mr. Cohen. He did not rush at Mr. Cohen. And, he did not indicate in any way that he was going to strike or injure Mr. Cohen. Rather, Detective McMains, with imminent patience, explained the fingerprint process to Mr. Cohen numerous times, and even gave him a blank card to read.

Eventually, after reading and rereading the card many times, Mr. Cohen agreed to sign the fingerprint card. At that point, he was permitted a phone call. Mr. Cohen was never "interrogated" at any point. The only information requested of him was the basic information needed to fill out a booking sheet. You state that Newton police officers

3

"improperly harassed, assaulted and used excessive force against Mr. Cohen" at the Newton Police station. There is not a shred of truth to this statement.

Any allegations concerning bail are not properly addressed to the Newton Police Department. It is the bail clerk in the District Court who controls the amount of bail and the bail process. Further, as noted above, any allegations relating to Mr. Cohen's subsequent prosecution by the Middlesex District Attorney's office are likewise not properly addressed to the Newton Police Department.

Your insinuations that the Newton Police Department would manufacture arrests and arrest reports to give the appearance that it was solving the rash of recent car break-ins is frankly ridiculous. And your "upon information and belief" story of upset and overly aggressive senior police officers ordering the arrest of Mr. Cohen is even more preposterous. There is no evidence whatsoever that Newton was pursuing arrests in the fashion you suggest.

It is difficult to understand at all your allegations concerning the training and supervision of Newton Police officers. Newton has recently been touted as the safest city in the United States. Its police force is highly trained and its officers have received countless commendations. The officers at issue in this matter followed proper and lawful Newton Police Department policies and procedures to the letter. Your client's rights were respected every step of the way. His own eccentric and paranoid behavior was the only thing that interfered with the arrest and booking procedures. Had your client agreed to come to the police station, the detectives would not have had to come to get him. Had your client been compliant, the booking process would have been completed sooner. The officers, however, did everything right and nothing wrong.

Under the facts presented in this matter, the initial stop and subsequent arrest of Mr. Cohen were lawful. Officer Marini had probable cause to stop and later arrest Mr. Cohen when Mr. Cohen approached the baited van shining a flashlight in the window at the wee hours of the morning in dark clothing and gloves, and then began running after hearing Officer Marini's police radio. The fact that Mr. Cohen was not subsequently convicted is irrelevant. The stop and arrest were lawful. Therefore, the City must deny your claim on behalf of Mr. Cohen as there is no evidence whatsoever of liability under Chapter 258 and no violation of Mr. Cohen's civil rights.

Finally, pursuant to your requests, copies of all relevant documents are annexed hereto.

Very truly yours,

Donnalyn B. Lynch Kahn
Assistant City Solicitor

DBLK/brr
Enclosures

4

NOV-10-2004 WED 05:54 PM  FROM:                    FAX:                    PAGE 2





# POLICE DEPARTMENT
# NEWTON, MASSACHUSETTS

Form # BOOKING.2

**Name:** COHEN, Barry M          **Age**     41.84
**Alias:**
**Address:** 87 HAMMOND STREET
              Newton, MA 02467
**Offense:** WARRANT 0312CR000954
             ATTEMPT TO COMMIT CRIME (B&E MV)



**BOOKING:** N0309251814      9/25/2003
**Arrested Date :** 9/25/2003  1810          **Incident #**  03-59046          **OBTN #** TNET035904601

| | | |
|---|---|---|
| **Sex:** Male | **Height:** 5 ' 6 " | **Occupation:** ACTOR |
| **Race:** White | **Weight:** 132 | **SS No.:** 025385081 |
| **DOB:** 12/1/1961 | **Build:** Slight | **Operators License:** |
| **Birth Place:** BOSTON | **Eyes:** Blue | **State:** |
| **Marital Status:** Single | **Hair:** Black | **Home Ph::** (617) 969-2459 |
| **Mothers Name:** STONE | **Complexion:** Medium | **Work Ph:** |
| **Fathers Name:** SAL COHEN | **Location of Arrest:** 87 HAMMOND STREET | |

| | |
|---|---|
| **Breathalyzer Released:** | **Marks/Scars:** NONE |
| **Readings:** | |
| **Tested By:** | **Facial:** SLIGHT BEARD MUSTACHE GROWTH |

| | |
|---|---|
| **Arresting Officer:** SAMPSON, ROBERT F. | **Cell:** 1    **By:** MCLAUGHLIN, JOSEPH T |
| **Booking Officer:** MCMAINS, SGT. GEORGE | **Transport Unit:** N494 |
| **Advised 263 5a:** | **Transporting Officer:** RAYMOND, ZACHARY |
| **Advised 276 33a:** YES    SGT MCMAINS | **Processing Officer:** MCLAUGHLIN, JOSEPH T. |

| | |
|---|---|
| **Visible Injuries Examined:** No | **Booking Comments:** |
| **On Medication:** No | |
| **Mental State:** UNCOOPERATIVE | |
| **Warrant & Court :** 0312CR000954 | |

### JUVENILE INFORMATION

**Notification Information:**
        **Notified By:**
**Probation Officer Notified::**
OIC Notified when 6Hour maximum holding time begins                    Notified by _____

**Bail:**
**Bailed by:**

                                                  **Individual Booked**
I have been advised of and understand my right to remain silent, use a telephone to call a lawyer or have one provided and to have my own physician test for alcohol.

| **Property** | $0.00 |
|---|---|
| BELT, KEY RING W/2 KEYS, GLASSES. | **Individual Booked**  *Signed upon release* |
| | *I acknowledge that I have received the listed property* |
| | |
| | **Booking Officer** |



### NEWTON POLICE DEPARTMENT
*NEWTON, MA*

# Incident Report #359046

| | |
|---|---|
| Case Title | Location |
| | **FELLSMERE RD** |
| Reporting Area | Sector |
| 134 | **B494** |
| Date/Time Reported | Date/Time Occurred |
| 09/25/2003 05:25:00 | 09/25/2003 01:20:00 to 09/25/2003 01:40:00 |

Incident Type/Offense

**ATTEMPT TO COMMIT CRIME c274 S6 (274/6 )**

Reporting Officer

**MARINI, R. (13963)**

### Persons

| Role | Name | Sex | Race | Age | DOB | Home Phone | Address |
|---|---|---|---|---|---|---|---|
| INVOLVED PARTY | COHEN, BARRY | MALE | WHITE | 41 | 12/01/1961 | | 87 HAMMOND ST. NEWTON, MA |

### Offenders

| Status | Name | Sex | Race | Age | DOB | Home Phone | Address |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

### Narrative

ON THE ABOVE DATE AND TIME I WAS RUNNING SURVEILLANCE IN AN UNMARKED BROWN VAN, THAT WAS BAITED WITH A CELL PHONE AND TWO ONE DOLLAR BILLS PLACED ON THE CONSOLE INSIDE THE VAN. THE VAN WAS PARKED ON FELLSMERE RD. NEAR WARD ST. I WAS POSITIONED THERE BECAUSE OF THE HIGH AMOUNT OF M.V. BREAK INS, IN THE AREA. AT ABOUT 0130 HRS. I SAW A MALE WALKING NORTHBOUND ON FELLSMERE RD. ABOUT A HOUSE AWAY FROM WARD ST. WITH A FLASH LIGHT ON. THE STREET HAS NUMEROUS STREET LIGHTS WHICH WERE ON. HE WAS WALKING TOWARDS THE UNMARKED VAN WHICH I WAS SITTING INSIDE AND IN THE REAR OF. I COULD SEE THE SUSPECT THROUGH THE FRONT WINDSHIELD OF THE VAN .I LOST SIGHT OF THE SUSPECT WHEN HE WENT TO THE SIDE OF THE VAN. HE WAS ON THE SIDE OF THE VAN AND I SAW THE FLASHLIGHT COME UP TO THE SIDE WINDOW. THE WINDOW WAS OPENED HALF WAY AND THE WINDOW BESIDE WAS OPENED. I NOTICED THE FLASH LIGHT BEAM TO WHAT APPEARED AS IF HE WAS LOOKING INSIDE THE VAN WHEN AT THE SAME TIME AN UNRELATED CALL CAME OVER THE AIR ON MY PORTABLE RADIO. THEN THE SUSPECT RAN TOWARDS WARD ST. I EXITED THE VAN AND SAW THE SUSPECT RUNNING TOWARDS WARD ST. I SAW THE SUSPECT WITH THE FLASHLIGHT AND TOLD HIM TO "STOP POLICE." HE STILL RAN AND I CAUGHT UP TO HIM ON THE CORNER OF FELLSMERE RD. AND WARD ST. AND HE FINALLY STOPPED. I ASKED HIM WHAT HE WAS DOING AT 0130 HRS. WITH FLASH LIGHT POINTING IN THE WINDOW OF THE VAN. HE SAID HE WAS GOING FOR WALK. I ALSO NOTICED HE WAS WEARING DARK FOOT WEAR, DARK PANTS, DARK SHIRT, DARK COAT, AND BROWN LEATHER LIKE GLOVES. AND CARRYING A BLACK FLASHLIGHT. I ASKED HIM WHY HE WAS WEARING GLOVES. HE SAID IT WAS COLD. AT THAT TIME IT WAS STILL WARM OUT. I ASKED HIM FOR I.D. HE SAID HE DIDN'T HAVE ANY. I ASKED HIM WHY HE RAN, HE SAID BECAUSE I WAS CHASING HIM. I DIDN'T EXIT THE VAN TILL HE STARTED TO RUN AWAY FROM THE VAN DUE TO THE NOISE OF MY POLICE RADIO. I ASKED HIM FOR HIS NAME AND D.O.B. HE TOLD ME THE INFORMATION , I CALLED DISPATCH AND RAN HIM FOR WANTS AND WARRANTS. HE WAS IDENTIFIED AS COHEN ,BARRY OF 87 HAMMOND ST. NEWTON, M.A. D.O.B. 12-01-61, SSN# 025385081. I ALSO ASKED HIM WHAT KIND OF JOB HE HAD. HE SAID THAT HE LIVES IN NEW

