UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

```
------------------------------------
                                    )
Barry M. Cohen,                     )
                                    )
     Plaintiff,                     )
                                    )
     v.                             )     Civil Action No.:
                                    )     05-11727-DPW
The City of Newton, The Newton      )
Police Department,                  )
Police Chief Jose M. Cordero,       )
Newton Police Officer Rocky Marini  )
(Badge No. 13963),                  )
Newton Police Detective Robert F.   )
Sampson, Newton Police Detective    )
Sergeant George McMains,            )
Newton Police Officer Zachary       )
Raymond, and Newton Police Officer  )
Joseph T. McLaughlin,               )
                                    )
     Defendants.                    )
------------------------------------
```

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE CLEKR MAGISTRATES' MOTION TO QUASH SUBPOENAS, OR IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

NOW COMES the Plaintiff, Barry M. Cohen (hereinafter "Mr. Cohen") and hereby opposes the Motion to of the Clerk Magistrates' to Quash Subpoenas, Or in the Alternative, For Protective Order (hereinafter "Motion to Quash"). In opposition to the Motion to Quash, Mr. Cohen submits the within Memorandum of Law and states as follows:

**SUMMARY**

The Clerk Magistrates have failed to demonstrate that a substantial and compelling reason exists to quash the deposition subpoenas served upon them and/or otherwise limit the scope of Plaintiff's inquiry of the Clerk Magistrates. There is no controlling federal or Massachusetts legal doctrine which precludes this Honorable Court from compelling the testimony of judicial officials in situations where said officials possess critical factual information.

The Clerk Magistrates are important witnesses in this matter inasmuch as they have first hand knowledge of the nature of the events and circumstances surrounding the issuance of the warrant for Plaintiff's arrest (which events are material to the Plaintiff's Complaint). Moreover, the Clerk Magistrates are a critical source of independent verification of the Newton Police's version of those same events. The full story regarding the issuance of the arrest warrant is known only by the Clerk Magistrates. Thus, they should be compelled to relate a full and complete description of their knowledge of said events and circumstances.

2

Therefore, it is critical that the Clerk Magistrate's Motion to Quash be denied in its entirety.  If this Honorable Court were to allow the Clerk Magistrate's Motion to Quash, such a ruling would be contrary to the spirit of 42 U.S.C. § 1983, which endows citizens with the right to hold governmental officials liable for civil rights violations and thus affords citizens the opportunity to fully investigate the actions of the sovereign in connection with such claims.

### FACTUAL BACKGROUND

The factual assertions contained in the Plaintiff's Complaint are incorporated herein by reference.  There are several unequivocal and elementary facts which gave rise to the Plaintiff's claims, which are summarized herein:

1.   The Plaintiff has never before been arrested, charged with a crime, or otherwise been involved in a criminal proceeding;

2.   On or about September 25, 2003, during the early morning hours the Defendant Officer Marini encountered Mr. Cohen in the area of Fellsmere Road, Newton, and did not arrest, frisk, search, or otherwise detain Mr. Cohen (See portions of transcript of deposition of Officer Marini, hereto attached as Exhibit 1);

3

3.  After his encounter with Mr. Cohen, Officer
    Marini submitted a request that Mr. Cohen be
    issued a summons to the Newton District Court for
    a probable cause hearing.  (See Exhibit 1 and
    copy of form with "Summons" box initially checked
    by Officer Marini, hereto attached as Exhibit 2).

4.  Despite Officer Marini's (the only witness to Mr.
    Cohen's conduct) wish to have a summons issued to
    Mr. Cohen, the Newton Police unlawfully
    determined that it wished to seek an arrest
    warrant (despite knowing no basis existed for the
    issuance of any such warrant) and Detective Curry
    was charged with obtaining same.  (See relevant
    portions of deposition of Detective McMains,
    hereto attached as Exhibit 3).

5.  Upon information and belief, Magistrate McEvoy
    rejected the Police's initial request for a
    warrant.  The Newton Police apparently re-
    submitted their request for the issuance of the
    warrant and the second request was apparently
    granted by Magistrate McEvoy on the order of
    Magistrate Schultz at the improper urging of
    Cordero and the Newton Police. (It should be

4

noted that the Plaintiff's version of the events in this regard  has not been denied).

6. Mr. Cohen was arrested by the Defendant Detectives McMains and Sampson (who were not witnesses to Officer Marini's prior encounter with Mr. Cohen) many hours later during the late afternoon/early evening of September 25, 2003. Officer Marini was not present at any time during Mr. Cohen's arrest and was never consulted regarding the arrest of Mr. Cohen (See Exhibit 1);

7. Mr. Cohen was subsequently charged with violating M.G.L. c. 274, Section 6, Attempt to Commit A Crime, Breaking Into A Motor Vehicle, the basis for the charges against Mr. Cohen was improperly suggestive and false report prepared by Defendants;

8. Shortly after Mr. Cohen's arrest, notice thereof was reported in the Newton Tab on or about October 1, 2003.

9. Mr. Cohen was forced to retain private counsel to defend against the criminal charges.  The Newton District Court dismissed the charges against Mr. Cohen on October 21, 2003, approximately one

5

month after Mr. Cohen's arrest during a pre-trial proceeding and was entered by the Court over the objection of the Middlesex District Attorney's office.

10. On or about November 1, 2004, Mr. Cohen sent the City of Newton and the Newton Police Department demand letters seeking damages and other relief as a result of the conduct of the Newton Defendants. The City of Newton denied Mr. Cohen's claim by indicating that they believed the "initial stop and arrest of Mr. Cohen were lawful." Thus, Mr. Cohen was compelled to initiate the within lawsuit.

## MR. COHEN'S CLAIMS

Mr. Cohen has asserted claims for damages pursuant to the following counts: Policy of Non-Feasance in the Protection of Plaintiff's Civil Rights (42 U.S.C. § 1983); False Arrest/Imprisonment; Malicious Prosecution; Assault and Battery; and Common Law Negligence. In essence, Mr. Cohen claims that the Defendants violated his civil rights by implementing and then executing a policy which led to his false arrest, false imprisonment, and malicious prosecution.