Main Form

Page 2 of 2

YORK AND IS AN UNEMPLOYED ACTOR. I ASKED HIM WHERE HE STAYING NOW. HE SAID WITH
MY FATHER AT 87 HAMMOND ST. I ASKED HIM WHEN HE ARRIVED IN NEWTON, HE SAID A COUPLE
OF DAYS AGO, I ASKED WHAT DATE AND DAY. HE SAID A COUPLE OF DAYS AGO. I ALSO
ASKED HOW LONG HE WAS STAYING, HE SAID A COUPLE OF DAYS. I ALSO NOTICED
WHILE TALKING TO MR. COHEN HE SEEMED NERVOUS AND HESITANT ABOUT ANSWERING
QUESTIONS. HE HAD NO WANTS OR WARRANTS, SO I TOLD HE COULD GO. A COPY OF THIS
REPORT WILL BE FORWARDED TO THE DETECTIVE BUREAU FOR FURTHER INVESTIGATION. I WILL
BE TAKING OUT CHARGES / SUMMONS. FOR ATTEMPTING TO COMMIT A CRIME ( B & E OF A M.V. )
CHAPTER 274 / SEC. 6

 **NEWTON POLICE DEPARTMENT**
*NEWTON, MA*
## Incident Report #0359046

# Basic Information

| Agency | Incident # | Report # | Date | Report Status |
|---|---|---|---|---|
| NWT-PD | 359046 | 0 | 09/25/2003 05:25:00 | APPROVED |
| Case Title/Victim | | Incident Type/Offense | | |
| | | ATTEMPT TO COMMIT CRIME c274 S6 (274/6) | | |

| Incident Date | |
|---|---|
| Date/Time Incident Reported | Occurred between |
| 09/25/2003 05:25:00 | 09/25/2003 01:20:00 and 09/25/2003 01:40:00 |

### Location Information

| Address | Street Name | | Unit # | Cross Street |
|---|---|---|---|---|
| | FELLSMERE RD | | | WARD ST |
| City | State | | Zip | Reporting Area |
| NEWTON | MA | | | 134 |
| Business Name | | | Business Phone | |
| | | | | |

### Authorization

| Reporting Officer | Signature | Date/Time Entered |
|---|---|---|
| MARINI, R.(13963) | | 09/25/2003 05:29:06 |
| Reviewed By | Signature | Date/Time Reviewed |
| CHISHOLM G(13371) | | 09/25/2003 22:39:03 |
| Approved By | Signature | Date/Time Approved |
| GROMADA M(11920) | | 09/26/2003 00:56:44 |

### Other Signatures

| Patrol Supervisor | Shift Commander |
|---|---|
| | |

### Last Modified By

| SAMPSON R.(14183)  on 09/26/2003 07:52:52 |
|---|

# Units

| Unit ID | Dispatched | On-Location | Cleared | Officer(s) |
|---|---|---|---|---|
| 999 | 09/25/2003 05:26:07 | | 09/25/2003 05:26:14 | ( ) |

# Offenses

NOV-10-2004 WED 06:01 PM  FROM:                          FAX:                          PAGE 9

Main Form                                                               Page 2 of 3

| Offense #1: ATTEMPT TO COMMIT CRIME c274 S6 (274/6) | | |
|---|---|---|
| NIBRS Offense | | NIBRS Offense Description |
| 90Z | | ALL OTHER OFFENSES |
| Attempted/Completed | NIBRS Group | NIBRS Offense Type |
| ATTEMPTED | B | GROUP B OFFENSE |
| Other Jurisdiction | Bias #1 | Bias #2 |
| N | NONE | NO BIAS, NOT APPLICABLE |
| Location Code | | Offender Using |
| HIGHWAY/ROAD/ALLEY | | |

# Persons

| Person #1: INVOLVED PARTY | | | | | |
|---|---|---|---|---|---|
| MNI # | Last Name | First Name | Middle Name | Suffix | SSN |
| 300008820 | COHEN | BARRY | | | 025385081 |

| Home Address | | | | | |
|---|---|---|---|---|---|
| Address | Street Name | | | Apt. # | |
| 87 | HAMMOND ST. | | | | |
| City | | State | Zip Code | Home Phone | |
| NEWTON | | MA | 02465 | | |
| Cell Phone | | | | | |

| Person Details | | | | | | | |
|---|---|---|---|---|---|---|---|
| DOB | Age Range | | Is Juvenile? | Sex | Race | | Ethnicity |
| 12/01/1961 | 41 | 41 | N | M | WHITE | | UNKNOWN |
| Hair Color | Height | Weight | Complexion | Build | | | Eye Color |
| BLACK | 506 | 160 | FAIR | THIN | | | BROWN |
| Scars, Marks, Tatoos | | | | | | | |
| | | | | | | | |
| Residency | | | Victim Type (If Applicable) | | | | |
| | | | INDIVIDUAL | | | | |

| Injuries Sustained By Person | | | |
|---|---|---|---|
| NONE | | | |
| Hospital Taken To | Transported By | Treating Physician | |
| NONE | | | |
| Other Description of Injuries | | | |
| NONE | | | |

# Narrative

NOV-10-2004 WED 06:01 PM FROM:                         FAX:                    PAGE 6

M.. n Form                                                                    Page 3 of 3

ON THE ABOVE DATE AND TIME I WAS RUNNING SURVEILLANCE IN AN UNMARKED BROWN VAN,
THAT WAS BAITED WITH A CELL PHONE AND TWO ONE DOLLAR BILLS PLACED ON THE CONSOLE
INSIDE THE VAN. THE VAN WAS PARKED ON FELLSMERE RD. NEAR WARD ST. I WAS POSITIONED
THERE BECAUSE OF THE HIGH AMOUNT OF M.V. BREAK INS, IN THE AREA. AT ABOUT 0130 HRS.
I SAW A MALE WALKING NORTHBOUND ON FELLSMERE RD. ABOUT A HOUSE AWAY FROM WARD
ST. WITH A FLASH LIGHT ON. THE STREET HAS NUMEROUS STREET LIGHTS WHICH WERE ON. HE
WAS WALKING TOWARDS THE UNMARKED VAN WHICH I WAS SITTING INSIDE AND IN THE
REAR OF. I COULD SEE THE SUSPECT THROUGH THE FRONT WINDSHIELD OF THE VAN .I LOST
SIGHT OF THE SUSPECT WHEN HE WENT TO THE SIDE OF THE VAN. HE WAS ON THE SIDE OF THE
VAN AND I SAW THE FLASHLIGHT COME UP TO THE SIDE WINDOW. THE WINDOW WAS
OPENED HALF WAY AND THE WINDOW BESIDE WAS OPENED. I NOTICED THE FLASH LIGHT BEAM
TO WHAT APPEARED AS IF HE WAS LOOKING INSIDE THE VAN WHEN AT THE SAME TIME AN
UNRELATED CALL CAME OVER THE AIR ON MY PORTABLE RADIO. THEN THE SUSPECT RAN
TOWARDS WARD ST. I EXITED THE VAN AND SAW THE SUSPECT RUNNING TOWARDS WARD ST. I
SAW THE SUSPECT WITH THE FLASHLIGHT AND TOLD HIM TO "STOP POLICE." HE STILL RAN AND I
CAUGHT UP TO HIM ON THE CORNER OF FELLSMERE RD. AND WARD ST. AND HE FINALLY
STOPPED. I ASKED HIM WHAT HE WAS DOING AT 0130 HRS. WITH FLASH LIGHT POINTING IN
THE WINDOW OF THE VAN. HE SAID HE WAS GOING FOR WALK. I ALSO NOTICED HE WAS
WEARING DARK FOOT WEAR, DARK PANTS, DARK SHIRT, DARK COAT, AND BROWN LEATHER
LIKE GLOVES. AND CARRYING A BLACK FLASHLIGHT. I ASKED HIM WHY HE WAS
WEARING GLOVES. HE SAID IT WAS COLD. AT THAT TIME IT WAS STILL WARM OUT. I ASKED
HIM FOR I.D. HE SAID HE DIDN'T HAVE ANY. I ASKED HIM WHY HE RAN, HE SAID BECAUSE I
WAS CHASING HIM. I DIDN'T EXIT THE VAN TILL HE STARTED TO RUN AWAY FROM THE VAN
DUE TO THE NOISE OF MY POLICE RADIO. I ASKED HIM FOR HIS NAME AND D.O.B. HE TOLD ME
THE INFORMATION , I CALLED DISPATCH AND RAN HIM FOR WANTS AND WARRANTS. HE
WAS IDENTIFIED AS COHEN ,BARRY OF 87 HAMMOND ST. NEWTON, M.A. D.O.B. 12-01-61,
SSN# 025385081. I ALSO ASKED HIM WHAT KIND OF JOB HE HAD. HE SAID THAT HE LIVES IN NEW
YORK AND IS AN UNEMPLOYED ACTOR. I ASKED HIM WHERE HE STAYING NOW. HE SAID WITH
MY FATHER AT 87 HAMMOND ST. I ASKED HIM WHEN HE ARRIVED IN NEWTON, HE SAID
A COUPLE OF DAYS AGO, I ASKED WHAT DATE AND DAY. HE SAID A COUPLE OF DAYS AGO.
I ALSO ASKED HOW LONG HE WAS STAYING, HE SAID A COUPLE OF DAYS. I ALSO NOTICED
WHILE TALKING TO MR. COHEN HE SEEMED NERVOUS AND HESITANT ABOUT ANSWERING
QUESTIONS. HE HAD NO WANTS OR WARRANTS, SO I TOLD HE COULD GO. A COPY OF THIS
REPORT WILL BE FORWARDED TO THE DETECTIVE BUREAU FOR FURTHER INVESTIGATION. I WILL
BE TAKING OUT CHARGES / SUMMONS. FOR ATTEMPTING TO COMMIT A CRIME ( B & E OF A M.V. )
CHAPTER 204 / SEC. 6