6

**LEGAL ARGUMENT**

Section 1983 creates the opportunity for a citizen to
hold liable "[e]very person" who, acting under color of
state law, commits prohibited acts by the means of a civil
action for damages. See Buckley v. Fitzsimmons, 509 U.S.
259 (1993). In essence, Section 1983 provides individual
citizens with the ability to hold those acting under the
cloak of governmental authority responsible for conduct
which results in the violation of the citizen's civil
rights.

Section 1983 claims arise from the Fourteenth
Amendment provision that no person shall be deprived "of
life, liberty, or property, without due process of law."
The United States Supreme Court has recognized, in County
of Sacramento v. Lewis, 523 U.S. 833, 846 (1998), that
deprivations of liberty caused by "the most egregious
official conduct," may violate the Due Process Clause and
thus constitute 1983 violations. Thus, as in this case,
when a Plaintiff is claiming that egregious official
conduct caused a deprivation of his civil rights, that
Plaintiff should be permitted to fully and comprehensively
investigate the full extent of the questioned official
conduct.

The Clerk Magistrates should not be shielded from
providing testimony regarding the conduct of the local
officials involved in Mr. Cohen's arrest, including
themselves, as such a shield would be in direct
contravention of the solemn principle, embodied in Section
1983, that a citizen may hold governmental officials to
task for egregious and unlawful conduct that results in the
deprivation of liberty.

**I. The Clerk Magistrates May Be Compelled to Testify**

The Plaintiff does not dispute the Clerk Magistrates'
contention that judicial officials generally should not be
compelled to testify concerning the mental processes
employed in formulating judgments and rulings.  See U.S. v.
Morgan, 313 U.S. 409, 413 (1941).  This general prohibition
against compelling judicial officials to testify regarding
the mental processes employed is primarily designed to
preserve the sanctity of judgments and the judicial
process.  See Day v. Crowley, 341 Mass. 666, 670 (a
judgment is a solemn record which ought not to be
overthrown by the subsequent testimony of a judge).

In the Day case, the Court ruled a judge could not be
compelled in a subsequent proceeding to state the reasons
for his decision in a prior proceeding, in conformity with

8

the principle of *res judicata*.  The Court made no pronouncement that a judge could not be compelled to testify as to the facts and circumstances surrounding a legal proceeding.  Indeed, if one were to extrapolate the view set forth by the Clerk Magistrates of such an expansive prohibition against judicial testimony, a judicial official could not be compelled to testify as to any official action, even if there were allegations judicial misconduct involved therein.

   The law in Massachusetts regarding the prohibition against compelling judicial testimony, set forth in Day v. Crowley, is primarily directed at preserving the doctrine of *Res Judicata* by preventing the scenario where a party brings a previously decided claim into a new tribunal in an effort to obtain a more advantageous result and in so doing attempts to require the judicial official from the prior proceeding to reveal his or her thoughts regarding their initial decision in a subsequent proceeding.  See also U.S. v. Morgan, supra; see also Robinson v. Comm'r of Internal Revenue, 70 F.3d 34, 38 (5th Cir. 1995)(secondary tribunal not permitted to question judge from prior related matter as to decisions in that matter).

9

In this case, the Plaintiff does not seek to re-litigate the Clerk Magistrate's decision to issue a warrant for Plaintiff's arrest (which is not analogous to a final judgment) and/or seek to have this Honorable Court review said decision.  Rather, the Plaintiff reasonably seeks to discover the facts and circumstances surrounding the issuance of the warrant, including the details as to why the warrant was initially denied and to determine how the warrant ultimately came to be issued, in an effort to diligently investigate this matter.  Such inquiries do not disturb the judicial process and are consistent with the dictates and spirit of both Fed.R.Civ. P. 26 and Section 1983.

**B.    The Clerk Magistrates Testimony Is Critical To Verify the Testimony of Other Involved Parties**

As the Clerk Magistrates readily admit, judicial officers may be compelled to testify in certain circumstances.  See U.S. v. Edwards, 39 F.Supp. 692, 706 (M.D. La. 1993); see also Standard Packaging Corp. v. Curwood, Inc., 365 F.Supp. 134, 135 (N.D.Ill. 1973).  In U.S. v. Frankenthal, 582 F.2d 1102 (7th Cir. 1978), the Seventh Circuit found that testimony of a sitting district judge as a percipient witness for the prosecution was not unfairly prejudicial to defendant inasmuch as the judicial

10

official had pertinent factual knowledge and was the only possible source of that testimony.  Id. at 1108.

     The Clerk Magistrates have not adduced any precedent that Massachusetts follows a strict "mental process rule" which prevents a judicial official from being compelled to testify as to the basis for making a decision.  All of the cases cited by the Clerk Magistrates in support of the "mental process" doctrine originate from outside of both Massachusetts and the First Circuit.

     As discussed herein above, Massachusetts law is focused upon limiting judicial testimony to preserve the sanctity of judgments.  See Day v. Crowley, supra. Moreover, Massachusetts law permits consideration of the judge's mental process in certain circumstances. Massachusetts Courts have examined the mental process of a judge in ruling that a judge cannot be deemed to have taken judicial notice of facts which were privately known to him, unless same were a matter of common knowledge or observation.  See Mady v. Holy Trinity Roman Catholic Polish Church, 223 Mass. 23, 27; Day v. Crowley, 341 Mass. 666, 669--670.

     In this matter, the Clerk Magistrates are the only officials with complete knowledge as to the circumstances surrounding the issuance of the warrant and thus are the

11

only possible source thereof.  Officer Curry and Chief
Cordero's knowledge is limited to the extent of their
involvement in the process of obtaining the warrant, but
they cannot likely testify as to the complete scope of the
actions of the Clerk Magistrates.  The Plaintiff should
also be permitted to depose the Clerk Magistrates as a
method of verifying the testimony of the various Newton
Police officials.