NEWTON POLICE DEPARTMENT
*NEWTON, MA*
# Incident Supplement #359046-1

Case Title

Reporting Area
**134**

Date/Time Reported
**09/25/2003 05:25:00**

Incident Type/Offense

Location
**FELLSMERE RD**

Sector
**B494**

Date/Time Occurred
**09/25/2003 01:20:00 to 09/25/2003 01:40:00**

**ATTEMPT TO COMMIT CRIME c274 S6 (274/6 )**

Reporting Officer
**SAMPSON R (14183)**

| Persons | | | | | | | |
|---------|---|-----|------|-----|-----|------------|---------|
| Role | Name | Sex | Race | Age | DOB | Home Phone | Address |

| Offenders | | | | | | | |
|-----------|------|-----|------|-----|-----|------------|---------|
| Status | Name | Sex | Race | Age | DOB | Home Phone | Address |

Narrative

DETECTIVE REPORT:
ON THURSDAY 09/25/03 AN ARREST WARRANT WAS ISSUED BY THE NEWTON DISTRICT COURT FOR
BARRY M. COHEN FOR ATTEMPTING TO COMMIT A CRIME (B&E OF A M/V). DETECTIVE SGT.
MCMAINS AND I RESPONDED TO 87 HAMMOND ST. AND PLACED BARRY M. COHEN UNDER
ARREST ON THE WARRANT. HE WAS TRANSPORTED TO HEADQUARTERS BY OFFICER RAYMOND
AND BOOKED BY DETECTIVE SGT. MCMAINS.

| **WARRANT** | 0312CR000954 | | | | | | **Trial Court of Massachusetts** |
|---|---|---|---|---|---|---|---|

| Newton | NAME, ADDRESS AND ZIP CODE OF DEFENDANT |
|---|---|

**Newton District Court**

TO ANY AUTHORIZED OFFICER:
REASON FOR WARRANT

COHEN, BARRY
87 HAMMOND ST.
NEWTON, MA 02465

☒ Representation of prosecutor that defendant may not appear unless arrested.

| DATE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|
| 12/01/1961 | M | W | 5'06" | 160 | BRO | BLK |

☐ Defendant failed to appear after being summoned to appear.

| C.C. # | SOCIAL SECURITY # |
|---|---|
| 03-59046 | 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 |

☐ Defendant failed to appear after recognizing to appear.

☐ Defendant failed to pay court ordered monies in the amount of $_____.

| DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|
| 09/25/2003 | NEWTON |

☐ Defendant failed to pay non-criminal motor vehicle fine in the amount of $_____.

| COMPLAINANT | POLICE DEPARTMENT |
|---|---|
| CURRY, CAROLYN | NEWTON PD |

☐ Defendant failed to appear for Probation Surrender Hearing

| DATE OF COMPLAINT | RETURN DATE AND TIME |
|---|---|
| 09/25/2003 | |

☐ Other:

COUNT-OFFENSE
1 - 274/6  ATTEMPT TO COMMIT CRIME c274 §6

on 09/25/2003 did ATTEMPTED TO BREAK INTO A MOTOR VEHICLE and thereby did attempt to commit the offense of BREAKING & ENTERING IN THE NIGHTTIME TO COMMIT A FELONY, but did fail in the perpetration of such offense, or was intercepted and prevented in the execution of such offense, in violation of G.L. c.274, §6. (PENALTY: (1) If attempted offense punishable by state prison for life or 5 years or more: state prison not more than 5 years; or jail or house of correction not more than 2½ years; (2) If attempted offense punishable by state prison for less than 5 years; or by jail or house of correction, or by fine: jail or house of correction not more than 1 year; or not more than $300; (3) If attempted offense is larceny under c.266, §30: jail or house of correction not more than 2½ years; or fine; or both. If attempted offense was G.L. c.265, §13B, indecent assault and battery on a mentally retarded person under c.265, §13F, or G.L. c.265, §§ 13H, 22, 22A, 23, 24 or 24B, kidnapping of a child under 16 under c.265, §26, or G.L. c.272, §§ 2, 3, 4A, 4B, a subsequent offense under c.272, §16, or an offense under G.L. c.272, §§ 17, 28, 29A, 29B, 29C or 35A, upon conviction must register as a sex offender pursuant to G.L. c.6, §§178C-178P. If attempted offense was G.L. c.265, §§1, 13, 13B, 13F, 13H, 14, 15, 16, 17, 18, 18A, 18B, 18C, 22, 22A, 23, 24, 24B or 26, G.L. c.266, §§14

COUNT-OFFENSE

COUNT-OFFENSE

COUNT-OFFENSE

THE COURT HAS ORDERED THAT A  ☒ WARRANT    ISSUE AGAINST THE ABOVE DEFENDANT
                                ☐ DEFAULT WARRANT

Therefore you are hereby commanded to arrest the above named defendant and bring the defendant forthwith before this court to answer to the offense(s) listed above and to be dealt with according to law.

| | FIRST JUSTICE | DATE OF ISSUE | CLERK-MAGISTRATE/ASST. CLERK |
|---|---|---|---|
| WITNESS: | KLEIN, DYANNE J | 09/25/2003 | |



THE COMMONWEALTH OF MASSACHUSETTS
ADMINISTRATIVE OFFICE OF THE TRIAL COURT
Two Center Plaza
Boston, Massachusetts 02108

Tel: (617) 742-8575
Fax: (617) 742-0968

February 3, 2005

Herbert Stuart Cohen, Esq.
Attorney At Law
500 Commercial Street, Suite 4R
Boston, Massachusetts 02109

**RE:   Chapter 258 Claim for Damages by Barry M. Cohen**

Dear Attorney Cohen:

Your claim dated November 4, 2004 on behalf of Mr. Cohen was received by the
Administrative Office of the Trial Court on November 30, 2004.

This office has reviewed the claim and concluded that the facts do not warrant settlement
by the Trial Court. Therefore, please consider this correspondence to be notice of denial of said
claim.

Sincerely,

Brian T. Mulcahy
Administrative Attorney

cc:   Alec Gray, General Counsel, Legal Department Director



# The Commonwealth of Massachusetts
# Executive Office of Public Safety

One Ashburton Place
Boston, Massachusetts 02108
Tel: (617) 727-7775
TTY Tel: (617) 727-6618
Fax: (617) 727-4764
www.mass.gov/eops

**Mitt Romney**
Governor

**Kerry Healey**
Lieutenant Governor

**Edward A. Flynn**
Secretary

February 9, 2005

Herbert Stuart Cohen, Esq.
500 Commercial Street
Suite 4R
Boston, MA 02109

**RE: Mass Tort Claim**

Dear Attorney Cohen:

You have made a claim alleging that your client, Barry M. Cohen, was falsely arrested by
the Newton Police Department and maliciously prosecuted by the City of Newton.
Pursuant to M.G.L. c. 258, § 4, presentment of a claim against a public agency must be
made to "... the executive officer of such agency." This office has determined that the
Executive Office of Public Safety does not have jurisdiction over the Newton Police
Department or the City of Newton. You may wish to make your presentment to the
Newton Police Department and the City of Newton.

On behalf of the Secretary of Public Safety the above referenced claim is denied.

Sincerely,

Anne Marie Ferreira

Anne Marie Ferreira
Assistant General Counsel

♲ PRINTED ON RECYCLED PAPER



# The Commonwealth of Massachusetts
# Executive Office of Public Safety

One Ashburton Place
Boston, Massachusetts 02108
Tel: (617) 727-7775
TTY Tel: (617) 727-6618
Fax: (617) 727-4764
www.mass.gov/eops

**Mitt Romney**
Governor

**Kerry Healey**
Lieutenant Governor

**Edward A. Flynn**
Secretary

February 24, 2005

Christopher W. McHallam
Law Office of Herbert Stuart Cohen
500 Commercial Street, Suite 4R
Boston, MA 02109

**RE: Claim of Barry M. Cohen**

Dear Attorney McHallam:

I am writing in response to your February 16, 2005 letter regarding the claim of Barry M. Cohen. As stated in my February 9, 2005 letter, the Executive Office of Public Safety does not have jurisdiction over the Newton Police Department. As such, the Executive Office of Public Safety is not the 'executive officer', as required by G.L. c. 258, § 4, of the Newton Police Department and therefore, denies your claim. The executive officer for the Newton Police Department is the City of Newton.

You also wrote asking for status of an investigation conducted by the Middlesex County District Attorney's Office with respect to your client's claims. The Executive Office of Public Safety does not oversee the Middlesex District Attorney's Office. You should make your inquiry to the Middlesex District Attorney's Office.

I hope that this information adequately addresses your concerns.

Sincerely,

Anne Marie Ferreira
Assistant General Counsel

# Teacher indicted on rape charges

By Andrew Lightman
STAFF WRITER

A grand jury has indicted a New school driver's education charges he raped and sexually a 16-year-old student.

Norman Swerling, 56, 18 Maugut f Wellesley, allegedly raped and "inappropriately" touched the girl during her driver's education instruction, said Seth Horowitz, spokesman for Middlesex District Attorney Martha Coakley.

Swerling is a teacher at both Newton North and Newton South high schools. It is not known which school the alleged victim attends.

Swerling was not arrested, but re ragned in Middlesex District Court 22. At that time, Swerling will be ch one count of rape, five counts of sex assault and battery and two counts of battery. The charges stem from thre incidents, one in December 2003 a January, Horowitz said.