The Plaintiff's desire to inquire as to the
circumstances surrounding the issuance of the warrant,
including the reasons why the Clerk Magistrates issued the
warrant, does not invade any protection of mental processes
that might be afforded the Clerk Magistrates.

At issue here is what evidence was presented in the
warrant application; what transpired at any hearings; what
conversations took place between the Newton Police and the
Clerk Magistrates and the Clerk Magistrates themselves; and
whether the warrant application was initially denied and,
if so, why it was later granted.

Moreover, the Plaintiff has claimed that there was no
basis for his arrest and/or the issuance of the warrant.
Thus, the Plaintiff should be permitted to inquire as to
why, based upon the evidence presented, the Clerk
Magistrates issued the warrant.

12

If such an inquiry is not permitted, the Plaintiff's ability to investigate the nature of how official conduct resulted in the deprivation of his civil rights would be so severely curtailed as to be almost meaningless and this Honorable Court will be effectuating legal principles not presently recognized in the First Circuit.

## III. Quashing the Subpoenas Will Not Promote Comity

As the Clerk Magistrates concede, Massachusetts law permits the compelling of the testimony of magistrates. See Weisberg v. Lupo, No. 93-5904, 1995 WL 1146847 (Mass.Super.Ct. July 31, 1995).  As discussed herein at length, Massachusetts' policy regarding judicial testimony is principally designed to preserve the sanctity of judgments, rather than simply shield judicial officials from testimony.  Thus, there would be no promotion of comity between the Massachusetts courts and this Honorable Court by quashing the subpoenas.

Permitting the Plaintiff to depose the Magistrates would not undermine judicial immunity and/or reduce that concept to merely a no-damages rule.  As set forth herein above, Section 1983 brings to life the Fourteenth Amendment's prohibition against deprivation of due process of law by allowing a citizen to sue governmental actors for

13

civil rights violations caused by their conduct.  In this case, the Plaintiff should be permitted to discover what took place during the hearing and determination of the Newton Police's arrest warrant application and the nature and course of the adjudication of same.  If this Honorable Court blocks the Plaintiff from obtaining this information, the Plaintiff is denied a full opportunity to understand the manner and method surrounding the deprivation of his rights and thus may lack crucial information about the nature of the Newton Police's official conduct.

Judicial immunity limits pecuniary liability and seeks to prevent a diminution of judicial independence.  There will be no harm to the independence of effectiveness of the Clerk Magistrates if they are compelled to describe the nature and circumstances of the issuance of the warrant for Plaintiff's arrest.  Rather, if such testimony is quashed, the Plaintiff's opportunity to obtain justice and a full understanding the actions of the sovereign will be denied.

**IV.   The Circumstances Do Not Warrant a Protective Order**

Federal Rules of Civil Procedure Rule 26(c) governs the issuance of protective orders.  It provides, in relevant part, as follows:

14

> (c) PROTECTIVE ORDERS. Upon motion by a party or by the person from whom discovery is sought . . . the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

In this case, the Plaintiff seeks information from the Clerk Magistrates relating to the issuance of the warrant for Plaintiff's arrest.  Thus, there are no grounds for a determination by the Honorable Court that the Plaintiff is seeking to annoy, embarrass, oppress, or unduly burden the Clerk Magistrates.  Therefore, there is no basis for issuing any protective orders with respect to the Clerk Magistrates.

## CONCLUSION

Based on the foregoing, the Court should deny the Clerk Magistrates Motion to Quash.  In the event, however, that this Honorable Court is inclined to grant limit the scope of the Plaintiff's inquiry, the Plaintiff respectfully requests that his opportunity to discover all the facts and circumstances surrounding the issuance of the warrant for his arrest be preserved to the greatest possible extent.

Respectfully submitted,
Plaintiff,
Barry M. Cohen,
By his attorney,


/s/ Christopher W. McHallam
Christopher W. McHallam
BBO #637464
500 Commercial Street
Suite 4R
Boston, Massachusetts
(617) 523-4552


Dated:  July 19, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), which includes counsel for all parties in this matter.

/s/ Christopher W. McHallam
Christopher W. McHallam

-EXHIBIT 1

Page 1

VOLUME I

PAGES 1-92

EXHIBITS 10

UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS

BARRY M. COHEN,                          )
    Plaintiff,                          )
                                        )
vs.                                      )   NO. 05-11727-DPW
                                        )
THE CITY OF NEWTON, THE NEWTON           )
POLICE DEPARTMENT, POLICE CHIEF          )
JOSE M. CORDERO, NEWTON POLICE           )
OFFICER ROCCO MARINI, NEWTON             )
POLICE DETECTIVE SERGEANT                )
GEORGE MCMAINS, NEWTON POLICE            )
OFFICER ZACHARY RAYMOND AND              )
NEWTON POLICE OFFICER JOSEPH T.          )
MCLAUGHLIN                               )
    Defendants.                         )

DEPOSITION OF ROCKO MARINI, a
Defendant in the above-entitled cause, taken before
Tracy A. Coffman, Notary Public in and for
Commonwealth of Massachusetts, pursuant to the
Massachusetts Rules of Civil Procedure, at the Law
Offices of Christopher W. McHallam, 500 Commercial
Street, Boston, Massachusetts, on Monday, May 22,
2006, commencing at 10:15 a.m.

EYAL COURT REPORTING, INC.
4 FANEUIL HALL MARKETPLACE
BOSTON, MASSACHUSETTS 02109
(800) 322-3925

1    A.    Well, it's all dark, there may be a couple of

2          street lights, and what caught my eye is the

3          flashlight.

4    Q.    Okay, you saw a flashlight?

5    A.    Uh huh.

6    Q.    Okay, what did you do next?

7    A.    Well, I saw a person holding that flashlight,

8          so I sat still in the van and I followed the

9          individual with the flashlight.