Horowitz said the Middlesex dist ney's office has been investigating since it was first reported. Newtor

---

# Crime down, arrests skyrocket

By Andrew Lightman
STAFF WRITER



STAFF PHOTO BY JIM WALKER

**Chief Jose Cordero cites recent statistics that show crime is at a 30-year low in the city.**

ARRESTS BY NEWTON POLICE

Source: Newton Police Department

After two years on the job, Police Chief Jose Cordero's get-tough approach to fighting crime is yielding some telling statistics.

For starters, serious crimes reported in the city are down. At the same time, Newton's finest are making many more arrests.

Newton is enjoying a 30-year low in seven of the most serious crimes categories — including murder, rape and robberies — over the past two years, newly released figures show.

The same report suggests that while police made just 206 arrests in 2001 — the year before Cordero's arrival — there were 712 arrests last year. That's a 245 percent increase.

Cordero said the increase in arrests is due to a change in philosophy under his leadership. Since he began as chief in February 2002, Cordero has enforced mandatory arrests on domestic assault suspects as well as those accused of attacking others with dangerous weapons.

"I couldn't have painted a better picture of what the end results would be," he said.

Cordero's supporters, including Mayor David Cohen, say the crime drop is proof of the great job the chief is doing. But one academic warns that targeting specific groups with aggressive arresting tactics can be damaging as well.

Jack McDevitt, an associate dean at the College of Criminal Justice at Northeastern University, said cities and towns with community policing programs, like Newton, rely on help from residents to identify problem areas.

"But," in other communities, we've seen that policing that is too aggressive can damage trust," said McDevitt, adding that in turn, hurts policing efforts in the long run.

"When arrests are targeted to a specific target area, it can have a big effect on crime in that area," he said.

"But just increasing the amount of arrests can backfire, when people get annoyed."

However, McDevitt said targeting certain types of crime, such as domestic violence, can have a positive effect in a community such as Newton.

"Arrests are a deterrent in communities where public image is important," he said.

Cordero, who came to Newton from the New York City Police Department, where he was an inspector in the borough of Queens, cites the low crime rate as proof that his way is working. According to statistics compiled by his office, the city's total index crime rate — **CRIME, page 15**

# Get-tough policy gets results

CRIME, from page 1

which measures murder, rape, robbery, burglary, car theft, larceny and assault — has fallen by 10.8 percent in the last two years, despite a slight 6 percent rise in 2003 over 2002.

Those numbers mean, for the second consecutive year, Newton's reported incidents of the seven index crimes have dipped below 1,000. Part of the reason for that, he says, is his crackdown against domestic violence and traffic offenders.

And it's that crackdown, as well as a stronger push to nab suspects wanted on warrants, that account for the staggering rise in arrests, from 206 in 2001 to 712 last year.

When he came to Newton, Cordero said officers weren't always arresting known suspects in domestic violence cases. He began asking his officers why those suspects weren't getting locked up, and since then, felony assault arrests have risen by 81 percent.

"We have become sensitized to that over the years," said Cordero. "If you are going to assault your spouse or your kids, we're going to intervene in a significant way."

When asked about accusations that Newton police officers are targeting teenagers, Cordero said the number of youth arrests has not changed in the last four years.

Cordero also called the criticism "a poor reflection on the officers who make the arrests and make the determination to make the arrest," and noted that "in certain cases, an arrest is statutory."

With improved youth outreach and risk-behavior intervention, Cordero said he hopes the number of arrests will decline.

Meanwhile, Cordero said his department's stepped-up efforts netted 152 warrant arrests last year, which accounted for 21.3 percent of the department's total.

And with an increased presence in high-traffic areas, Cordero said his officers successfully removed 173 intoxicated or unlicensed drivers from Newton's streets.

That increased presence, said

> "It's not a matter of tipping your cap and saying 'Nice to see you Mrs. Jones,' because if her problems don't go away, then she is going to be less inclined to speak to you."
>
> Chief Jose Cordero

Cordero, has also led to 195 fewer traffic accidents in 2003, a 15.3 percent drop.

"That's 195 fewer opportunities for injury or property damage," he said. "Has the traffic volume reduced? I don't think so."

Overall, Cordero said the increased number of arrests brings Newton in line with communities such as Brookline, which historically has had higher arrest rates.

"We've come to par with agencies that are not only our size, but in general have similar crime problems," he said.

Cordero attributed a 9 percent rise in larcenies last year to a rash of car break-ins, which the chief dubbed "crimes of stealth," because they happen late at night, and can occur almost anywhere in the city.

"Newton is easy pickings," he said. "All you need to do is work your way around the police officers."

But while Cordero insists those numbers cannot be argued with, Newton Police Patrolman's Union President Jay Babcock said the chief may be exaggerating his role in reducing crime.

Babcock said the chief credits himself without accounting for other factors when he cites the drop in traffic accidents. This year's mild winter and fewer road construction projects on Newton's streets also have a big impact in traffic safety, Babcock said.

"If you think outside the box, there are more factors," he said.

Babcock also said the chief's numbers sugarcoat the low morale and dissention among the rank and file. Cordero's management style is different

than what people are used to in Newton, Babcock added.

"Before the policy was 'you work it out.'" said Babcock. "Now it appears there's ... a nononsense approach."

"We've had no murders," he added. "It wasn't because of his policy. It's because we had no murderers."

Cordero has been criticized for the way he treats his officers, from the suit he wears to work each day, rather than a police uniform, to the "ice-cream" window that officers now are greeted with when they go to see the chief.

Cordero said the window was installed to curb constant distractions his administrators are faced with each day. Likewise, Cordero stands by his policy changes and his data.

"Despite fabrications and misrepresentations, our department is not in a state of disrepair," he said. "A department in disrepair does not have this high level of success."

Unlike in the past, patrols now visit frequent-accident intersections and in neighborhoods where residents call and complain about traffic safety, said Cordero.

"We have a system in place when we don't respond just once," said Cordero. "We stay there until problems are reduced or turned around."

"I've got to tell you, I'm goal-oriented because people expect you make results," he added. "It's not a matter of tipping your cap and saying 'Nice to see you Mrs. Jones,' because if her problems don't go away, then she is going to be less inclined to speak to you."

*Andrew Lightman can be reached at andrew.lightman@cnc.com*



Visit us at www.co

Bellingham
508 966-2200

Burlington
781 270-5333

Braintree
781 356-2220

Cambridge
Memorial Drive
617 492-0733
Porter Square
617 661-8661

Brookline
617 469-5400

# Changes in the police department make Newton safer

Newton is a safe place to live and work. Your Police Department is an organization with great professional pride, respect for the rights of all and dedication to meeting the concerns of the people it is sworn to serve. I say this to allay the undue concerns caused by the opinion letter written by Officer John M. Daly and published in the Oct. 1 edition of the Newton TAB. I also want to reassure Newton citizens

## GUEST COMMENTARY

### JOSE CORDERO

that the comments it contained are inaccurate and not reflective of the high level of public safety in our city or the attitude and policies of the police department towards the people it is meant to protect.

I'm afraid that Officer Daly's article mistakenly implies that the citizens of Newton are somehow less safe as a result of the policies that I have implemented since taking over the Newton Police Department. Nothing could be further from the truth. Newton citizens are safer now more than they have ever been. Officer Daly and a few others mistakenly complain about the statistics the department has so painstakingly compiled. Apparently they feel the police can either be about statistics or people but not both. Yes, we now use statistics and numbers, but we use them to better serve and protect you.

Allow me to briefly inform you how and why we use them. The Newton Police Department has always served Newton citizens well, especially as it related to their handling of individual incidents. However, the department lacked an effective system for gauging what was going on in the community and how well ¬lice department responded to ¬tizen complaints. As a re- ¬nalyze problems, de- ¬lutions and al- ¬iveness of ¬city's

crime and complaint statistics only at the end of the year as was done in the past, we now collect and analyze them daily. We want to know what problems are developing, and whether ongoing problems are improving so that we can address them.

In the past, our cruisers were primarily on random patrols. When citizens complained about crimes or other issues, we would dispatch them to the location for a short period of time. We made casual observations and tried to ensure that the complaining citizen observed the cruiser in the area to allay their fears. We have replaced these random patrols with more targeted directed patrols, placing officers at the locations that our carefully gathered information tells us they are most needed to protect you. And they stay there for as long as they are needed to prevent the incidents, which you and others have reported.

The result: Last year, when we first introduced these methods, Newton Police officers netted a 16 percent overall crime reduction for the year. Not only was this the largest crime reduction recorded by any police department in our region, but our city's crime rate was reduced to levels not seen in over 30 years. While this year has brought many crime-related challenges to the city at a time when we are comparing our performance to a 30-year low, our crime rate is still 13 percent below the 2001 level.

Officer Daly mistakenly points to a number of overnight car breaks involving unlocked vehicles that have occurred throughout the city as evidence that the new system of night patrols didn't work. In fact, our response shows it is working very well. Under the old way, which Officer Daly apparently favors, we would have had just six cars patrolling the entire city randomly without a plan. Under the new system, we were able to bring in extra personnel and through careful planning precisely deploy these additional officers to exact locations where we anticipated, based on our analysis of data

involving one of several car breaks patterns that car breaks were likely to occur. The result: Car breaks did occur at those locations and we were able to effect an arrest.

Is this luck? No, this is policing in the 21st century, a strategy that uses crime data and statistics to increase policing effectiveness and enhance your safety. At my weekly staff meetings, I encourage supervisors to query our rank-and-file members for suggestions. Regrettably, I haven't heard any from Officer Daly. If he or any other person who is truly concerned about the issues reported in this letter, the best way to air them is to bring the matters to my attention or to another supervisor's attention.