10   Q.    And where was the individual going?

11   A.    Towards this way. (Indicating)

12   Q.    Walking down Fellsmere road?

13   A.    Right, in the middle of the street.

14   Q.    In the middle of the street?

15   A.    Uh huh.

16   Q.    And what happened next?

17   A.    Watching the individual, the individual is

18         coming closer to the van, and right around

19         the side of the van, so the individual is

20         walking this way, I lost sight, I lost sight

21         of the individual with the flashlight, so I

22         just sat in my seat to keep quiet, I saw a

23         beam of light come into the van, and it was

24         moving around, as to look around.

1   Q.   Okay, let's just back up for a minute, so you

2       saw the individual start to walk down

3       Fellsmere Road?

4   A.   Right.

5   Q.   And according to your picture, started to

6       walk closer to van?

7   A.   Right.

8   Q.   And were you still looking out the front

9       windshield, at that point?

10   A.   Right.

11   Q.   And at some point you lost sight of that

12       person?

13   A.   Right.

14   Q.   Now could you see out the windows that were

15       facing towards the middle of Fellsmere Road,

16       in other words, the windows of van that faced

17       towards the middle of Fellsmere Road, could

18       you see out --

19   A.   The driver's side?

20   Q.   The driver's side window?

21   A.   Could I see out?  No, my view was blocked by

22       this curtain, I only opened it up so far.

23   Q.   So curtain blocked the view, it also blocked

24       the view outside the side window?

1  A.  The front side.

2  Q.  Okay, and how far open do you think the

3      curtain was, how many inches?

4  A.  Within an arms reach.

5  Q.  And once you saw this individual start to

6      walk closer to the van, did you change your

7      position inside the van?

8  A.  No.

9  Q.  And correct me if I'm wrong, I believe what

10     you said was, after you lost sight of that

11     person, you saw with a beam of light inside

12     that van?

13 A.  Right.

14 Q.  Where was the beam of light?

15 A.  Inside the van.

16 Q.  Where inside?

17 A.  This area.

18 Q.  When you say this area, what do you mean?

19 A.  In front of the curtain.

20 Q.  So in the front section, the driver's seat

21     and the passenger side?

22 A.  Right, in the front of the curtain, driver's

23     side, passenger side, front of vehicle.

24 Q.  When you saw that beam of light, could you

Page 28

1        see the person who was apparently holding the

2        flashlight?

3    A.   At that time?

4    Q.   Yes?

5    A.   No.

6    Q.   So you saw a beam of light inside the van,

7        but you couldn't see the source of that beam

8        of light?

9    A.   Right.

10   Q.   Okay, what happened next?

11   A.   My radio went off.

12   Q.   Your radio went off?

13   A.   Right, we're assigned a portable radio that

14       calls go through, and at that time, it was a

15       unrelated call that came over, what it was in

16       detail, I don't remember.

17   Q.   Before you saw this individual with the

18       flashlight, the time period from just after

19       midnight to between 1:00 and 1:30, had your

20       radio gone off?

21   A.   I don't remember.

22   Q.   Are there any requirements about whether or

23       not you are to keep your radio on?

24   A.   Requirements?  You're supposed to keep your

1    radio on, whether it's a requirement or not.

2  Q.  Were you surprised when your radio went off?

3  A.  No.

4  Q.  What happened after your radio went off?

5  A.  After the radio went off?

6  Q.  Uh huh?

7  A.  The individual holding the flashlight, the

8      flashlight was still on I believe, and I saw

9      the individual going back towards Ward

10     Street.

11  Q.  Okay, from the time you first saw the person

12      with the flashlight, was the flashlight on

13      the whole time?

14  A.  From the intersection, yes, that's what

15      caught my attention in the beginning, was the

16      flashlight being on by a person at the

17      intersection.

18  Q.  Is there anything else you observed about the

19      individual?

20  A.  At that time?

21  Q.  Yes?

22  A.  No.

23  Q.  After your radio went off, when was the first

24      time you saw the person who you described

Page 30

1       here?

2   A.   Well, what I did was, after I saw the

3       individual running this way, I got out of the

4       chair, saw a visual from him from looking out

5       straight, I opened the door, and started

6       running towards him.

7   Q.   Okay, and which direction did the individual

8       run?

9   A.   Towards Ward Street.

10   Q.   And you followed?

11   A.   I followed the person.

12   Q.   What were you wearing that night, what was

13       your uniform?

14   A.   The uniform was issued police pants, my

15       police boots, my tool belt which has all my

16       issued equipment on it, I was wearing my

17       jacket, issued jacket, patches that say

18       Newton Police on both sides, and my badge.

19   Q.   Okay, after you saw the individual running

20       and you followed, what happened?

21   A.   As soon as I opened the door, I yelled, stop

22       police, the individual kept running faster

23       towards Ward Street, so I ran faster to try

24       to catch up to him, I kept saying, stop,

1    police, and somehow right around the corner

2    here I believe it was when I caught up with

3    the individual.

4  Q.  Okay, can you just draw line showing the

5    approximate path where you followed the

6    individual?

7  A.  Well, I want to say from here, I lost sight

8    and then I came out this way, I would say

9    approximately this way.

10  Q.  Okay, and when you say you caught up to the

11    person, what do you mean?

12  A.  I caught up to him, somehow, I don't know how

13    it happened, but I know we caught up to each

14    other at this intersection, around the

15    corner.

16  Q.  Did the person that we're describing, did

17    they stop running?

18  A.  I believe so, after I caught up to him.

19  Q.  When you say caught up to him, did you grab

20    the person?

21  A.  I don't remember how it happened.

22  Q.  Once you caught up to that person, what did

23    you do?

24  A.  I asked him what he was doing.

1    Q.    And what was the response?

2    A.    He said, at that time I think I asked him why

3          he was running, I think at the time I asked

4          him why he was running, and he said because I

5          was chasing him.