Officer Daly also mistakenly insinuates that people in the city have to worry about being stopped and becoming a name in our database of possible suspects. Nothing could be further from the truth. A training bulletin was distributed to Officer Daly and the rest of the department in July of this year regarding the proper procedures for conducting field interviews, interrogations and observations. It stresses the importance and absolute necessity of guaranteeing the protection of the precious civil liberties of all individuals. It is disturbing and inaccurate for Officer Daly to suggest that officers of our department don't know the difference between a resident of a neighborhood out for a walk with his/her dog at midnight and a person possibly engaged in criminal conduct. We do interact with the public in the middle of the night to serve them usually by informing them of what is going on in their neighborhoods and to ask for their cooperation. That is called a field interaction, not an interrogation. Such contacts or the identities of persons we interact with have never been entered into any database as the officer claims. Most people who we speak to in this manner feel the police are being helpful and they are reassured to know the police are out there. If there is a field interro-

gation, information is only entered into our database after three separate layers of review by competent supervisors and command staff personnel.

Officer Daly is similarly wrong in saying he was under orders to interrogate and fingerprint homeless people. He may be referring, in a misleading fashion, to one of the following incidents: In one instance, our detective work had shown that a certain individual, suspected of breaking into cars, was trespassing on city property. Officers were encouraged to lawfully arrest this person if found in violation of the law. This person happened to be homeless, but it was his suspected criminal conduct and not his homeless condition that was of concern to the police. In another instance, a homeless person who was trespassing on private property agreed to be photographed and fingerprinted. While well intentioned, this set of circumstances, in it of itself, was deemed insufficient for entry into our system and fingerprints were never processed.

Officer Daly says that officers were ordered to issue citations at directed patrols throughout the city. This is also inaccurate. As a result of careful analysis of intraffic accidents throughout the city we have identified locations, which had a high rate of accidents. In the interest of public safety, I felt a duty to do all we can to reduce traffic accidents and the potential for injuries. Much to my dismay, I learned that our officers were issuing warnings at the alarming rate of 10-to-1 over citations at a time when our accident rate continued to soar. I ordered that officers issue citations while assigned to directed patrols at these "high accident locations." The order applied to "high accident locations" solely. Using this approach we succeeded last year and again this year in reducing accidents.

So far this year, we are enjoying a 15 percent reduction in accidents. That is, we have had 137 fewer accidents. The anecdotes in which Officer Daly asserts it took 15 minutes to respond to calls on

several occasions troubles me. W don't know the facts of the particular dent(s). I can reassure you that r sponse times remain around 5-6 m In fact, I am about to introduce tec gy that will improve those respons even more. Officer Daly goes on t that a computer realigned out boundaries. This statement no dou intended to reinforce his claim t have become mechanical or statist bots. The fact is that sector bou were realigned after an exhaustive spearheaded by a very capable lieutenant of this department. As of this realignment we have now maintained good response times, b have more patrol officers working streets of Newton than in the 1 years. For example, from July to of this year, we fielded 165 more officer-days than last year at no ad al cost to taxpayers.

Finally, I would like to addr issue of my allegedly being pull for "speeding" in the spring of 20 simply not true. And as the TAB out in its editorial, the charge is year and a half after its supposed rence at a time of growing city-uni sions.

In conclusion, let me assure y the members of my department t intentions are sincere and heartfel ize than many of the innovation have instituted in the Police Dep have been challenging. I am pr how well the vast majority of our have met that challenge. Our acco ments in the last 17 months are reflection of their professionalis dedication to serving the citizens ton. We will continue moving f with the business of enhancing th of the citizens in our community proving officer safety. I pledg commitment in February of 2002 took the oath of office and I agai that commitment to you today.

*Jose Cordero is the chief of the Police.*

Chief: 'target of a union smear campaign'                                Page 1 of 4

Boston Herald    Daily News Tribune    MetroWest Daily News    Milford Daily News    Daily News Transcript    Town Online    The I



NEWTON TAB
...on TOWNONLINE.com

Town Online Home
TOL Sports
TOL Entertainment

News & Opinion
  Local News
  Opinion
  Obituaries
  Police / Fire Log
  Sports
  Arts & Lifestyle
  Town Resources


TOWN SEARCH
Select a town

Classifieds
  carfind.com
  homefind.com
  jobfind.com
  merchandise
  services
  personals
  Place an Ad

Features
  Photo Reprints new
  Parents & Kids
  Shop TownOnline
  Tunes a Brewing
  weather
  horoscope
  crossword
  lottery results

## LOCAL NEWS

## Chief: 'target of a union smear campaign'

**By Andrew Lightman / Staff Writer**
Tuesday, October 14, 2003

In his second-floor office at the Newton Police Headquarters, overlooking a row of stores and restaurants on Washington Street, Police Chief Jose Cordero sits in civilian clothes. Out on the street, it would be hard to peg him as a law man, save for the shiny Newton police badge he wears at his hip.

And Cordero knows there are a some who wish he didn't have that anymore.

Two weeks ago, three Newton police officers claimed in a TAB article that Cordero was pulled over for speeding on Commonwealth Avenue in the spring of 2002, but wasn't given a ticket - an allegation that ruffled many feathers considering the chief's orders to crack down on traffic violators.

"I almost fell off my chair when I heard that one," said Cordero. "The intent clearly was to bring up my motivation and my integrity."

"It takes a moment to create a lie," he added. "It takes months and years to create something positive."

A column by Newton Police officer John Daly also printed in the TAB two weeks ago additionally alleged that Cordero re-instituted a ticketing quota for officers on directed patrols, in spite of a court decision striking that order down. Jay Babcock, head of the Newton Police Association, a union, confirmed Daly's assertion. Daly also criticized Cordero's system of patrol divisions and aggressive use of field interrogations.

After declining to be quoted at the time, in an interview last week, Cordero said he's being targeted by a union-led smear campaign designed to distort his policy and accomplishments in order to gain leverage at the negotiating table.

"These are all hot-button issues in this city and in any other city," he said. "Their hope is at the end of the day [they can say] 'We have 30 grievances against the chief. This chief is inflexible, he's an outsider, he's not concerned with public safety.' But all of a sudden, if there's a good wage package...."

Babcock denied those claims, saying collective bargaining has nothing to do with what has been reported in the media.

### LOCAL REGIONAL

-- RELATED ARTICLES --

Condo owners say they're getting soaked

South-side views from Ward 8 Aldermen at-large candidates

Sparks fly from Ward 5 Alderman candidates

Zaleznik, Bardin in School Committee race

-- RELATED SITES --

Find a Job in NEWTON

Find a Home in NEWTON

Find a Apartment in NEWTON

Yard Sales around NEWTON

MCAS Rankings for NEWTON

Boston Homes: The Complete Guide

BostonHerald.com Local & Regional News

-- HERALD INTERACTIVE TOOLS --

Email this Article to a Friend

Email the Online Staff

Email the Newspaper

Printer Friendly Version

Subscribe to the Newton TAB



Do you h
child w
Crohn's Di
or
Ulcerat
Coliti

Come to
CROHN
&
COLIT
PEDIAT
SYMPOS
on Octobe



For More
CLICK H
or cal
800.314.
x13
by Oct 2

"We've never attacked the chief in the media," said Babcock. "The only time we talked about the chief with the media is when the media called us."

Babcock said Daly, a Newton resident and member of the patrolman's union, was acting on his own when he wrote the TAB column, not as a representative of the union.

"John Daly is not a union leader. He is a union member," he said. "We didn't bring up negotiation, we don't know anything about [the column]."

"We've never called the chief a bad person, a bad leader," he added.

But Cordero expects the smear to get uglier. The police union has hired a public relations consultant, Kendall & Company, and Cordero expects what he sees as personal attacks on him to escalate.

"They don't hire a PR firm to get out the word that they care about public safety and better wage packages," he said.

Babcock said the union simply hired the PR company to help match the chief's media savvy.

"We don't have the experience dealing with the media the way the chief does coming from New York City," he said. "We want to be sure our message is being forwarded accurately."

As for the genesis of the recent attacks, Cordero cited resistance to the changes he has asked his officers to make.

"Much to the credit of the vast majority of the department, they have [changed]," he said. "They may not like it, but they have done it." But pockets of officers remain, he said, who have tried to paint him as ineffective and overly aggressive in hopes of returning to what he calls the "old way of doing things."

"To me, clearly the intent there is to gain leverage in labor negotiations," the chief said. "Folks believe I am something to be used to gain leverage. These are common tactics."

"I will not allow the union to hold hostage public safety issues for their gains. Not everything has a price tag," he added.

Cordero said the union brings up issues like traffic tickets, and overly aggressive nighttime interrogations, because residents are sensitive to them. But the criticism misrepresents the facts, he said.

"In terms of public safety, our record is clear."

**Traffic measures**

Before he implemented his changes shortly after taking over as police chief in February 2002, Cordero said Newton Police had no way of tracking the number or location of traffic accidents.

"When I came into the city, I was bombarded with traffic complaints," said Cordero. Newton had no systematic way to respond, he said.

He also knew that 90 percent of the time, officers handed out warnings to drivers caught violating traffic laws.

"No matter what you did, the worst you could hope for was a five- to 10-minute lecture," he said. "How long, how many years do you have to educate people not to commit violations?"

So Cordero said he ordered his patrol officers to spend 30 minutes of each eight-hour shift patrolling the highest frequency accident areas in Newton, issuing tickets for any observed violations. That order, which was struck down in court in June, reduced traffic accidents by 15 percent in the last nine months, he said.

But while Cordero was criticized for his approach by the union and the court, he said he gets the opposite feedback from residents.

"By and large, people ask me 'When is it coming to my neighborhood?'" he said.

### Nighttime patrols

Before he took over, Cordero says, officers would drive around neighborhoods at night and patrol the streets without ever exiting their cars.

"How can an officer see broken glass on the ground from a car window at 20 miles per hour?" he said.

Cordero said instead of tying cars to areas, waiting for crimes that likely won't happen, he has officers out patrolling areas statistically proven to be high risk. The officers are encouraged to walk the streets, engage the public and look for signs of suspicion.

"Last week, three times we put our officers right where the incidents were happening," he said. "The week before, we did it two times."