6    Q.    So before you go on, you think the first

7          thing you said to him is, Why you are

8          running?

9    A.    I'm not positive.

10   Q.    Okay, you're not positive, okay.  So your

11         belief is, the first thing you said is, why

12         are you running?

13   A.    Right.

14   Q.    And what did that person respond?

15   A.    He said, because I was chasing him.

16   Q.    And how did you respond to that?

17   A.    I don't remember I know I asked him -- just

18         trying think out how the events went.  Sorry

19         for the inconvenience.  I'm just trying to

20         think how it happened.

21               MS. KAHN:  Take your time.

22   A.    I remember a few events that happened in

23         sequence, I could be off, but after the

24         initial contact with the individual, I do

Page 33

1    recall asking him why he was running, he said

2    because I was chasing him.  I believe I said,

3    I asked him why he was looking into the van,

4    or what he was doing out with a flashlight,

5    and I asked him, I asked him what he was

6    doing out here, and he said he was going for

7    a walk, and I said you were going for a walk

8    with a flashlight, I believe I said.  The

9    conversation, I could be off a little, I'm

10   not positive on the conversation and the

11   events, but at some point I asked him what he

12   was doing out there, he said he was going for

13   a walk, I asked him why he was wearing

14   gloves, he said it was cold out, and it

15   wasn't cold, that time of season, it wasn't

16   cold out.  I asked him why he was carrying a

17   flashlight looking into the van, and every

18   time I was talking with him he would not

19   answer the questions, like he was hesitant

20   about answering my questions.  So the

21   conversation took a little while and I had to

22   repeat the questions a few times because he

23   would not answer me.  I know I asked him for

24   his ID, he did not have it on him.  I

1    noticed, at the time, I noticed all his

2    clothes were dark, his handwear, footwear,

3    and his clothes. I believe he was wearing

4    glasses at the time. I know I, what else, I

5    know I asked him for ID, he didn't have any

6    ID. I asked him where he lived, every time

7    he was hesitant, took me awhile to get the

8    information I asked of him. He told me his

9    name, his date of birth, where he lived, so I

10   called through my portable radio to dispatch

11   and I asked them to run this party. I gave

12   them his name, his date of birth, and I

13   believe his Social Security number. I'm not

14   sure if he gave it to me at the time, and I

15   also, I believe we had a conversation too, I

16   asked him where he lives, he said in New

17   York, at that time he said he lived in New

18   York. I asked him what he was doing here, he

19   said he was staying at his father's house on

20   Hammond Street. I asked him what he did in

21   New York, he said he was an unemployed actor,

22   he was told me he was approximately 43. I

23   asked him how long he has been here, I

24   believe he said, I asked him when he got

Page 35

1        here, he said a couple of days ago.  I asked

2        him how long he was staying, a few days he

3        said, and I asked him when he was going back,

4        he said a few days.

5   Q.   Let's back up.  You described that the

6        individual who you saw with a flashlight was

7        hesitant in answering your questions, what do

8        you mean by that specifically?

9   A.   Well, in my opinion.  It seemed like he was

10       nervous, I believe he was sweating a little

11       bit, he was nervous, he was thinking, like he

12       was thinking about what to say.

13  Q.   So, in your judgment, it appeared to you that

14       he was thinking about what to say before he

15       answered?

16  A.   Correct.

17  Q.   And earlier you testified that you came on

18       the force late in 2002, correct?

19  A.   I went to the academy in late 2002.

20  Q.   And when do you think, approximately, you

21       actually started as a police officer?

22  A.   Do you mean when we graduated from the

23       academy?

24  Q.   Yeah?

1    A.    It's a 22 or 24 week program.

2    Q.    So when your class graduated, when do you

3          think that was?

4    A.    That was in May of 2003.

5    Q.    May of 2003, so in September of 2003, you had

6          been working as an active police officer

7          since May of 2003?

8    A.    Sworn in police officer as of May of 2003.

9    Q.    Okay, and you also mentioned, at some point,

10         you called into dispatch, and I believe you

11         used the words, to run?

12   A.    To query the party.

13   Q.    To run the individual I think is what you

14         said?

15   A.    Right, run, query, what I mean by that is the

16         information you receive, you relay that

17         information to dispatch and they will give

18         you information on the individual.

19   Q.    And for what purpose do you that?

20   A.    For what purpose?

21   Q.    Yes?

22   A.    To see if they have a warrant.

23   Q.    Do they also, can they verify, in the case of

24         Newton, if someone tells you they live in

Page 37

1        Newton, can they verify an address?

2   A.   If they're registered with the city census

3        and the party says they live in Newton, if

4        the census is up-to-date, you can find out if

5        the party lives in Newton.

6   Q.   And can dispatch do that through a radio

7        call?

8   A.   Yes.

9   Q.   Okay, when you talked to dispatch, what did

10       dispatch indicate to you?

11  A.   Well, first they ran him, because originally

12       he told me he was from New York, so I had

13       them query him out of New York to see if

14       there any wants or warrants, as well as

15       Newton.

16  Q.   And what was the result of that search?

17  A.   The information that I received through

18       dispatch seemed credible to the information

19       that he gave me that night.

20  Q.   What do you mean by that?

21  A.   He told me his name, his date of birth, where

22       his parents, his father's name and the

23       address, all that information that he told me

24       at the end checked out through dispatch.