Before he took over, Cordero said officers accepted that car break-ins would happen, instead of attempting to stop them.

"It's a big deal all of a sudden because we've had 156 car breaks in the is city and we have 156 upset residents, and we're going to have 156 more if we don't do anything," said Cordero. "If that means we are going to be inconvenienced, then let's be inconvenienced because that's what we're paid for."

"You can't attack the results. You attack the process," said Cordero. "I think I have a record that can show that I am working as hard as I can to improve public safety."

But even with the skepticism he has faced, Cordero said he is still happy he chose to work in Newton.

"I had options. This wasn't the only place I could have gone," he said. "Despite what has gone on and what appears to be going on ... I know why I love doing this."

"I want to stay on as long as they'll have me."

Cordero also vowed that he won't back down under the pressure of the union attacks.

"At the end of the day, I'm not going to be swayed. I'm not going to be intimidated into leaving this position. I'm not going to stop working hard for these cops."

*Andrew Lightman can be reached at andrew.lightman@cnc.com*

a d v e r t i s e m e n t



[ contact us ] :: [ print advertising ] :: [ online advertising ]   :: Click here for home delivery or call 1.800.882.1211

http://www.townonline.com/newton/news/local_regional/new_covnecorderogrdsms10142003.htm     10/16/2003

· Jose M. Cordero
Chief of Police
1321 Washington Street
West Newton, MA 02465
Newton Police Department home page

PRESS RELEASE REFER ALL INQUIRIES
TO                          -
Sgt. Ken Dangelo, Public Information Officer
(617) 796-2103 FAX (617) 796-3687

NUMBER: 03-0918

DATE: September 18, 2003

### MOTOR VEHICLE BREAK-INS

Newton Police Chief Jose M. Cordero is reminding
residents that we have had a number of motor vehicle
break-ins throughout the city, and is again asking for
their help in trying to prevent them from occurring.

In the last few months, residents have reported a
number of motor vehicle break-ins, and in most of the
incidents, the vehicles were parked in the driveway,
with the doors unlocked and valuables left inside.
Vehicles parked in the driveway appear to be most
vulnerable because it provides the suspect with some
concealment. Leaving a vehicle unlocked with
valuables inside, especially in plain view, is inviting
someone to break-in and steal them. By following a
few crime prevention tips, residents can greatly reduce
their chances of becoming a victim.

- Always lock your vehicle, especially at night.
- Remove all valuables from your vehicle.
- Ensure that you have good lighting around your property,
  motion lights work especially well. Light is one of the main
  deterrents to crime.
- Call police immediatley if you hear or see anything that may
  be suspicious. If you see someone on your property, do not
  yell or chase the person away, call 911.
- If you discover that your vehicle has been broken into, do
  not touch or disturb anything until police have had an
  opportunity to process it.

Contact the Newton Police Detective Bureau at 617-

796-2104 if you have any information about these
crimes. Newton Police Chief Jose M. Cordero thanks
all residents for their cooperation.

October 1, 2003    **Newton TAB**, page 19

ECTIVE

# The chief's 'heavy-handed' tactics threaten public safety

## GUEST COMMENTARY

JOHN M. DALY

I have been a lifelong Newton resident, and I am an 11-year veteran of the Newton Police Department. I am writing this letter to warn the public and dispute the mayor's claim that the police chief is making great strides with the department. Morale is the lowest I have ever seen it. Considering the fact that the city recently settled the "dog walker" case for $80,000, this particularly alarms me. I wish to alert the public of my concern as a police officer about our over-aggressive police policy based upon computer-based policing.

We are all about the numbers. Tickets, field interrogations, directed patrols, all numbers and statistics. Those statistics are the citizens I have sworn to protect. Take, for example, the irate mother who called the station to complain her son was stopped and questioned by the police. A field interrogation was conducted on him. His name has been entered into a police database, where he may come up as a possible suspect someday. Why? Just because he was walking home. He is not alone. He is just another statistic. Someday that could be you or your child. Some officers are given orders to field interrogate anything that moves. Officers are field-interrogating people walking their dogs. I have had orders to look for any homeless people, then field-interrogate them, then fingerprint and photograph them. Why? Because they might be involved in a crime. What's another $80,000?

that a Superior Court judge has already ruled unlawful. We are ordered to write citations at directed patrols all over the city. No officer is refusing to write anyone a ticket who deserves it. Our families live here, their safety and your safety are why we are here. The issue is the statistics.

We are ordered to maintain a 33 percent quota on these directed patrols. It doesn't matter how many tickets or reckless drivers we stop, only stats

> ← **No offic refusing anyone a that deserves it. Our families live here, their safety and your safety are why we are here**

these unlawful  pa-
trols. I recently the
"hit list" (discipl  my
percentage was  ent.
But what the hit list failed to look at was other citations I had wrote not on a directed traffic patrol. The biggest issue is that we are required to only write money fines at these locations. It may be a seatbelt or an inspection sticker, it doesn't matter as long as it is a money ticket for our stats. It's not important to stop aggressive driving, or accident causing infractions, just money fines. Some people feel the new policy is about the money. Court personnel have told me nearly 70 percent of these tickets are dismissed at Newton District Court. But what both the

one of these directed patrols for speeding. We normally would give a verbal or written warning in such cases. Chief Cordero wasn't given a citation. But yet he orders us to give you one.

When we give out these heavy-handed money fines for a minor motor vehicle infraction, the citizen will often complain and ask why. We explain the chief has designated the intersection a directed patrol and we have no discretion. If they complain to the department or City Hall about the new policy, we are warned by internal affairs not to advise the public it is the chief's policy.

Another concern is that a computer has redesigned the way the city is patrolled. Put your scanner on. Count how many times officers from Newton Corner are dispatched to the Route 9 area and vice versa. It has taken me 15 minutes to get to a call on several occasions. The patrol divisions are huge, compared to the way they used to be. I feel this is contributing to the recent crime spree of car breaks.

The heavy-handed tactics and lack of common sense are a dangerous combination considering the fact the city is willing to hand out $80,000 at any given moment. Call the mayor's office at 617-796-1100; tell him you are concerned about the morale of the department, the safety of its officers and our citizens. Tell the mayor you don't agree with the heavy-handed tactics.

*John M. Daly is a Newton police officer.*

*Editor's note: Chief Jose Cordero, through a spokesman, denies the writer's statement that he was ever pulled over by Newton Police*

'Major-league problem' with city's 911 dispatchers

# NEWTON TAB

Community Newspaper Company ■ www.newtontab.com    WEDNESDAY, JUNE 30, 2004    Vol. 27, No. 12 ■ 58 Pages

# Police chief abruptly quit

**By Andrew Lightman**
STAFF WRITER

Police Chief Jose M. Cordero ended his troubled tenure in Newton yesterday, halting the former New York cop's 28-month stint in the Garden City.

Cordero's abrupt decision to quit drew mournful sighs from City Hall and cheers within police headquarters, where many of his officers resented Cordero's numbers-driven approach to policing and his inability to relate to the rank-and-file.

Superintendent Robert MacDonald will become Newton acting police chief until a

**The TAB's View**
page 16

Perhaps learning from his controversial decision to hire Cordero, a 20-year New York police veteran, Mayor David Cohen said he expects to hire the next chief from within the current ranks.

The chief, meanwhile, departs without an-

> **"All my men are
> somewhat jubilant."**
>
> Jay Babcock, president
> of the Newton Police Association

other job lined up, although he claimed he has

Cordero came to Newton in February 2002, after serving as an inspector for the NYPD in Queens. Known for reducing robberies, burglaries, homicides and shootings, and for arresting hundreds of gang members, Cordero's critics questioned whether he was the right fit to run a suburban police department.

Now, after just 28 months on the job, Cordero will officially step down sometime next week.

But the length of his tenure, Cordero said, is irrelevant.

"The police department has not only met, but exceeded every goal we set when I was hired," Cordero said. "My job here is largely

# TOOTH WHITENING

*Summer*
*Special*

$ **450<sup></sup>**

(Regularly $600)

*Offer expires July 31, 2004.
Payment due in full at the time of service.

**Dental Group**

Suite 201 • Newton Corner

332-3100

## al DIRECTORY

### COUNSELING

**Learn skills to decrease stress in your life, whether due to,**

• *work*
• *anxiety*
• *depression*
• *personal relationships*
• *chronic illness*

Evening hours available

**Ellen Shawsby, Ph.D.**
Licensed clinical psychologist
Instructor in Medicine Harvard Medical School
Newton (617) 630-1918

### EDUCATION

Music Teachers Collaborative



**Police Chief Cordero announces his resignation at a press conference Tuesday morning as Mayor Cohen and the new interim chief, Superintendent Robert MacDonald listen.**

STAFF PHOTO BY KATE FLOCK

**CHIEF,** *from page 1*

it took five years. I would have stayed five years. If it took 10 years, I would have stayed 10 years."

By resigning, Cordero opted out of the remaining two-and-a-half years on his five-year contract. Cordero also forfeited his sick leave because he failed to give 120 days notice, the mayor said, but he will be paid for his remaining vacation.

During some tough budget years, Cordero said he was able to upgrade the department's technology and put more officers on the street. The crime rate has dropped, he said, and there are fewer traffic accidents than before.

"In terms of real results, accidents, injuries, I think our results are immeasurable," Cordero said.

Cordero said he also had to deal a number of vocal critics, including the media.

"It's probably a good move for him and it's probably a good

Noting the low police department morale, Lennon said he hopes the next chief will work to lessen tension in the ranks.

"We've got to get back to business," Lennon said, "where guys want to come to work and serve the citizens of Newton."

Rank-and-file officers, meanwhile, were said to be elated to hear that their chief is leaving.

"All my men are somewhat jubilant," said Jay Babcock, president of the Newton Police Association. "Today is the first day I've seen people smile so much."