Page 38

```
 1    Q.    Okay, and I think you also mentioned he might
 2          have provided you his Social Security number?
 3    A.    Possibly, it was so long ago.
 4    Q.    It was so long ago it's hard to remember?
 5    A.    Not that it's hard to remember but I remember
 6          certain things, I can't remember every exact
 7          detail of the night and the social security
 8          number, I don't remember if he gave it to me
 9          or not, he may have.
10    Q.    But just so we're clear in term of
11          information that this individual gave you,
12          name, address of his parent's house, where he
13          was staying, name of his father, where he
14          otherwise lived, and also his occupation?
15    A.    And his date of birth.
16    Q.    And date of birth, and what was the name that
17          the person gave you, this individual, when
18          you asked him his name, what name did he
19          respond?
20    A.    He told me his name was Barry Cohing (sic)
21          and now you're asking me --
22                MS. KAHN:   Wait until you answer
23          that question, then he'll ask another one.
24    Q.    So you asked him his name, he said Barry
```

Page 43

```
 1              write the report.
 2    Q.    When you say log on to the computer, where is
 3          the computer?
 4    A.    There's various areas, there's what we call
 5          the library where there's three or four
 6          computers there, there is also a computer at
 7          the front desk, and some of the cruisers have
 8          mobile computers.
 9    Q.    Did the surveillance van have a mobile
10          computer?
11    A.    No.
12    Q.    So you logged on when you got back to the
13          station?
14    A.    Right.
15    Q.    You wrote a report?
16    A.    Right.
17    Q.    And when you finished writing your report,
18          what did you do?
19    A.    I put together, after I wrote the report, we
20          have an application that we also have to fill
21          out, so when we write the incident report, we
22          write an application, we put that together
23          with the information that was ran through
24          dispatch, put it together in an envelope and
```

EYAL COURT REPORTING, INC., BOSTON, MA (800) 322-3925

Page 44

1      we put the envelope on the prosecutor's desk,

2      there is a box where we put it into.

3  Q.  A box on the prosecutor's desk?

4  A.  No, it's inside the station, they have a

5      cubbyhole.

6  Q.  And who is the prosecutor, or excuse me, who

7      was the prosecutor in September of 2003?

8  A.  At that time, I don't know.

9  Q.  So is it fair to say you took your report,

10     your application, and the dispatch

11     information, you put it in an envelope and

12     you left it with the prosecutor?

13 A.  At the time there wasn't a cubbyhole and

14     there used to be desk that we would place it

15     on, that would be for the prosecutor.

16 Q.  Okay, when you say an application, what's the

17     application?

18 A.  The application is for, it's paper work for

19     the courts, it's the application for a

20     summons.

21 Q.  For a summons, okay, and what's a summons?

22 A.  A summons is when you summon someone to

23     court.

24 Q.  Before we go on, can you just tear off that

Page 45

1           page of that diagram that you drew?  Can you

2           mark that please?

3                   (Exhibit No. 8; so marked.)

4    Q.    So going back to the writing of the report

5           and the application, what's your recollection

6           in terms of what crime you claim Mr. Cohen

7           committed?

8    A.    The incident report?

9    Q.    Or the application?

10   A.    The application in the incident report, I

11          summonsed him for a hearing for attempted

12          B&E of a motor vehicle, chapter and section,

13          I don't know.

14   Q.    You say you summonsed him for a hearing?

15   A.    Yes, that's what a summons is.

16   Q.    So explain, when you say you summons for a

17          hearing, what do you mean?

18   A.    You summons the person for a hearing.

19   Q.    What kind of a hearing?

20   A.    A hearing on the incident that occurred.

21   Q.    And what's the purpose of the hearing?

22   A.    The purpose of the hearing?

23   Q.    Uh huh?

24   A.    Is the purpose of the hearing is for, you

EYAL COURT REPORTING, INC., BOSTON, MA (800) 322-3925

Page 46

1        bring the individual in for the event that

2        happened, and a hearing will determine if

3        there is enough to bring this to court.

4   Q.   Is it your understanding that sometimes those

5        hearing are referred to as probable cause

6        hearings?

7   A.   I don't know.

8   Q.   Just so we're clear, you did not arrest

9        Mr. Cohen, correct?

10  A.   I did not, correct.

11  Q.   Going back to the incident, did you search

12       Mr. Cohen?

13  A.   I don't remember.

14  Q.   You don't remember, okay, if you know, is the

15       crime of attempted breaking and entering of a

16       motor vehicle, is that a felony?

17  A.   I don't know.

18  Q.   You don't know, and if you're convicted, do

19       you know what the punishment is?

20  A.   No.

21  Q.   All right.  We're going review some

22       documents, I've pre marked as Exhibit 1 the

23       notice, I am not going question him, I just

24       wanted to put it in.

  
```
 1    A.    Right.

 2    Q.    Do you have any idea why this information is

 3          blacked out?

 4    A.    I don't know why it was blacked out, no.

 5    Q.    I'm going to hand you what we've marked as

 6          Exhibit 6, it's an application for the

 7          complaint.  Did you have a chance to review

 8          that?

 9    A.    Yes.

10    Q.    Do you recognize that document?

11    A.    Yes.

12    Q.    Is that a copy of the application that you

13          referred to in the deposition that you filled

14          out?

15    A.    There is some other writing on here that is

16          not mine.

17    Q.    Well, we'll get to that in a minute, but is

18          that a copy of the application, at least a

19          portion of it you filled out?

20    A.    That's correct.

21    Q.    And if I direct you to the top of the

22          application, there is the word summons, you

23          see?

24    A.    Right.
```

Page 72

1   Q.   And there is a box next to the word summons?

2   A.   Right.

3   Q.   And there appear to be some kind of a mark in

4        that box?

5   A.   Right.

6   Q.   Did you put a mark in that box?

7   A.   The summons box, yes.

8   Q.   And why did you elect to put a mark next to

9        word summons?

10  A.   Because I summonsed him into court.

11  Q.   So you wanted to summons Mr. Cohen into

12       court?

13  A.   That's correct.

14  Q.   And why did you want to summons Mr. Cohen

15       into court?

16  A.   Because of the incident that occurred.

17  Q.   Okay, and I'll also put at the top of this

18       form, there is the word warrant, you see

19       that?

20  A.   Yes.

21  Q.   And there is box next to the word warrant?

22  A.   Right.

23  Q.   Did you put any mark next to the word

24       warrant?