Babcock said his union gave the chief a three-month grace period when he was first hired. And since, he and the other officers have suffered through two years of labor, equipment and morale problems, Babcock said.

"What he's accomplished, I don't know. But personally, the union thinks he's mismanaged," Babcock said. "He's come in

gratitude to this chief, who has served this city well," said Cohen. "In short, the city of Newton is a safer place due to the outstanding job done by Chief Jose Cordero.

"I think it's a real loss for the city," Samuelson said. "He did a lot with a little."

Samuelson worked with Cordero as chairwoman of the public safety and transportation committee of the Board of Aldermen, and saw firsthand the impact he had on managing traffic problems, she said.

"It was the first time that neighborhoods came in with complaints and we got results," Samuelson said. "Neighborhoods were feeling that they were getting responsiveness from the police department."

Samuelson, who helped select Cordero over a group of internal candidates for the chief's position nearly, said hindsight has only strengthened her belief



**OUR HOME**
for summer and fall
377-6874 or visit
herscollaborative.com

Scott Lennon, one of Cordero's acknowledged opponents. "There have been too many inquiries and too many questions over the two-and-a-half years."



the most diverse selections of rugs and ug in our multitude of collections is a nce, created from a wealth of inspiration

by constantly mixing in new colors and ate his distinctive textures and moods. the familiar, although often in a dream-nd elegant, spare and confident. Because rtable, never contrived or overly formal.

e Earth

Pictured - Lagoon Twilight

From the beginning, Marc Gromada, president of the Newton Police Superior Officers Union, who applied for the chief's job back in 2001, said Cordero was a bad fit.

"He came from a department where there was a lot of crime," said Gromada. "We don't have that kind of crime here."

Though Cohen and Cordero say the chief made the decision to leave, Gromada believes Cordero's exit was not voluntary.

"He definitely got fired," Gromada said. "Read between the lines. He got fired today, it's pretty obvious. He doesn't have a job. Why would he get up and leave?"

But Cohen and Alderman Christine Samuelson, two of Cordero's most ardent defenders, say they are disappointed to see the chief go.

"My main feeling is one of

"I think we could have chosen one of the in-house captains and one group might have supported him and another group wouldn't have," Samuelson said. "I don't know how to address 'fit,' but it seemed to me that he was head and shoulders above the rest."

Cordero, meanwhile, praised his command staff and the rank-and-file officers who patrol the city's streets as he said goodbye.

"It's not what I have been able to accomplish," Cordero said. "It's what the department has been able to accomplish."

"To the citizens, I'd like to thank them for allowing me to serve as their police chief," he added. "I hope that at the end of the day they feel the city is a lot safer and the police department is working a lot harder than it was before."

*Andrew Lightman can be reached at andrew.lightman@cnc.com.*

# Morning-after pill to be offered to rape victims

**By Cyndi Roy**
STATE HOUSE NEWS SERVICE

Rape victims who seek immediate help at hospitals across the state would be guaranteed access to emergency contraceptives under a bill approved by the Senate last week on a voice vote without debate.

Hospitals operated by the Catholic Church oppose the measure, saying it is not the Legislature's responsibility to mandate health care at their institutions.

"This is a religious freedom issue," said Maria Parker, associate director for public policy at the Massachusetts Catholic Conference. "We have a right as a

into the womb. Sen. Linda Melconian, D-Springfield, sponsored the bill, calling it a "necessary step in providing comprehensive contraceptive treatment for women in the Commonwealth."

"If one woman is denied access to EC after surviving the horrific effects of rape, we have failed to protect our citizens," she said in a statement. "We must provide women with reliable and time-sensitive access to contraceptive methods in emergency situations."

A study conducted last year by the pro-choice group, NARAL, found that one in five hospitals in Massachusetts do not provide emergency contraceptives to rape

www.newtontab.com

# Chief Cordero's tenure in Newton

**Jan. 23, 2002:** Mayor David Cohen announces Jose Cordero is his choice to become Newton's Chief of Police, replacing former Chief Frank Gorgone.

**Feb. 19, 2002:** Cordero is sworn in as Chief of Police in Newton.

**May 2002:** Cordero orders his patrol officers to ticket any traffic offenders at Newton's 20 most dangerous intersections. The officers were told to write up a violation or give the chief a detailed explanation from the officer why he or she declined.

**August 2002:** To "energize" the department, Cordero deploys the first of Newton's black painted police cruisers, saying it will be good for morale.

**January 2003:** Police Officer and Nonantum resident James Caira alleges that Cordero violated state and federal disability laws by trying to make him retire early. Caira had been working in a full-time duty in a desk position and suffering a stroke in April 1999. He had been a patrol officer for 16 years when he fell ill. The city eventually settled the case.

**April 2003:** Cordero modifies the hours and coverage areas for patrol officers, assigning those officers to directed patrols — canvassing sections of the city where crime has been reported recently to prevent it from continuing — than ever before.

**May 2003:** Two Newton Police officers reportedly interrogate a teenage Newton resident for more than 30 minutes after they find him sitting outside on his front steps late one night drinking tea.

**July 1, 2003:** To reduce overtime costs, and put more uniformed cops out on the street, Cordero hires civilians to staff certain desk jobs in police headquarters.

**July 2003:** A Superior Court justice strikes down Cordero's mandatory ticketing policy for violating officer discretion.

**September 2003:** The Newton Police Superior Officers Association writes a letter to Mayor David Cohen criticizing him for

center in the Newton Community Service Center to discuss their concerns about changes within the police department community policing and its negative impact on Newton's youth.

**May 1, 2004:** Cordero cancels the on-site assessment of his department by accreditation agency CALEA, casting doubt on the status of Newton's accreditation. Newton was the first city in Massachusetts to have its police force accredited by the agency.

**May 10, 2004:** Cordero and Superintendent of Schools Jeffrey Young sign a new memorandum of understanding, outlining how police will conduct law enforcement activities in school and in school-sponsored activities.

**May 27, 2004:** After Officer John Daly said he fears Cordero will fire him for writing his October 2003 newspaper column, Cordero promises that Daly will not be fired.

**June 8, 2004:** The city petitions the court to reinstate Cordero's May 2002 tickets-only order for Newton's most dangerous traffic areas.

**June 29, 2004:** Cordero resigns as police chief. He says he does not yet have another job.



## SONIA PAINE ANTIQUES

### CELEBRATING OUR 35TH YEAR IN BUSINESS

373 Boylston Street
(Rte. 9), Newton
Open Monday Thru
Saturday 10-4

**(617) 566-9669**



**Oct. 1, 2003**: Officer John Daly writes a guest column in the Newton TAB alleging, among other things, that Cordero was pulled over for speeding in spring 2002. Daly later becomes the subject of an internal affairs investigation.

**Oct. 15, 2003**: Cordero announces that he is the target of a union smear campaign designed to distort his policy and accomplishments in order to gain leverage at the negotiating table.

**March 17, 2004**: Cordero boasts a 10.8 percent drop in crime during his tenure as chief. He also cites a 245 percent increase in arrests in 2003.

**March 19, 2004**: State Rep. Peter Koutoujian submits a letter to the TAB, accusing Cordero of taking "credit for enforcing the arrest of individuals accused of domestic assault." Koutoujian also wrote that Cordero's "other claims of reduced crime have more to do with massaged data than actual reductions." Koutoujian later says the letter wasn't intended to be printed.

**March 23, 2004**: Students, parents and child-care professionals meet at the teen REACH

**Delivery problems?**

*Call :*

**888-343-1899**



**HERE: The best place for a baby to be.**

**HERE: A very close second.**

Nowhere is a newborn more comfortable than in its mother's arms. That's why at New we've created an equally nurturing environment for both newborns and expectant mot and Women's / Newton-Wellesley Obstetrics. This unique program — a collaborati obstetricians and nurses and Brigham and Women's obstetricians, midwives, and hig brings you a state-of-the-art, special care nursery with 12 private baby care areas; a ne facility, featuring more spacious labor and delivery rooms; and the expertise to han To learn more, or schedule a tour, call 1-617-243-6566 or visit nwh.org

**PARTNERS** HEALTHCARE    Partners HealthCare includes Brigham and Women's/Faulkner Hospitals, Massachusetts General Hospital, North Shore Medical Hospital, Spaulding Rehabilitation Hospital, and the community-based doctors and hospitals of Partners Community HealthCare, Inc



**july 4th celebration!**    no interest. no payments. no d

**All Leather Sofas. Star**

$599⁹⁹    Chocolate-29        $699⁹⁹    Creamy White-12        $699⁹⁹

$799⁹⁹    Burgundy-98        $899⁹⁹    Saddle-24

Real choices. Real

Call **1-800-JENNIFER** for locations in **Boston, Cambridge, Natick, West Roxbury, Burlington, S**

Subject to credit approval. If not paid in full by Jan. 2006, finance charges will be assessed from date of delivery at current annual interest rate of 23.99%. Fina tax & delivery charges required at time of purchase. All products may not be available/displayed in all showroom



## NEWTON POLICE DEPARTMENT
*NEWTON, MA*
# Incident Report #359046

---

Not For Public Release        Date/Time Printed: **Thu Sep 25 21:08:40 EDT 2003** By: **ddowling**

| | Date/Time |
|---|---|
| | 09/25/2003 08:45:51 |

Case Title | Location
| | **FELLSMERE RD**

Reporting Area | Sector
**134** | **B494**

Date/Time Reported | Date/Time Occurred
**09/25/2003 05:25:00** | **09/25/2003 01:20:00 to 09/25/2003 01:40:00**

Incident Type/Offense
**ATTEMPT TO COMMIT CRIME c274 S6 (274/6 )**

Reporting Officer
**MARINI, R. (13963)**

### Persons

| Role | Name | Sex | Race | Age DOB | Home Phone | Address |
|---|---|---|---|---|---|---|
| **INVOLVED PARTY** | **COHEN, BARRY** | **MALE** | **WHITE** | **41    12/01/1961** | | **87 HAMMOND ST. NEWTON, MA** |