Page 73

1   A.   No.

2   Q.   But in this form, Exhibit 6, there is a mark

3        next to the word warrant, correct?

4   A.   Right.

5   Q.   And there appears to be an "X"?

6   A.   Right.

7   Q.   Do you know who put that "X" there?

8   A.   No.

9   Q.   But after the incident, just so we're clear,

10       you only checked summons, you did not check

11       warrant, am I correct?

12  A.   I marked off summons, correct.

13  Q.   So it was your opinion that the appropriate

14       thing to do was to summons Mr. Cohen?

15  A.   In my opinion, yes.

16  Q.   And you didn't think that the police should

17       obtain a warrant for Mr. Cohen, correct?

18  A.   I have no knowledge of that area.

19  Q.   But when you filled out the form, you checked

20       summons?

21  A.   Correct.

22  Q.   Not warrant?

23  A.   Correct.

24  Q.   If you had wanted to get a warrant for

Page 74

```
 1          Mr. Cohen's arrest, you could have checked
 2          warrant, correct?
 3    A.    I don't believe that I could do the warrant
 4          on this, it depends, I don't check off
 5          warrants.
 6    Q.    You don't check off warrants?
 7    A.    In certain circumstances, like a domestic
 8          issue with an assault and battery, but I do
 9          not, it's usually a supervisor would refer to
10          check off a warrant.
11    Q.    So, in general, if you're involved in an
12          incident, like the incident with Mr. Cohen,
13          you'd generally check off summons?
14    A.    Usually, yes.
15    Q.    Have you ever checked off warrant?
16    A.    Possibly, I may have.
17    Q.    And why do you feel it's not within your
18          scope of responsibility to check off warrant?
19    A.    I don't know.
20    Q.    Were there any other witnesses to the
21          incident with Mr. Cohen that you're aware of?
22    A.    During the incident?
23    Q.    The incident that you refer to in exhibit 4,
24          were there any other witnesses?
```

1    A.    No.

2    Q.    There is a signature above yours, do you know

3          whose signature that is?

4    A.    No.

5    Q.    Okay, going back to the incident when you

6          encountered Mr. Cohen, did you ever consider

7          arresting Mr. Cohen?

8    A.    Consider?

9    Q.    During the incident, from 1:30 till whenever

10         it ended?

11   A.    Did I consider it, no.

12   Q.    Why not?

13   A.    I felt at that time I would summons him in

14         for a hearing.

15   Q.    At some point did you find out that Mr. Cohen

16         had been arrested?

17   A.    I don't know.

18   Q.    You don't know?

19   A.    Unless I read it in a report.

20   Q.    Do you recall ever talking to Detective

21         McMains about the incident?

22   A.    In passing, I remember him telling me that

23         they had an interview with Mr. Cohen and that

24         was the extent of the conversation.

Page 79

1    Q.    Do you know, what did Detective McMains tell

2          you about the interview?

3    A.    That they had an interview, that was it.

4    Q.    Do you know what happened to the charges

5          against Mr. Cohen?

6    A.    No.

7    Q.    Who was the chief at the time of this

8          incident?

9    A.    At the time of the incident the chief was,

10         his last name was Cordero.

11   Q.    Okay, and did you, around this time, did you

12         have any communication with chief Cordero?

13   A.    No.

14   Q.    Did you ever have any communications with

15         chief Cordero?

16   A.    I think once when he pinned the badge on me,

17         no, when he issued my, when we got sworn in,

18         that was my only interaction.

19   Q.    That was your only interaction?

20   A.    Correct.

21   Q.    Did you ever receive any memorandum from

22         Chief Cordero, any documents?

23   A.    As far as?

24   Q.    Just --

```
 1        started doing the computer system.

 2   Q.   Just need one minute, I'm just about

 3        finished.

 4              ( A short break was taken.)

 5        BY MR. MCHALLAM:

 6   Q.   Do you know who Carolyn Curry is?

 7   A.   Yes.

 8   Q.   Who is she?

 9   A.   She works in the police department.

10   Q.   What's her job?

11   A.   I believe it's a detective.

12   Q.   She's a detective?

13   A.   I believe so.

14   Q.   Have you ever had any conversations with Ms.

15        Curry about this case, about the incident

16        with Mr. Cohen?

17   A.   No.

18   Q.   And excluding your attorneys, have you had

19        any other discussions with anyone else in the

20        police department regarding this incident,

21        since after the incident occurred?

22   A.   Not to my knowledge.

23   Q.   And again, not talking about your own

24        attorneys, since the time that this lawsuit
```

1        has started, have you had any discussions

2        with anyone in the police department about

3        it?

4    A.  Not to my knowledge.

5    Q.  You haven't talked to anyone in the police

6        department about this?

7    A.  No.

8    Q.  Other than this case, are you aware of any

9        complaints filed against the police

10       department since September of 2003?

11           MS. KAHN:  Objection, you can

12       answer that if you're aware.

13   A.  I don't know.

14   Q.  Has anybody filed any complaints about you?

15   A.  Not to my knowledge.

16   Q.  Not to your knowledge, did you ever go to

17       court in connection with the charges against

18       Mr. Cohen?

19   A.  No.

20   Q.  Did Detective Curry, McMains or Sampson ever

21       contact you to ask you any questions about

22       the incident?