### Offenders

| Status | Name | Sex | Race | Age | DOB | Home Phone | Address |
|---|---|---|---|---|---|---|---|

### Narrative

ON THE ABOVE DATE AND TIME I WAS RUNNING SURVEILLANCE IN A UNMARKED
BROWN VAN, THAT WAS BAITED THERE WAS A CELL PHONE AND TWO
ONE DOLLAR BILLS PLACED ON THE CONSOLE INSIDE THE VAN. WHICH WAS
PARKED ON FELLSMERE RD. NEAR WARD ST. I WAS POSITIONED THERE
BECAUSE OF THE HIGH AMOUNT OF M.V. BREAK INS, IN THE AREA. AT
ABOUT 0130 HRS. I SAW A MALE WALKING NORTHBOUND ON FELLSMERE RD.
ABOUT A HOUSE AWAY FROM WARD ST. WITH A FLASH LIGHT ON, WHICH THE
STREET HAS NUMEROUS STREET LIGHTS ON. HE WAS WALKING TOWARDS
THE UNMARKED VAN THAT I WAS SEATING IN THE REAR OF THE VAN. I
COULD SEE THE SUSPECT THROUGH THE FRONT WINDSHIELD OF THE VAN. I LOST
SIGHT OF THE SUSPECT WHEN HE WENT TO THE SIDE OF THE VAN. HE WAS ON
THE SIDE OF THE VAN AND I SAW THE FLASHLIGHT COME UP TO THE_____      8ES3A
SIDE WINDOW. WHICH WAS OPENED HALF WAY AND THE WINDOW BESIDE

Main Form

WAS OPENED. I NOTICED THE FLASH LIGHT BEAM TO WHAT APPEARED AS IF
HE WAS LOOKING INSIDE THE VAN WHEN AT THE SAME TIME AN UNRELATED
CALL CAME OVER THE AIR ON MY PORTABLE RADIO. THEN THE SUSPECT RAN
TOWARDS WARD ST. I EXITED THE VAN AND SAW THE SUSPECT RUNNING
TOWARDS WARD ST. I SAW THE SUSPECT WITH THE FLASHLIGHT AND TOLD HIM
TO "STOP POLICE." HE STILL RAN AND I CAUGHT UP TO HIM ON THE CORNER OF
FELLSMERE RD. AND WARD ST. AND HE FINALLY STOPPED. I ASKED HIM WHAT
HE WAS DOING AT 0130 HRS. WITH FLASH LIGHT POINTING IN THE WINDOW
OF THE VAN. HE SAID HE WAS GOING FOR WALK. I ALSO NOTICED HE
WAS WEARING DARK FOOT WEAR, DARK PANTS, DARK SHIRT, DARK COAT, AND
BROWN LEATHER LIKE GLOVES. AND CARRYING A BLACK FLASHLIGHT. I
ASKED HIM WHY HE WAS WEARING GLOVES. HE SAID IT WAS COLD. AT THAT
TIME IT WAS STILL WARM OUT. I ASKED HIM FOR I.D. HE SAID HE DIDN'T HAVE
ANY. I ASKED HIM WHY HE RAN, HE SAID BECAUSE I WAS CHASING HIM. I DIDN'T
EXIT THE VAN TILL HE STARTED TO RUN AWAY FROM THE VAN DUE TO
THE NOISE OF MY POLICE RADIO. I ASKED HIM FOR HIS NAME AND D.O.B. HE TOLD
ME THE INFORMATION , I CALLED DISPATCH AND RAN HIM WANTS
AND WARRANTS. HE WAS IDENTIFIED AS COHEN ,BARRY OF 87 HAMMOND ST.
NEWTON, M.A. D.O.B. 12-01-61, SSN# 025385081. I ALSO ASKED HIM WHAT KIND
OF JOB HE HAD. HE SAID THAT HE LIVES IN NEW YORK AND IS AN UNEMPLOYED
ACTOR. I ASKED HIM WHERE HE STAYING NOW. HE SAID WITH MY FATHER AT
87 HAMMOND ST. I ASKED HIM WHEN HE ARRIVED IN NEWTON, HE SAID A
COUPLE OF DAYS AGO, I ASKED WHAT DATE AND DAY. HE SAID A COUPLE
OF DAYS AGO. I ALSO ASKED HOW LONG HE WAS STAYING, HE SAID A COUPLE OF
DAYS. I ALSO NOTICED WHILE TALKING TO MR. COHEN HE SEEMED
NERVOUS AND HESITANT ABOUT ANSWERING QUESTIONS. HE HAD NO WANTS
OR WARRANTS, SO I TOLD HE COULD GO. A COPY OF THIS REPORT WILL
BE FORWARDED TO THE DETECTIVE BUREAU FOR FURTHER INVESTIGATION. I
WILL BE TAKING OUT CHARGES / SUMMONS. FOR ATTEMPTING TO COMMIT
A CRIME ( B & E OF A M.V. ) CHAPTER 274 / SEC. 6 .

AC638

| WARRANT | 0312CR000954 |
|---|---|

| Newton | NAME, ADDRESS AND ZIP CODE OF DEFENDANT |
|---|---|
| | COHEN, BARRY<br>87 HAMMOND ST.<br>NEWTON, MA 02465 |

| DATE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|
| 12/01/1961 | M | W | 5'06" | 160 | BRO | BLK |

| C.C. # | SOCIAL SECURITY # |
|---|---|
| 03-59046 | 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 |

| DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|
| 09/25/2003 | NEWTON |

| COMPLAINANT | POLICE DEPARTMENT |
|---|---|
| CURRY, CAROLYN | NEWTON PD |

| DATE OF COMPLAINT | RETURN DATE AND TIME |
|---|---|
| 09/25/2003 | |

**Trial Court of Massachusetts**
**Newton District Court**
TO ANY AUTHORIZED OFFICER:
REASON FOR WARRANT

- ☒ Representation of prosecutor that defendant may not appear unless arrested.
- ☐ Defendant failed to appear after being summoned to appear.
- ☐ Defendant failed to appear after recognizing to appear.
- ☒ Defendant failed to pay court ordered monies in the amount of $_____.
- ☐ Defendant failed to pay non-criminal motor vehicle fine in the amount of $_____.
- ☐ Defendant failed to appear for Probation Surrender Hearing
- ☐ Other:

COUNT-OFFENSE
1 - 274/6  ATTEMPT TO COMMIT CRIME c274 §6

on 09/25/2003 did ATTEMPTED TO BREAK INTO A MOTOR VEHICLE and thereby did attempt to commit the offense of BREAKING & ENTERING IN THE NIGHTTIME TO COMMIT A FELONY, but did fail in the perpetration of such offense, or was intercepted and prevented in the execution of such offense, in violation of G.L. c274, §6. (PENALTY: (1) If attempted offense punishable by state prison for life or 5 years or more: state prison not more than 5 years; or jail or house of correction not more than 2½ years; (2) If attempted offense punishable by state prison for less than 5 years; or by jail or house of correction, or by fine: jail or house of correction not more than 1 year; or not more than $300; (3) If attempted offense is larceny under c.266, §30: jail or house of correction not more than 2½ years; or fine; or both. If attempted offense was G.L. c.265, §13B, indecent assault and battery on a mentally retarded person under c.265, §13F, or G.L. c.265, §§ 13H, 22, 22A, 23, 24 or 24B, kidnapping of a child under 16 under c.265, §26, or G.L. c.272, §§ 2, 3, 4A, 4B, a subsequent offense under c.272, §16, or an offense under G.L. c.272, §§17, 28, 29A, 29B, 29C or 35A, upon conviction must register as a sex offender pursuant to G.L. c.6, §§178C-178P. If attempted offense was G.L. c.265, §§1, 13, 13B, 13F, 13H, 14, 15, 16, 17, 18, 18A, 18B, 18C, 22, 22A, 23, 24, 24B or 26, G.L. c.266, §§14

COUNT-OFFENSE

COUNT-OFFENSE

COUNT-OFFENSE

THE COURT HAS ORDERED THAT A  ☒ WARRANT  ISSUE AGAINST THE ABOVE DEFENDANT
☐ DEFAULT WARRANT

Therefore you are hereby commanded to arrest the above named defendant and bring the defendant forthwith before this court to answer to the offense(s) listed above and to be dealt with according to law.

| FIRST JUSTICE | DATE OF ISSUE | CLERK-MAGISTRATE/ASST. CLERK |
|---|---|---|
| WITNESS:  KLEIN, DYANNE J | 09/25/2003 | |

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF

Barry M. Cohen

### DEFENDANTS

The City of Newton, et al.

**(b)** County of Residence of First Listed Plaintiff  Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Middlesex
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)  617-523-4552
Christopher W. McHallam, Esq.
500 Commercial Street, Suite 4R
Boston, MA  02109

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

(nature of suit table — checkbox 440 Other Civil Rights marked)

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. §1983
Brief description of cause: False arrest, false imprisonment, malicious prosecution

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Unknown damages
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
None

DATE  8/17/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) _____ Cohen v. City of Newton, et al _____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   [ ]  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   [X]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

   [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

   [ ]  IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

   [ ]  V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   _____ None _____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                           YES [ ]     NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
                                                           YES [ ]     NO [X]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                           YES [ ]     NO [X]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                           YES [ ]     NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                           YES [X]     NO [ ]

   A.  If yes, in which division do all of the non-governmental parties reside?

       Eastern Division [X]        Central Division [ ]        Western Division [ ]

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

       Eastern Division [ ]        Central Division [ ]        Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                           YES [ ]     NO [X]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _____ Christopher W. McHallam, Esq.

ADDRESS _____ 500 Commercial Street, Suite 4R

TELEPHONE NO. _____ Boston, MA 02109    (617) 523-4552

(CategoryForm.wpd - 5/2/05)