23   A.  No.

24   Q.  Did anyone else ever contact you from the

Page 90

1          police department to ask you questions about
2          what happened?
3    A.    Not to my knowledge.
4    Q.    What shift did you work the next day, do you
5          recall?
6    A.    I believe I did not.
7    Q.    You didn't work the next day?
8    A.    I believe I was working for someone that
9          night, I believe I owed someone a day.
10         Sometimes you can work for another officer,
11         you work their shift and they'll work another
12         shift later on for you, and I believe that
13         night I was on the night off when I worked
14         that, I was supposed to be on the night off
15         and I was working for someone that night.
16   Q.    So your recollection is you weren't at the
17         station the next day?
18   A.    I don't believe so.
19   Q.    And when you got back to the station after
20         the incident, did you do any investigation,
21         in terms of any further check on Mr. Cohen's
22         background?
23   A.    Just what I ran through dispatch.
24   Q.    That was it?

| APPLICATION FOR COMPLAINT | ☒ ADULT ☐ JUVENILE | NUMBER 359046 | | |
|---|---|---|---|---|

| ☐ ARREST | ☐ HEARING | ☒ SUMMONS | ☒ WARRANT | COURT DIVISION |
|---|---|---|---|---|

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

Newton District Court
(Temporarily at E. Cambridge)
121 Third Street
East Cambridge, MA 02141

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 9/25/03 | 9.25.03 | FELLSMERE RD |

NAME OF COMPLAINANT
OFFICER ROCCO MARINI

ADDRESS AND ZIP CODE OF COMPLAINANT
1321 WASHINGTON ST.
NEWTON, M.A. 02458

| NO. | OFFENSE | G.L. Ch. and S |
|---|---|---|
| 1. | ATTEMPT TO COMMIT A CRIME TO WIT B&E M.V. NIGHTTIME | 274/6 |
| 2. | | |
| 3. | | |
| 4. | | |

NAME, ADDRESS AND ZIP CODE OF DEFENDANT
BARRY COHEN
87 HAMMOND ST.
NEWTON, MA. 02465

OK/Warrant

| COURT USE ONLY → | A hearing upon this complaint application will be held at the above court address on | DATE OF HEARING | AT | TIME OF HEARING | COURT USE ← ONLY |
|---|---|---|---|---|---|

## CASE PARTICULARS — BE SPECIFIC

| NO. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OR PROPERTY Over or under $250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

OTHER REMARKS:

X _____
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 2-01-61 | | 025385081 | M | W | 506 | 160 | BRWN | BLK |

| OCCUPATION | EMPLOYER/SCHOOL | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|
| UNEMPLOYED | | | SAL COHEN |

## ↓ COURT USE ONLY ↓

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|
| | NO PROCESS TO ISSUE ☐ At request of complainant ☐ Complainant failed to prosecute ☐ Insufficient evidence having been presented | |
| | PROCESS TO ISSUE ☐ Sufficient evidence presented ☐ Defendant failed to appear     TYPE OF PROCESS ☐ Warrant ☐ Summons returnable _____ | |
| | ☐ Continued to _____ | |

COMMENTS

EXHIBIT SFL
4
5-23-06

EXHIBIT
6
TC 5/22/06

CR2 (3/88)

EXHIBIT 3

```
1                UNITED STATES OF AMERICA
                 DISTRICT OF MASSACHUSETTS
2

3    Barry M. Cohen,
             Plaintiff,                    )
4                                          )   CIVIL ACTION
     v.                                    )   NO.:  05-11727-DPW
5                                          )
     The City of Newton, The Newton        )
6    Police Department, Police Chief        )
     Jose M. Cordero, Newton Police        )
7    Officer Rocky Marini (Badge No.        )
     13963), Newton Police Detective        )
8    Robert F. Sampson, Newton             )
     Police Detective Sergeant             )
9    George McMains, Newton Police         )
     Officer Zachary Raymond and          )
10   Newton Police Officer Joseph T.       )
     McLaughlin,                           )
11           Defendants.                    )

12   **DEPOSITION OF GEORGE R. MCMAINS,** a Defendant in the

13   above-entitled cause, taken before Susan Lozzi,

14   Shorthand Reporter and Notary Public in and for

15   Middlesex County, pursuant to the Federal Rules of

16   Civil Procedure, at the Law Offices of Christopher

17   W. McHallam, 500 Commercial Street, Suite 4R,

18   Boston, Massachusetts, on Tuesday, May 23, 2006,

19   commencing at 12:05 p.m.

20

21

22              EYAL COURT REPORTING, INC.
                4 FANEUIL HALL MARKETPLACE
23           SOUTH MARKET BUILDING - 4TH FLOOR
                BOSTON, MASSACHUSETTS 02109
24                   (800) 322-3925
```

17

A.    Depends on what's been done with those reports.

Q.    Can you elaborate?

A.    If it's a shoplifting at Filene's, we probably won't do anything with that.  If it's a house break, we're going to obviously follow up on that.  We're going to go process a scene, et cetera.  One, obviously, outweighs another one.

Q.    So the nature -- just generally, is it fair to say that depending upon the nature of the crime described in a criminal report, it may or may not require action by the Detective Bureau?

A.    That's correct.

Q.    And if we turn to September 25th, 2003, and we go -- you started your shift.  Can you tell me what happened when you started your shift?

A.    Specifically, I'm assuming you're talking about the warrants.  Came in.  I had a warrant on my desk for the arrest of Barry Cohen.

Q.    When you said you had a warrant on your desk, what do you mean specifically?

A.    A piece of paper that's printed out that has a warrant issued by a certain judge, by a certain court, for a certain person.

EYAL COURT REPORTING, INC.

Q.    When you say that, what did you do?

A.    Detective Captain Boudreau came out of his office at, I believe, roughly the same time and asked me to serve it.

Q.    Do you recall having any further discussion with Detective Captain Boudreau about the warrants?

A.    No, I don't recall.

Q.    But he instructed you to serve it?

A.    That's correct.

Q.    So what did you do next?

A.    I believe Detective Sampson came directly after me and I instructed him to see if we could locate him and serve the warrant.

Q.    And did you have any discussion with Detective Sampson beyond relaying those instructions?

A.    I'm sure I did.  I don't recall specifically what it would be.

Q.    And, generally, when you get a warrant, is it simply a warrant?  Is there any other paperwork that accompanies it?

A.    Such as what?  That's a very vague question.  It could be.  Depends on where I got the

EYAL COURT REPORTING, INC.